**In re Wayne Christopher ATTANASIO, Debtor.**

**Bankruptcy No. 97–01515–BGC–7.**

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Feb. 6, 1998.

James Henderson, Birmingham, AL, for debtor.

Tom Corbett, Birmingham, AL, for Bankruptcy Administrator.

### Memorandum Opinion on the Bankruptcy Administrator's Section 707(b) Motion to Dismiss

BENJAMIN COHEN, Bankruptcy Judge.

The matter before the Court is a *Motion to Dismiss Pursuant to 11 U.S.C. Section 707(b)* filed on May 27, 1997 by the U.S. Bankruptcy Administrator for the Northern District of Alabama. A hearing was held on July 2, 1997. By agreement of the parties, the matter was submitted on the record; a *Joint Stipulation of Facts* filed on July 16, 1997; written briefs; and arguments. For the reasons expressed below, the Court finds that the motion is due to be denied.[1]

### Part I—Findings of Fact

#### A. Income

The debtor is a traveling salesman employed by the Miller Brewing Company. His income fluctuates. His 1995 income was $83,266.00. His 1996 income was $66,169.50.

---

1. While there is no indication that the parties agreed to any other evidence, the debtor submitted a sworn affidavit along with his attorney's letter brief of July 16, 1997. Because there was no objection to that affidavit, this Court has considered it as part of the record in this case and has consulted it in arriving at the findings of fact and conclusions of law herein. Because the information in the affidavit does not replace the evidence contained in the parties' submission, but only supplements it, the Court sees no prejudice to the movant. See also note 2.

His current net monthly income is approximately $3,072.00.

### B. Debts

As of February 26, 1997, the date the Debtor filed his bankruptcy petition, he owed unsecured, nonpriority debts of $126,293.29. According to an amendment to his schedules filed on July 17, 1997, and his affidavit filed along with his attorney's letter brief of July 16, 1997, the debtor also owed the Internal Revenue Service $3,338.00 for pro petition income and capital gains taxes. The debtor does not owe any secured debts.

■ Of the $126,293.29 in non-tax debts, the debtor owes his father $90,657.95. That amount represents debts arising from money loaned to the debtor in 1990, 1994, 1995, 1996, and 1997. In a written agreement executed by the debtor on January 5, 1997 (submitted along with his affidavit), the debtor agreed to repay the total amount loaned plus interest at the rate of 8% per year, in monthly installments of $1,500.00.[2]

The remaining $35,635.34 of the debtor's non-tax unsecured debts includes $22,132.20 on three credit cards, $3,641.25 to an institutional lender on a signature loan and $9,861.89 owed to Providian Bankcorp on a line of credit.[3]

### C. Expenses

From his approximate net monthly income of $3,072.00, the debtor pays monthly living expenses of $2,065.00. Those expenses, as itemized by the debtor in his affidavit (although the parties agree generally as to the amounts of the debtor's income and expenses), are: $750 for rent, $353 for utilities (including $150 for gas and electricity, $20 for water and sewer, $150 for telephone service, and $33 cable television service), $50 for home maintenance, $350 for food, $125 for clothing, $75 for laundry and dry cleaning, $40 for medical expenses, $250 for recreation, entertainment, newspapers, books and magazines; $33 for charitable contributions, and $14 for renter's insurance. In addition to these actual monthly living expenses, the debtor pays $278.17 each month on the delinquent tax debt and pays Providian Bankcorp $280.00.

### D. Disposable Income

If this Court deducts the IRS and Providian payments along with the debtor's monthly expenses, the debtors monthly disposable income would be $449.00. If the Court assumes that the Providian debt will be paid in about eight months and does not deduct that amount, the debtor's disposable income would increase to $729.00, after that period. If neither the Providian nor the IRS payments are considered, the debtor's disposable income would be $1,007.00.

### E. Assets

As confirmed by the trustee's final report and account filed on March 28, 1997, the debtor does not own any non-exempt property that may be liquidated to produce a dividend for unsecured creditors. The debtor does own exempt property, as valued by him,

---

**2.** The parties agree that the debtor owes approximately $90,000 to his father. See Joint Stipulation of Facts at ¶ 11. The Bankruptcy Administrator argues however, that this Court should not consider that debt in making a substantial abuse calculation. This Court disagrees.

The Administrator relies on *In re Weber*, 208 B.R. 575 (Bankr.M.D.Fla.1997) where the court granted a U.S. Trustee's motion to dismiss a Chapter 7 case pursuant to section 707(b). That court did not, however, cite any legal authority for the proposition that a court may, for any reason, ignore a valid debt owed by a bankruptcy debtor to a family member and this Court is not aware of any such authority. There was no evidence in this case that suggests that the debtor does not owe the money to his father and this Court is not at liberty, without evidence to the contrary, to ignore either the debtor's sworn statement that clearly proves a valid debt owed by him to his father or to ignore the parties'

stipulation that the debt is owed. Granted, the Bankruptcy Administrator has no real means of rebutting the debtor's testimony that the debt is legitimate, but, on the other hand, there is no other way for the debtor to prove the legitimacy of the debt. But without more, there is simply no reason why this Court should not consider the debt in addressing substantial abuse. Suspicion without more is certainly insufficient.

**3.** The debt owed to Providian Bankcorp was reduced by settlement to $3,000.00 after this case was filed and the debtor agreed to reaffirm that debt. The effect of dismissal of this case on that settlement and agreement is unclear, consequently the reduction of the debtor's overall unsecured debts as a result of the agreement should not be taken into account for purposes of the Court's 707(b) calculations.

of $9,308.91. The majority of that amount represents his investment of $5,967.96 in a retirement account.

## Part II—Conclusions of Law

Section 707(b) is more impressive for what it does not contain than for what it does. The section reads:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

*Id.* Clearly absent is any guidance on the meaning of "substantial abuse," the section's key provision.[4] As a consequence, after enactment of the section in 1984, bankruptcy courts were free to divine the parameters of 707(b) and to define "substantial abuse." With that freedom came both consistency and individuality: consistency in the recognition of two general standards of review; individuality in a lack of uniformity in selecting what factors should be considered in defining those standards. As a result, the issues before this Court are, which, if either of the two standards applies to the instant case and if either or both do, what factors defined those standards.[5] To begin, this court has considered the two standards. They are: (A) Substantial Abuse and a Debtor's "Ability to Pay" and (B) Substantial Abuse and the "Totality of a Debtor's Circumstances."

## A. The First Standard of Review: Substantial Abuse and a Debtor's "Ability to Pay"

Of the two standards, a vast majority of both courts and commentators have opined that a debtor's "ability to pay" is the *sine qua non* of section 707(b). This Court has considered five factors in its attempt to define that standard.

1. What is ability to pay?
2. What amount of repayment is an ability to pay?
3. What level of income is an ability to pay?
4. Is the ability to fund a Chapter 13 plan an ability to pay?
5. How do necessary expenses and a reasonable lifestyle affect ability to pay?

### 1. What is "ability to pay"

As courts have attempted to identify the detail factors necessary to define "ability to pay," no one accepted definition has emerged.[6] On the other hand, most courts

---

4. In a very recent case, the court in *In re McDonald*, 213 B.R. 628 (Bankr.E.D.N.Y.1997) wrote:

> Since 11 U.S.C. Section 707(b) does not articulate the parameters of "substantial abuse," I feel that it would be wrong for me to interpret that section so broadly as to authorize it to be used to coerce debtors into a proceeding under a chapter that congress expressly intended to be exclusively voluntary.

*Id.* at 631.

5. Any attempt to determine the general sentiments of bankruptcy courts on the meaning and proper application of 707(b) is distorted by the fact that only a fraction of bankruptcy judges have published "substantial abuse" opinions. In addition, a high percentage of the reported cases have been published by a relatively low percentage of the courts. In fact, of the 326 or so bankruptcy judges currently in service, only 71, or 22% have published substantial abuse opinions *which relate to the issues involved in this case.* Of those 71 bankruptcy judges, 26 (ap-

proximately 8% of all bankruptcy judges) have penned approximately 62% of the opinions published by bankruptcy courts on the meaning and proper application of "substantial abuse." And, of those 26 bankruptcy judges, 11 (approximately 3% of all bankruptcy judges) have penned approximately 37% of the opinions published by bankruptcy courts on the subject.

6. Some courts have set fairly specific payment thresholds to activate 707(b). See *In re Zaleta,* 211 B.R. 178 (Bankr.M.D.Pa.1997) (substantial abuse not indicated unless a debtor can pay all of his creditors within a reasonable time (defined as three years)) from disposable income (as defined in 11 U.S.C. § 1325(b)(2)); *In re Messenger,* 178 B.R. 145 (Bankr.N.D.Ohio 1995) (substantial abuse not indicated unless a debtor is "clearly able" to fund a Chapter 13 plan that will pay his priority creditors in full and pay 70% of his unsecured debts over a period of 36 months in Chapter 13); *In re Edwards,* 50 B.R. 933 (Bankr. S.D.N.Y.1985) (substantial abuse indicated only if a debtor with elimination of unreasonable ex-

penses can pay 100% of unsecured debt over a period of 36 months in a Chapter 13 case).

Other reported decisions utilize percentages to determine whether the ability to pay an amount may meet the threshold requirement of 707(b). See *Fonder v. United States (In re Fonder)*, 974 F.2d 996 (8th Cir.1992) (substantial abuse indicated where the debtors could pay 89% of their unsecured debts over a period of 36 months, or could pay 100% of their unsecured debts over a period of 60 months in Chapter 13); *In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996)(substantial abuse indicated where the debtor, with the disposable income shown by him on his statement of income and expenses, could pay 100% of his unsecured debts over a period of 20 months, or could pay 100% of his unsecured debts over a period of 36 months, while retaining a monthly reserve of $1,000, in Chapter 13); *Heller v. Foulston (In re Heller)*, 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated where the debtor, after exclusion of the payments to select creditors from his stated expenses, could pay approximately 66% of his unsecured debts over a period of 36 months, or approximately 100% of his unsecured debts over a period of 60 months, in Chapter 13).

See also, *Wilson v. United States Trustee (In re Wilson)*, 125 B.R. 742 (W.D.Mich.1990) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 32% of her unsecured debts over a period of 36 months, or could pay 52% of her unsecured debts over a period of 60 months in Chapter 13); *In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors could pay creditors $148,212.00 over a period of 36 months, or $247,020.00 over a period of 60 months without depriving them or their dependents of adequate food, clothing, shelter or other necessities); *In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y.1997) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, could pay 60% of their unsecured debts over a period of 36 months in Chapter 13, without depriving them or their dependents of adequate food, clothing, shelter or other necessities or, with the disposable income shown by them on their statement of income and expenses, could pay 17% of their unsecured debts over a period of 36 months, in Chapter 13); *In re Seager*, 211 B.R. 81 (Bankr.M.D.Fla. 1997) (substantial abuse indicated where the debtors, with the disposable income shown by them on their statement of income and expenses, could pay their debts); *In re Lamanna*, 210 B.R. 17 (Bankr.D.R.I.1997) (substantial abuse indicated where the debtor could pay 100% of his unsecured debts over a 36 month period in Chapter 13, even though his income was only slightly above the poverty level, and he would be able to fund a 100%-payout plan only because he was living with his mother and his expenses were minimal); *In re Weber*, 208 B.R. 575 (Bankr.M.D.Fla.1997) (substantial abuse indicated where the debtors, accepting the figures shown by them on their statement of income and expenses, could pay 80% of their unsecured debts, other than $85,000 owed to family members, over a period of 60 months in Chapter 13, and still have a monthly reserve of $500).

See also, *In re Matias*, 203 B.R. 490 (Bankr. S.D.Fla.1996) (substantial abuse indicated where the debtor could pay, without any reduction in expenses, 100% of his creditors over a period of six months); *In re Duncan*, 201 B.R. 889 (Bankr. W.D.Pa.1996) (substantial abuse indicated where the debtor, by selling his home and reducing his housing expenses to $2,000–$2,500 per month, could pay $109,800 to creditors over a period of three years in Chapter 13); *In re Schmidt*, 200 B.R. 36 (Bankr.D.Neb.1996) (substantial abuse indicated where the debtors could pay 25% of their unsecured debts over a period of 36 months or 40% of their unsecured debts over a period of 60 months in Chapter 13); *In re Haffner*, 198 B.R. 646 (Bankr.D.R.I.1996) (substantial abuse indicated where the debtor, with only his own net monthly income of $2,503 and not involving his non-debtor spouse's income, could pay half of the family living expenses and still pay 100% of his unsecured debts over a period of 36 months in Chapter 13); *In re Mastromarino*, 197 B.R. 171 (Bankr.D.Me.1996) (substantial abuse indicated where the debtor, with the elimination of unnecessary expenses, including amounts used to support his live-in mate and her four children, could live on $2656 per month and at the same time pay 50% of his unsecured debt of $189,321 over a period of 60 months in Chapter 13); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, possibly could pay 19% of their unsecured debts over a period of 36 months, or 31.7% of their unsecured debts over a period of 60 months, in Chapter 13); *In re Jarrell*, 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors could pay 80% of their unsecured debts over a period of 36 months in Chapter 13, with the disposable income shown by them on their statement of income and expenses, or 100% of their unsecured debts over a period of 15 months in Chapter 13, with their actual disposable income, as determined by the court); *In re Snow*, 185 B.R. 397 (Bankr.D.Mass.1995) (substantial abuse indicated where the debtors, with the disposable income shown by them on their statement of income and expenses, could pay 81% of their unsecured debts over a period of 36 months in Chapter 13).

See also, *In re Blair*, 180 B.R. 656 (Bankr. N.D.Ala.1995) (substantial abuse indicated where the debtor could pay 83% of his unsecured debts over a period of 36 months, or 100% of his unsecured debts over a period of 40 months, in Chapter 13); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan.11, 1995) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 54% of his unsecured debts over a period of 36 months, or 90% of his unsecured debts over a period of 60 months, in Chapter 13); *In re Christie*, 172 B.R. 233 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses for recreation and gifts,

had "substantial earnings which could be devoted to repayment of her debts without depriving her of food, clothing, shelter and other necessities" and could pay approximately 100% of her unsecured debts over a period of 36 months in Chapter 13); *In re Rogers,* 168 B.R. 806 (Bankr. M.D.Ga.1993) (substantial abuse indicated where the debtors could pay 100% of their unsecured debts over a period of 34 months in Chapter 13); *In re Faulkner,* 165 B.R. 644 (Bankr.W.D.Mo. 1994) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, could pay 73% of their unsecured debts over a period of 36 months in Chapter 13); *In re Morse,* 164 B.R. 651 (Bankr.E.D.Wash.1994) (substantial abuse indicated where the debtors, with the disposable income stated on their income and expense statement, could pay 55% of their unsecured debts over a period of 36 months, or 100% of their unsecured debts in 60 months, in Chapter 13); *In re Lee,* 162 B.R. 31 (Bankr.N.D.Ga.1993) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses (tithing), could pay 100% of their unsecured debts over a period of 36 months in Chapter 13, or, with the disposable income stated on their income and expenses statement, could pay approximately 50% of their unsecured debts over a period of 36 months, or 80% of their unsecured debts over a period of 60 months, in Chapter 13); *In re Dickerson,* 166 B.R. 480 (Bankr.N.D.Ga.1993) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 50% of his unsecured debts over a period of 36 months in Chapter 13).

See also, *In re Buntin,* 161 B.R. 466 (Bankr. W.D.Mo.1993) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, could pay 70% of their unsecured debts over a period of 36 months in Chapter 13); *In re Hutton,* 158 B.R. 648 (Bankr.E.D.Ky.1993) (substantial abuse indicated where the debtors could pay 100% of their unsecured debts over a period of 36 months in Chapter 13); *In re Barnes,* 158 B.R. 105 (Bankr.W.D.Tenn.1993) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, could pay 100% of their unsecured debts over a period of 36 months in Chapter 13); *In re Smith,* 157 B.R. 348 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtor, with the elimination of unnecessary expenses, and after her non-debtor spouse finishes paying a small debt owed to his brother and father, would have sufficient disposable income to pay 70% of her unsecured debts over a period of 60 months in Chapter 13); *In re Fitzgerald,* 155 B.R. 711 (Bankr. W.D.Tex.1993) (substantial abuse indicated where the debtors, from their stated monthly disposable income, and without altering their comfortable lifestyle, could pay approximately 50% of their unsecured debts in 36 months, or 90% of their unsecured debts in 60 months, in Chapter 13); *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors, with elimination of amounts currently being paid to select creditors, could pay approximately 45–53% of their unse-

cured debts over a period of 36 months, or 75–89% of their unsecured debts over a period of 60 months, in Chapter 13); *In re Morris,* 153 B.R. 559 (Bkrtcy.D.Or.1993) (substantial abuse indicated where the debtor could pay 100% of her unsecured debts in 36 months in Chapter 13); *In re Smurthwaite,* 149 B.R. 409 (Bankr.N.D.W.Va. 1992) (substantial abuse indicated where the debtor could pay 28% of his unsecured debts over a period of 36 months, or 47% over a period of 60 months in Chapter 13); *In re Richmond,* 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, such as upkeep on mobile home and support for seven grandchildren, could pay 90% of their unsecured debts over a period of 36 months in Chapter 13).

See also, *In re Nolan,* 140 B.R. 797 (Bankr. D.Col.1992) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 55% of his unsecured debts over a period of 36 months, or 90% of his unsecured debts over a period of 60 months, in Chapter 13); *In re Stratton,* 136 B.R. 804 (Bankr. C.D.Ill.1991) (substantial abuse indicated where the debtors could pay, with the disposable income stated by them on their statement of income and expenses, 73% of their unsecured debts over a period of 36 months, or 100% of their unsecured debts over a period of 50 months, outside of bankruptcy); *In re Goodson,* 130 B.R. 897 (Bankr.N.D.Okl.1991) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay a substantial amount of his unsecured debt in Chapter 13 without being unduly burdened); *In re Berndt,* 127 B.R. 222 (Bankr.D.N.D.1991) (substantial abuse indicated where the debtor could pay from 74% to 100% of his unsecured debts in a period of 36 months in Chapter 13); *In re Dubberke,* 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the debtor could pay 60% of her unsecured debts in a period of 36 months or 100% in a period of 60 months in Chapter 13); *In re Palmer,* 117 B.R. 443 (Bankr.N.D.Iowa 1990) (substantial abuse indicated where the debtor could pay 65% of his unsecured debt over a period of 3 years, or could pay 100% of his unsecured debt over a period of 5 years, in Chapter 13); *In re Helmick,* 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where if they cannot now fund a Chapter 13 case, could the debtors, if the one was still working the same amount of overtime that he was working prior to bankruptcy, and the other had not quit her job, could pay 67% of their unsecured debt over a period of 60 months without "belt-tightening" and 100% of their unsecured debts over a period of 60 months with "belt-tightening" in Chapter 13); *In re Johnson,* 115 B.R. 159 (Bankr.S.D.Ill.1990) (substantial abuse indicated where the debtors could pay 39% of their unsecured debts over a period of 36 months in Chapter 13); *In re Piontek,* 113 B.R. 17 (Bankr.D.Ore.1990) (substantial abuse indicated where the debtors, with elimination of unnecessary expenses, could pay 100% of their unse-

cured debts over a period of 36 months, and still have $124 left over each month for unanticipated expenses).

See also, *In re Higginbotham*, 111 B.R. 955 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtor, with the elimination of unnecessary expenses, could pay 100% of his unsecured debts over a period of 60 months in Chapter 13); *In re Roth*, 108 B.R. 78 (Bankr. W.D.Pa.1989) (substantial abuse indicated where the debtors, with the elimination of unnecessary expenses, could pay 43% of their unsecured debts within a period of three years in Chapter 13); *In re Woodhall*, 104 B.R. 544 (Bankr. M.D.Ga.1989) (substantial abuse indicated where the debtor could pay 100% of his unsecured debts in a period of four years in Chapter 13); *In re Brady*, 95 B.R. 1004 (Bankr.W.D.Mo.1987) (substantial abuse indicated where the debtor, if she continued to reside with and be supported by others, so that all of her income could be committed to the payment of creditors, could pay 100% of unsecured debts over a period of 24 months in Chapter 13); *In re Gyurci*, 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor, after elimination of unnecessary expenses, could pay 40–50% of his unsecured debts over a 36 month period in Chapter 13); *In re Busbin*, 95 B.R. 240 (Bankr.N.D.Ga. 1989) (substantial abuse indicated where the debtor, with the disposable income stated by him in his statement of income and expenses, could pay 100% of his unsecured debt in a period of five months in Chapter 13); *In re Rushing*, 93 B.R. 750 (Bankr.N.D.Fla.1988) (substantial abuse indicated where the debtors, with the disposable income stated by them in their statement of income and expenses, could pay 100% of their unsecured debts in a period of 36 months in Chapter 13); *In re Byrne*, 1989 WL 268880 (Bankr.C.D.Ill., Nov. 13, 1989) (substantial abuse indicated where the debtor, with addition of disposable income to become available after the payment of taxes, could pay 47% of his unsecured debts over a period of 36 months in Chapter 13); *In re Ploegert*, 93 B.R. 641 (Bankr. N.D.Ind.1988) (substantial abuse indicated where the debtor, after elimination of "wildly extravagant and excessive expenses," could pay "all or a significant portion of his obligations through a Chapter 13 plan."); *In re Gaskins*, 85 B.R. 846 (Bankr.C.D.Cal.1988) (substantial abuse indicated where the debtors, even without discounting generous monthly expenses, could pay 54% of their unsecured debts over a period of 36 months in Chapter 13).

See also, *In re Strange*, 85 B.R. 662 (Bankr. S.D.Ga.1988) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 100% of her unsecured debts in a period of 24 months in Chapter 13); *In re Strong*, 84 B.R. 541 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, if his income and the income of his non-debtor spouse were combined, could pay 100% of his unsecured debts over a period of one year (or up to three years) in Chapter 13); *In re Webb*, 75 B.R. 264 (Bankr.W.D.Mo.1986) (substantial abuse in-

dicated where the debtor could pay 50% of his unsecured debt over a period of 60 months in Chapter 13); *In re Antal*, 74 B.R. 8 (Bankr. W.D.Mo.1987) (substantial abuse indicated where the debtor could pay two thirds of his unsecured debts over a period of 60 months in Chapter 13); *In re Peluso*, 72 B.R. 732 (Bankr. N.D.N.Y.1987) (substantial abuse indicated where the debtor could pay 100% of his unsecured debts over a period of 60 months in Chapter 13); *In re Struggs*, 71 B.R. 96 (Bankr. E.D.Mich.1987) (substantial abuse indicated where the debtor, with elimination of unnecessary expenses, could pay 100% of his unsecured debts in a period of from nine to 16 months); *In re Newsom*, 69 B.R. 801 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtors could pay 47% of their total unsecured debt in 36 months in a Chapter 13 case, or 80% in 60 months, with the disposable income described on their income and expense statement); *In re Cord*, 68 B.R. 5 (Bankr.W.D.Mo.1986) (substantial abuse indicated where the debtor could pay half or more of her unsecured debt over a period of 60 months in Chapter 13); *In re Hudson*, 64 B.R. 73 (Bankr.N.D.Ohio 1986) (substantial abuse indicated where the debtors could pay 70% of their unsecured debts over a period of 60 months in Chapter 13 "without imposing an undue hardship on themselves or their dependents"); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor, with the money that she was already paying to one "favored" unsecured creditor and one secured creditor each month, could pay 100% of all of her unsecured debts, including a debt owed to her former spouse, over a period of 33 months); *In re Kress*, 57 B.R. 874 (Bankr.D.N.D. 1985) (substantial abuse indicated where the debtor, with elimination of the "monthly expense items which appear overstated or excessive" could pay 100% of his unsecured debts in just over 36 months).

See also, *In re Kelly*, 57 B.R. 536 (Bankr. D.Ariz.1986) (substantial abuse indicated where the debtors could pay 64% of their total unsecured debt in 36 months in a Chapter 13 case with the disposable income described on their income and expense statement, or could pay 99% of their total unsecured debt in 36 months in a Chapter 13 case if their budgeted recreational expenses were reduced from $500 per month to $250 per month) *rev'd on other grounds sub. nom., Kelly v. Solot (In re Kelly)*, 70 B.R. 109 (9th Cir. BAP 1966) *rev'd sub. nom., Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1986); *In re Bell*, 56 B.R. 637, 642 (Bankr.E.D.Mich.1986) (substantial abuse indicated where the debtor could pay 50% of his unsecured debt over a period of 36 months in Chapter 13) *vacated on other grounds after appeal*, 65 B.R. 575 (Bankr. E.D.Mich.1986); *In re Grant*, 51 B.R. 385, 387 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors, with a "reasonable reduction in the style and cost of living" could pay 68% of their unsecured debts over a period of 60 months in Chapter 13); *In re Bryant*, 47 B.R. 21

(Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor, "with only a modicum of restraint" could pay 67% of his unsecured obligations over a 36 month period in Chapter 13).

Those courts utilizing some of these factors and finding no substantial abuse include, *In re Butts*, 148 B.R. 878 (Bankr.N.D.Ind.1992) (substantial abuse not indicated where the debtors could pay only 42% of their unsecured debts over a period of 36 months, or 75% in 60 months, in Chapter 13); *In re Shepherd*, 147 B.R. 422 (Bankr.N.D.Ohio 1992) (substantial abuse not indicated where it is "highly unlikely that the debtor will have sufficient future income to fund a Chapter 13 plan that would pay a substantial portion of the claims of the unsecured creditors."); *In re Hampton*, 147 B.R. 130 (Bankr. E.D.Ky.1992) (substantial abuse not indicated where the debtors, with elimination of unnecessary expenses, and assuming reasonable monthly expenses of $3,032, could pay only 5% of their unsecured debts over a period of 36 months in Chapter 13); *In re Beles*, 135 B.R. 286 (Bankr. S.D.Ohio 1991) (substantial abuse not indicated where the debtors have monthly disposable income of $664 and unsecured debts of $68,536, and could only pay 35% of their unsecured debt over a period of 36 months in Chapter 13); *In re Wilkes*, 114 B.R. 551 (Bankr.W.D.Tenn.1989) (substantial abuse not indicated where the debtor could not pay her unsecured debts from disposable income "with relative ease.").

See also, *In re Dickerson*, 193 B.R. 67 (Bankr. M.D.Fla.1996) (substantial abuse not indicated where the debtors, even with the elimination of unnecessary expenses, had no disposable income to pay to unsecured creditors and thereby lacked the ability to pay their creditors with future income); *In re Balaja*, 190 B.R. 335 (Bankr. N.D.Ill.1996) (substantial abuse not indicated where the debtors, with the disposable income shown by them on their statement of income and expenses, could only pay approximately 60% of their unsecured debts over a period of 36 months, or almost 100% over a period of 60 months, in Chapter 13); *In re Martens*, 171 B.R. 43 (Bankr.N.D.Ohio 1994) (substantial abuse not indicated where the debtors, even with elimination of donations to charity, could pay only 11% of her unsecured debts over a period of 60 months in Chapter 13); *In re Wegner*, 91 B.R. 854 (Bankr.D.Minn.1988) (substantial abuse not indicated where the debtors, who were supporting a family of three plus two adult sons, the former wife of one of the adult son's, and two children of one of the adult son's, on a combined net monthly income of $4,176, and who had $1,512 in monthly disposable income, and who owed 26 separate credit card debts totaling $104,845, were ineligible for relief under any chapter of the Bankruptcy Code other than Chapter 7, because interest, outside of bankruptcy, would accrue on credit card debt at such an enormous rate that the debtors would be required to make minimum monthly payments of $3,924, with monthly interest of $1,750); *In re Hamze*, 57 B.R. 37 (Bankr.E.D.Mich.1985) (substantial abuse not indicated where the debtor

lacked "the ability now or in the foreseeable future to pay his debts").

Other courts define "ability to pay" more generally. See *In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996) (substantial abuse indicated where the debtor had the ability to live comfortably and to pay off a substantial portion of his unsecured debts); *In re Walton*, 69 B.R. 150 (E.D.Mo.1986) (substantial abuse indicated where the debtor could "propose a workable Chapter 13 payment plan which the Bankruptcy Court could confirm" in which he would commit all of his disposable income to the payment of unsecured creditors for the duration of the plan (11 U.S.C. § 1325(b)(1)(B))), and pay his unsecured creditors more than they would receive in Chapter 7 (11 U.S.C. § 1325(a)(4)) *aff'd*, 866 F.2d 981 (8th.Cir.1989); *In re Kornfield*, 211 B.R. 468, 477–78 (Bkrtcy.W.D.N.Y. 1997)(substantial abuse indicated where the debtors could pay: "(1) all priority and unsecured debt in a Chapter 13 case under a plan of from one to five years in duration, or over a reasonable period of time in a Chapter 11 case, while properly providing for any secured debt; (2) all priority debt and a significant percentage of unsecured debt through such a Chapter 13 or 11 plan; or (3) a significant dollar amount, regardless of percentage, to unsecured creditors through such a Chapter 13 or Chapter 11 plan"); *In re Schmidt*, 200 B.R. 36 (Bankr.D.Neb.1996) (substantial abuse indicated where the debtors could fund a Chapter 13 plan); *In re Balaja*, 190 B.R. 335 (Bankr.N.D.Ill.1996) (substantial abuse not indicated unless the debtors could pay their debts without difficulty as they become due); *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors could pay a substantial amount to unsecured creditors without depriving the debtors of food, clothing, shelter, or other necessities); *In re Stratton*, 136 B.R. 804 (Bankr.C.D.Ill.1991) (substantial abuse indicated where the debtors could pay a substantial portion of their unsecured debts within a reasonable time); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl. 1990) (substantial abuse indicated where the debtors "have a likelihood of sufficient future income to fund a Chapter 13 plan that would pay considerable sums of money to unsecured creditors"); *In re Tefertiller*, 104 B.R. 513 (Bankr. N.D.Ga.1989) (substantial abuse not indicated where the debtors lacked the ability to pay their debts without difficulty as they come due); *In re Andrus*, 94 B.R. 76 (Bankr.W.D.Pa.1988) (substantial abuse indicated where the debtor could pay a substantial portion of his debts in Chapter 13); *In re Hudson*, 56 B.R. 415, 419 (Bankr. N.D.Ohio 1985) (substantial abuse indicated where the debtor had "the ability to repay all or a substantial portion of his debts within a reasonable time, while at the same time maintaining a reasonable standard of living"); *In re Grant*, 51 B.R. 385, 387 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors had "a likelihood of sufficient future income to fund a chapter 13 plan which would pay a substantial portion of the claims of the unsecured credi-

have agreed that Congress did, it seems, in enacting 707(b), mean to deprive Chapter 7 relief to those who have the realistic ability to pay a substantial portion of their debts, over a reasonable period of time, while living a reasonable lifestyle. But what portion of those debts must be paid, over what length of time, and at what level of personal sacrifice, are factors that are themselves, very difficult to define.

### 2. What amount of repayment is an ability to pay?

Ability presupposes disposable income sufficient to make payments to creditors over time. The key questions are what percentage of debts must a debtor be able to pay and over what period of time. Unfortunately, those questions raise even more questions. For example, is there substantial abuse if a debtor can pay 10% of debts over a period of 10 years? Or, is there substantial abuse if a debtor can pay 100% over a one year period?

Absent mitigating circumstances, of the above two examples, most courts of course would agree that the payment of 100% of debts over one year would be the ideal Congress intended to address by enacting 707(b). But realistically, this ideal situation is rare because there are many combinations that lie between the above extremes, and as the amounts in those combinations get closer together and further from the extremes, the line between a case which may be substantial abuse and the case which may not be substantial abuse, becomes more difficult to discern. And any attempt to do so raises more questions.

If a percentage based standard is used, what percentage is appropriate to carry out the purpose of the statute? [7] Should "ability to pay" be determined by reference to the *percentage* of debt that a debtor can pay— rather than *what amount*, without regard to

the percentage of his or her own debt, the debtor can pay? Is dismissal warranted if a debtor can pay only one-half? Is dismissal warranted if a debtor can pay only a small percentage? Is dismissal warranted only if a debtor can pay a large percentage? If the percentage standard is employed, could not the sheer magnitude of a person's debts preclude the ability to pay, even if the person is otherwise living a lavish lifestyle?

Would courts be better served in determining "ability to pay" by reference to the amount of money that a debtor can pay toward the retirement of debts rather than applying a percentage based standard? If so, how would the appropriate amount be determined and defined generally? Would a significant amount or substantial amount be required or only a reasonable amount or fair amount?

Arguably, there is an ideal level of income, absent extenuating circumstances, that will easily allow a normal family of a certain size to live a reasonable lifestyle. But does 707(b) require a debtor to apply anything received over and above that level of income, even if it is a pittance, to the payment of creditors? Or is 707(b) activated only if a debtor can pay a significant or substantial amount of money to creditors? If that is the proper question, does a "rich" or relatively wealthy person not have the ability to pay a substantial amount of money to creditors, whether that is a substantial portion or percentage of his or her overall debt or not? And conversely, does a "poor" or relatively impecunious person by definition not lack the ability to pay a substantial amount of money to creditors, whether that is a substantial portion or percentage of overall debt or not?

### 3. What level of income is an ability to pay?

Monthly incomes ranging from $19,000 to $448 appear in the reported cases.[8] In that

---

tors"); *In re White,* 49 B.R. 869 (Bankr.W.D.N.C. 1985) (substantial abuse not indicated where the debtor could not pay a "significant amount" of his debts in Chapter 13).

**7.** See the percentage based reviews discussed in note 6 above.

**8.** Cases involving debtors with monthly incomes over $10,000 include:
*In re Kornfield,* 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were supporting a family of six (including two minor children and two children in college) on net monthly income of $13,177; *In re Seager,* 211 B.R. 81 (Bankr.M.D.Fla.1997) (sub-

stantial abuse indicated where the debtors were supporting a family of four on net monthly income of $11,730); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was supporting himself, and paying $1,500 in monthly child support, on gross monthly income of $12,846); *In re Traub*, 140 B.R. 286 (Bankr.D.N.M.1992) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $19,000).

Cases involving debtors with monthly incomes under $10,000 but over $9,000 include:

*In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y.1997)(substantial abuse indicated where the debtors were supporting a family of 4 (including two teenage children) on gross monthly income of $9,552); *In re Mastromarino*, 197 B.R. 171 (Bankr.D.Me.1996) (substantial abuse indicated where the debtor was supporting himself and paying 53,850 in child support on net monthly income of $9,626); *In re Scheinberg*, 132 B.R. 443 (Bankr.D.Kan.1991) (substantial abuse indicated where the debtors were supporting a family of two on net monthly income of $9,000) *affirmed sub nom. Scheinberg v. United States Trustee (In re Scheinberg)*, 134 B.R. 426 (D.Kan.1992); *In re Woodhall*, 104 B.R. 544 (Bankr.M.D.Ga.1989) (substantial abuse indicated where the debtor was earning gross monthly income of $9,600).

Cases involving debtors with monthly incomes under $9,000 but over $7,000 include:

*In re Stratton*, 136 B.R. 804 (Bankr.C.D.Ill. 1991) (substantial abuse indicated where the debtors were supporting a family of two on combined net monthly income of $8,000); *In re Weber*, 208 B.R. 575 (Bankr.M.D.Fla.1997) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $7,212).

Cases involving debtors with monthly incomes under $7,000 but over $6,000 include:

*In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa. 1996) (substantial abuse indicated where the debtor, and his non-debtor spouse, were supporting a family of two adults on net monthly income of $6,200); *In re Haffner*, 198 B.R. 646 (Bankr. D.R.I.1996) (substantial abuse indicated where the debtor and his non-debtor spouse were supporting a family of four on gross monthly income of $6,833); *In re Kress*, 57 B.R. 874 (Bankr. D.N.D.1985) (substantial abuse indicated where the debtor was supporting a family of four on gross income in excess of $90,000 per year, or a minimum of $6,470 per month, but have only $37,927 in unsecured debt).

Cases involving debtors with monthly incomes under $6,000 but over $5,000 include:

*In re Schmidt*, 200 B.R. 36 (Bankr.D.Neb. 1996) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $5,201); *In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996) (substantial abuse indicated where the debtor was supporting himself on gross monthly income of $5,356); *In re Dempton*, 182 B.R. 38 (Bankr.W.D.Mo.1995) (substantial abuse indicated where the debtor was supporting a family of four, and paying child support for one other child, on net monthly income of $5,563); *In re Gaskins*, 85 B.R. 846 (Bankr.C.D.Cal.1988) (substantial abuse indicated where the debtors were supporting a family of two on a net monthly income of $5,961).

Cases involving debtors with monthly incomes under $5,000 but over $4,750 include:

*In re Hutton*, 158 B.R. 648 (Bankr.E.D.Ky. 1993) (substantial abuse indicated where the debtors were supporting a family of three (at least) on net monthly income of $4,825); *In re Fitzgerald*, 155 B.R. 711 (Bankr.W.D.Tex.1993) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $4,841); *In re Vesnesky*, 115 B.R. 843 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were supporting a family of four on combined net monthly income of $4,778); *In re Cook*, 110 B.R. 544 (Bankr. N.D.Okl.1990) (substantial abuse indicated where the debtors were supporting a family of three, including an "emancipated" daughter going to college, on combined net monthly income of $4,779); *In re Struggs*, 71 B.R. 96 (Bankr. E.D.Mich.1987) (substantial abuse indicated where the debtor was supporting himself, and paying child support to his former wife in the amount of $680 per month, on net monthly income of $4,919).

But see *In re Butts*, 148 B.R. 878 (Bankr. N.D.Ind.1992) (substantial abuse not indicated where the debtors were supporting a family of two adults on gross monthly income of $4,750).

Cases involving debtors with monthly incomes under $4,500 but over $4,250 include:

*In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y. 1996) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $4,307); *In re Tindall*, 184 B.R. 842 (Bankr.M.D.Fla.1994) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $4,347); *In re Goodson*, 130 B.R. 897 (Bankr. N.D.Okl.1991) (substantial abuse indicated where the debtor was supporting a family of four (two children in college) on net monthly income of $4,473); *In re Roth*, 108 B.R. 78 (Bankr. W.D.Pa.1989) (substantial abuse indicated where the debtor was supporting a family of five (two minor children and one child in college) on combined net monthly income of $4,424).

Cases involving debtors with monthly incomes under $4,250 but over $4,000 include:

*In re Stallman*, 198 B.R. 491 (Bankr. W.D.Mich.1996) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $4,051); *In re Gyurci*, 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor and his non-debtor spouse were supporting a family of three on combined net monthly income of $4,233); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor was supporting a family of two on a net monthly income of $4,015) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989).

But see *In re Wegner*, 91 B.R. 854 (Bankr. D.Minn.1988) (substantial abuse not indicated where the debtors, who were supporting a family of three plus two adult sons, the former wife of one of the adult son's, and two children of one of the adult son's, on a combined net monthly income of $4,176, and who had $1512 in monthly disposable income, and who owed 26 separate credit card debts totaling $104,845, were not eligible for relief under any chapter of the bankruptcy code other than Chapter 7 because interest, outside of bankruptcy, would have accrue on credit card debt at such an enormous rate that the debtor would have been required to make minimum monthly payments of $3,924, with monthly interest of $1750).

Cases involving debtors with monthly incomes under $4,000 but over $3,500 include:

*In re Bicsak*, 207 B.R. 657 (Bankr.W.D.Mo. 1997) (substantial abuse indicated where the debtor, and his non-debtor live-in mate, were supporting a family of four, which included the non-debtor's two minor children, on combined net monthly income of $3,656, which amount included the debtor's net monthly income of $3,166 and $490 child support payments being received by the non-debtor from her ex-husband); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995)(substantial abuse indicated where the debtor was supporting a family of two adults on net monthly income of $3,621); *In re Dickerson*, 166 B.R. 480 (Bankr. N.D.Ga.1993) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $3,943); *In re Lee*, 162 B.R. 31 (Bankr.N.D.Ga.1993) (substantial abuse indicated where the debtors were supporting a family of three (one minor child) on net monthly income of $3,549; *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $3,526); *In re Barnes*, 158 B.R. 105 (Bankr. W.D.Tenn.1993) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $3,857); *In re Smith*, 157 B.R. 348 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtor, and her non-debtor spouse, were supporting a family of four (with two minor children) on combined net monthly income of $3,645); *In re Kelly*, 57 B.R. 536 (Bankr.D.Ariz.1986) (substantial abuse indicated where the debtors were supporting a family of two adults on a combined net income of $3,719 per month) *rev'd on other grounds sub. nom., Kelly v. Solot (In re Kelly)*, 70 B.R. 109 (9th Cir. BAP 1986) *rev'd sub. nom., Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988).

But see *In re Balaja*, 190 B.R. 335 (Bankr. N.D.Ill.1996) (substantial abuse not indicated where the debtors were supporting a family of two adults on net monthly income of $3,589).

Cases involving debtors with monthly incomes under $3,500 but over $3,000 include:

*In re Braithwaite*, 192 B.R. 882 (Bankr. N.D.Ohio 1996) (substantial abuse indicated where the debtor was supporting herself on gross monthly income of $3,416); *In re Jarrell*, 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $3,197); *In re Rogers*, 168 B.R. 806 (Bankr. M.D.Ga.1993) (substantial abuse indicated where the debtors were supporting a family of two on net monthly income of $3,232); *In re Bacco*, 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where the debtor was supporting a family of two adults on combined net monthly income of $3,087); *In re Morris*, 153 B.R. 559 (Bkrtcy.D.Or.1993) (substantial abuse indicated where the debtor was supporting herself on net monthly income of $3,417); *In re Berndt*, 127 B.R. 222 (Bankr.D.N.D.1991) (substantial abuse indicated where the debtor and his non-debtor spouse were supporting themselves on combined net monthly income of $3,153); *In re Johnson*, 115 B.R. 159 (Bankr.S.D.Ill.1990) (substantial abuse indicated where the debtors were supporting a family of five (three minor children)on combined net monthly income of $3,302); *In re Bell*, 56 B.R. 637, 642 (Bkrtcy.E.D.Mich.1986) (substantial abuse indicated where the debtor was supporting himself and paying $375 in child support to ex-wife for support of son on net income of $3,136 per month) *vacated on other grounds after appeal*, 65 B.R. 575 (Bankr. E.D.Mich.1986); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtor was supporting a family of four (five including an emancipated son in college) on a net combined income of $3,385 per month); *In re Bryant*, 47 B.R. 21 (Bankr. W.D.N.C.1984) (substantial abuse indicated where the debtor was supporting a family of four on a net combined income of $3,420 per month).

But see *In re Messenger*, 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor was paying child support of $265 per month and, along with his non-debtor spouse, was supporting a family of two adults on combined net monthly income of $3295); *In re Hill*, 1994 WL 738663 (Bankr.D.Idaho, Dec. 22, 1994) (substantial abuse not indicated where the debtors were supporting a family of four (including two grade school children) on net monthly income of $3,175); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated where the debtors were supporting a family of two adults on combined net monthly income of $3,155); *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors were supporting a family of four on combined net monthly income of $3,400).

Cases involving debtors with monthly incomes under $3,000 but over $2,500 include:

*Fonder v. United States (In re Fonder)*, 974 F.2d 996 (8th Cir.1992) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $2,671); *In re Faulkner*, 165 B.R. 644 (Bankr.W.D.Mo.1994) (substantial abuse indicated where the debtors were supporting a family of three (including one minor child) on net monthly income of $2,607); *In re Morse*,

164 B.R. 651 (Bankr.E.D.Wash.1994) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $2,864); *In re Buntin,* 161 B.R. 466 (Bankr.W.D.Mo.1993) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $2,846); *In re Wray,* 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors were supporting a family of two adults on a combined monthly net income of $2,720); *In re Helmick,* 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were supporting a family of five including three children on combined net monthly income of $2,700); *In re Piontek,* 113 B.R. 17 (Bkrtcy.D.Or.1990) (substantial abuse indicated where the debtors were supporting a family of three including one minor child on combined net monthly income of $2,874); *In re Byrne,* 1989 WL 268880 (Bankr. C.D.Ill., Nov. 13, 1989) (substantial abuse indicated where the debtor was supporting himself and paying $600 in child support on net monthly income of $3,000); *In re Strong,* 84 B.R. 541 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor and his non-debtor spouse were supporting a family of two net monthly income of $2,944); *In re Newsom,* 69 B.R. 801 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtors were supporting a family of two net combined income of $2,816 per month).

But see *In re Dickerson,* 193 B.R. 67 (Bankr. M.D.Fla.1996) (substantial abuse not indicated where the debtors were supporting a family of three on net monthly income of $2690); *In re Edwards,* 50 B.R. 933 (Bankr.S.D.N.Y.1985) (substantial abuse not indicated where the debtors were supporting a family of five (and the wife was pregnant) on a combined net income of $2,550).

Cases involving debtors with monthly incomes under $2,500 but over $2,000 include:

*In re Matias,* 203 B.R. 490 (Bankr.S.D.Fla. 1996) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $2012); *In re Snow,* 185 B.R. 397 (Bankr.D.Mass.1995) (substantial abuse indicated where the debtors were supporting a family of two adults on net monthly income of $2475); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors were supporting a family of three on net monthly income of $2377); *In re Christie,* 172 B.R. 233 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was supporting herself on net monthly income of $2460); *In re Palmer,* 117 B.R. 443 (Bankr.N.D.Iowa 1990) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $2,432); *In re Higginbotham,* 111 B.R. 955 (Bankr.N.D.Okl. 1990) (substantial abuse indicated where the debtor was supporting a family of three (including one minor child) on net monthly income of $2038); *In re Rushing,* 93 B.R. 750 (Bankr. N.D.Fla.1988) (substantial abuse indicated where the debtors were supporting a family of two adults on combined net monthly income of $2176); *In re Hudson,* 64 B.R. 73 (Bankr.

N.D.Ohio 1986) (substantial abuse indicated where the debtor was supporting a family of five on a combined net income of $2,157 per month); *In re Shands,* 63 B.R. 121 (Bankr.E.D.Mich. 1985) (substantial abuse indicated where the debtor was supporting a family of five on a combined monthly income of $2,474, including child support of $264 per month being received from the debtor's former spouse and the current non-debtor spouse's income of approximately $1,064 per month).

Cases involving debtors with monthly incomes under $2,000 but over $1,500 include:

*Heller v. Foulston (In re Heller),* 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1829); *Wilson v. United States Trustee (In re Wilson),* 125 B.R. 742 (W.D.Mich. 1990) (substantial abuse indicated where the debtor was supporting herself on net monthly income of $1,836); *In re Walton,* 69 B.R. 150 (E.D.Mo.1986) (substantial abuse indicated where the debtor was supporting a family of five (including three minor children) on net monthly income of $1,600) *aff'd,* 866 F.2d 981 (8th.Cir.1989); *In re Dubberke,* 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the debtor was supporting a family of two (including one minor child) on net monthly income of $1,515); *In re Ploegert,* 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,600); *In re Strange,* 85 B.R. 662 (Bankr.S.D.Ga.1988) (substantial abuse indicated where the debtor was supporting a family of two (including one minor child) on a net monthly income of $1,540); *In re Peluso,* 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor was supporting a family of two (including one minor child) on a net monthly income of $2,000); *In re Sanseverino,* 171 B.R. 46 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,592); *In re Dominguez,* 166 B.R. 66 (Bankr. E.D.N.C.1994) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $2,000); *In re Smurthwaite,* 149 B.R. 409 (Bankr.N.D.W.Va.1992) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,904).

But see *In re Martinez,* 171 B.R. 264 (Bankr. N.D.Ohio 1994) (substantial abuse not indicated where the debtors were supporting a family of four (and the wife was pregnant) on net monthly income of $1909); *In re Fessler,* 168 B.R. 622 (Bankr.N.D.Ohio 1994) (substantial abuse not indicated where the debtor and his non-debtor spouse were living on combined net monthly income of $1,849); *In re Laury–Norvell,* 157 B.R. 14 (Bankr.N.D.Ohio 1993) (substantial abuse not indicated where the debtor was supporting herself on net monthly income of $1,841); *In re Farrell,* 150 B.R. 116 (Bankr.D.N.J.1992) (substantial abuse not indicated where the debtor was supporting himself on net monthly income

regard this court must ask, did Congress intend for 707(b) to apply to such a broad range? Similarly, is the abuse of Chapter 7 by a debtor who brings home $19,000 each month as egregious or "substantial" as that of a debtor who brings home $448 each month? Can a court utilize the same adjectives and criteria to describe or define the abuse of Chapter 7 by a debtor who brings home $19,000 each month as one who brings home $448 each month? If so, then of what benefit is the inclusion of the tend to describe the threshold of abuse that must be present for 707(b) to be invoked?

When considering whether every person, regardless of income, should be subject to scrutiny under 707(b) or whether there should be a minimum income threshold that must be exceeded before 707(b) comes into play, the meaning of "substantial" is particu-larly pertinent. Consider whether a poor person can ever be guilty of "substantial abuse." Did Congress intend to implement a form of economic peonage by enacting 707(b)? Was encouragement of repayment of debts by all debtors the impetus? Does the concept of "disposable income" have far reaching implications when a Court considers the financial condition of an impoverished debtor?

■ This Court concedes that a person living at or below the poverty level can technically abuse the bankruptcy system, but could anyone logically argue that the filing of a Chapter 7 petition by someone living at or below the poverty level can ever be a *substantial* abuse of the bankruptcy process? This Court does not believe so. And there is

of $1,933); *In re Penna,* 86 B.R. 171 (Bankr. E.D.Mo.1988) (substantial abuse not indicated where the debtor was supporting himself on net monthly income of $1,900); *In re Renner,* 70 B.R. 27 (Bankr.D.N.D.1987) (substantial abuse not indicated where the debtors were supporting a family of two on combined net monthly income of $1,736).

Cases involving debtors with monthly incomes under $1,500 but over $1,000 include:

*United States Trustee v. Harris (In re Harris),* 125 B.R. 254 (D.S.D.1991) (substantial abuse indicated where the debtors were supporting a family of three (including one minor child) and paying child support each month for two children of one debtor by a previous marriage, on net monthly income of $1,244) *aff'd, United States v. Harris (In re Harris),* 960 F.2d 74 (8th Cir.1992); *In re Lamanna,* 210 B.R. 17 (Bankr. D.R.I.1997) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,350); *In re Veenhuis,* 143 B.R. 887 (Bankr.D.Minn.1992) (substantial abuse indicated where the debtor was supporting a family of three (including one minor child) and paying $170 in child support each month, on net monthly income of $1,148); *In re Busbin,* 95 B.R. 240 (Bankr.N.D.Ga.1989) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,150); *In re Andrus,* 94 B.R. 76 (Bankr.W.D.Pa.1988) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,370); *In re Webb,* 75 B.R. 264 (Bankr.W.D.Mo.1986) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,104); *In re Antal,* 74 B.R. 8 (Bankr.W.D.Mo. 1987) (substantial abuse indicated where the debtor was supporting a family of three, and paying child support to his former spouse, on net monthly income of $1,200); *In re Cord,* 68 B.R. 5 (Bankr.W.D.Mo.1986) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $1,009 per month).

But see *In re Wilkes,* 114 B.R. 551 (Bankr. W.D.Tenn.1989) (substantial abuse not indicated where the debtor was supporting a family of three on net monthly income of $1,316 ($1,150 income plus $166 child support)); *In re Hamze,* 57 B.R. 37 (Bankr.E.D.Mich.1985) (substantial abuse not indicated where the debtor was supporting a family of six on net combined income of $1,010 per month).

Cases involving debtors with monthly incomes under $1,000 but over $500 include:

*In re Wilkinson,* 168 B.R. 626 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor had net monthly income of $800, but her non-debtor spouse had net monthly income of $1,053 than could be used to pay the debtor's debts); *In re Day,* 77 B.R. 225 (Bankr.D.N.D. 1987) (substantial abuse indicated where the debtor was supporting a family of one on a net monthly income of $811).

But see *In re Martens,* 171 B.R. 43 (Bankr. N.D.Ohio 1994) (substantial abuse not indicated where the debtor was supporting a family of two (including one minor child) on net monthly income of $984, which income included child support of $228).

Cases involving debtors with monthly incomes under $500 include:

*In re Brady,* 95 B.R. 1004 (Bankr.W.D.Mo. 1987) (substantial abuse indicated where the debtor was supporting himself on net monthly income of $448).

But see *In re Shepherd,* 147 B.R. 422 (Bankr. N.D.Ohio 1992) (substantial abuse not indicated where the debtor was supporting herself on gross monthly income of $440).

a good argument that 707(b) simply does not apply to a certain group of people.[9]

■ Substantial abuse of Chapter 7 should not occur just because a poor person can theoretically pay something, given sufficient time and a high enough level of sacrifice.[10] Poor people should be allowed the opportunity to use whatever surplus income they can scrape together to better their predicament, even if that predicament is of their own making. One tool available to them most certainly must be the act of filing a Chapter 7 bankruptcy petition, the primary purpose of which is to provide, as Justice George Sutherland explained in *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), "the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Id.* "The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act." *Id.* at 245, 54 S.Ct. at 699. This Court believes that to construe 707(b) in regards to the poor in any other manner, would effectively extinguish the light at the end of the tunnel represented by a discharge in bankruptcy and with it any motivation for earning a living. Justice Sutherland's opinion appears to agree. It reads, "The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy." *Id.* This Court must ask, would not an impoverished debtor be more inclined to simply throw hands up and give up, rather than continue to work simply for the purpose of turning all income over and above that needed for necessities, to creditors, if not allowed the opportunity to improve a meager existence? Justice Sutherland concludes, "From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either." *Id.*

In determining what level of income is an ability to pay, this court must recognize some level above that of those less fortunate than most.

### 4. Is the ability to fused a Chapter 13 plan an ability to pay?

■ Applying the "disposable income" threshold of section 1325(b) to section 707(b) may taint the involuntary nature of Chapter 13.[11] However, many courts hold that the ability of a debtor to fund a Chapter 13 plan weighs in favor of dismissal. This court, and others, are of the opinion that the theoretical ability of a debtor to fund a Chapter 13 plan should not *ipso facto* weigh in favor of dismissal. One court explains, "The fact that a debtor may ultimately have a few hundred dollars per month in surplus funds does not support the argument that [he] can successfully and adequately fund a chapter 13 plan to repay all or substantially all of his debts."

---

9. In *In re Halverson*, 189 B.R. 840 (Bankr. N.D.Ala.1995), this Court considered the dischargeability of a student loan and for purposes of the three-part test from *Brunner v. New York State Higher Edu. Serv. Corp.*, 831 F.2d 395 (2nd Cir.1987) considered whether payment of the loans would cause the debtor's standard of living to fall below that minimally necessary. In its opinion, this Court noted:

> For convenience some courts recognize the United States Department of Health and Human Services Poverty Guidelines as the level of a "minimum standard of living" and recognize an annual income above or below that as exceeding or falling below the "minimum standard of living." The undersigned has fortunately never had firsthand experience of these

levels. The undersigned has neither had long-term exposure to those who have. There are aspects of judging that lend themselves to extrapolation from the facts presented and there are areas that do not. This is an area that does not.

*Id.* at 844, n. 11.

10. "A debtor's ability to pay is a function of the level of sacrifice demanded." Teresa A. Sullivan, et al., *As We Forgive Our Debtors*, 200 (1989).

11. See *In re McDonald*, 213 B.R. 628 (Bankr. E.D.N.Y.1997) where the Court discusses the relationship of section 707(b) to the involuntary notice of chapter 13.

*In re Farrell,* 150 B.R. 116, 119 n. 3 (Bankr. D.N.J.1992). There are also other factors to consider.

The high failure rate of Chapter 13 cases mitigates against hasty decisions to require debtors with budgets based on bare bone living expenses to file Chapter 13 cases.[12] And, in light of the frequent, and almost predictable failure of many Chapter 13 cases, placing emphasis on a theoretical ability to pay that stretches a debtor so thin that it leaves no extra money to meet the unplanned expenses that will inevitably and frequently arise during the course of a repayment effort, only assures the inevitable, which is why a debtor "should not be pushed to the edge of financial survival because a plan looks feasible on a cold financial statement." *In re Martin,* 107 B.R. 247, 249 (Bankr.D.Alaska 1989).

Similarly, if income with which to fund a Chapter 13 plan is not comfortably within the means of a debtor to pay in Chapter 13, the debtor ultimately, as experience teaches, stops paying; consequently, many long term, high payout cases do not survive. A debtor cannot live the same austere existence day in and day out over a period of three to five years. Life is full of surprises. Unanticipated expenses are the rule rather than the exception. Requiring a debtor to file a Chapter 13 case may have no benefit whatsoever.

With a contrary view however, many courts have, in effect, grafted a "no disposable income" threshold to Chapter 7 eligibility by way of 707(b). Under that view, a debtor is not permitted to file a Chapter 7 case if there is any disposable income. Under the theory, only a debtor at an income and expense breakeven point, or one who is underwater each month, may get a Chapter 7 discharge. All others must either file a Chapter 13 case or work out their problems without the assistance of the bankruptcy. The result, therefore, of using the same disposable income test for determining Chapter 7 eligibility as is used to determine whether a debtor may pay debts through Chapter 13 is, practically speaking, a requirement that low and middle income debtors who lack the financial ability to resort to non-bankruptcy alternatives, must file Chapter 13 cases rather than Chapter 7 cases. This appears contrary to the purpose of Section 707(b). While Congress clearly envisioned that the ability to pay one's debt would be the cornerstone of 707(b), most courts and commentators agree, that Congress specifically did not intend for 707(b) to result in a mandatory Chapter 13 case for any class of debtors.[13]

This Court does not believe that Congress intended for 707(b) to be invoked, if doing so would reduce a low or middle income debtor to living on the kind of harsh budget that might be required for confirmation of a Chapter 13 plan, thereby depriving that debtor of the "clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt" envisioned by Justice Sutherland in *Local Loan.* Had Congress intended to disregard that pronouncement, it would have done so and would not have included the very specific language of the last sentence of 707(b), which requires the court to presume *favorably,* not that the debtor cannot pay debts, and not that the debtor is entitled to a Chapter 7 discharge of all debts, but that the debtor is entitled to be in Chapter 7, as opposed to Chapter 13. That presumption, along with the historic purpose of Chapter 7 bankruptcy, as described in *Local Loan,* mandates that the disposable income threshold of 707(b) be more generous than the disposable income threshold of 1325(b) and that a case be dismissed from Chapter 7

---

**12.** What if a debtor was dismissed from chapter 13, prior to filing Chapter 7, for inability or failure to pay? Does that fact *ipso facto* mitigate against a finding that the debtor has the ability to pay his debts or fund a Chapter 13 plan, even though the debtor's schedules may reflect disposable income?

**13.** "To Rule that Chapter 13 is the only way out where there is some disposable income after bankruptcy is to thwart and circumvent the express will of Congress that no one can be forced into Chapter 13 and that 11 U.S.C. § 707(b) is not meant to establish a 'future income' test for 'substantial abuse.'" *In re Walton,* 866 F.2d 981, 987 (8th Cir.1989) (dissent of Judge McMillian). Consider also, the Court's refusal in *In re McDonald,* 213 B.R. 628, 631 (Bankr.E.D.N.Y.1997) to force a debtor into Chapter 13 where congress expressly intended Chapter 13 to be "exclusively voluntary."

only if the debtor will have a "clear field for future effort" even if the debtor is not granted a Chapter 7 discharge. The proper question to ask under 707(b) therefore should be, can the debtor fund a Chapter 13 plan and still have a clear field of effort, not whether the debtor can fund a Chapter 13 plan.

### 5. How do necessary expenses and a reasonable lifestyle affect "ability to pay?"

Application of an "ability to pay" standard requires qualitative judgments regarding a debtor's *necessary expenses* and *lifestyle*. Questions such as, what level of austerity is required of a debtor during the repayment period so that the debtor will continue to have the "ability to pay" and what amenities of life and future opportunities must a debtor forego during the repayment period in order to maintain the "ability to repay," are not theoretical, they are essential to the formulation of a standard that can be applied fairly to all debtors. Or in other words, "Where to draw the line—how much sacrifice to require of people in debt—is a key question in bankruptcy." Teresa A. Sullivan, et al., *As We Forgive Our Debtors* 200 (1989).

### a. Necessary expenses

Are all debtors required to live the same lifestyle during the period of repayment? Can a court create an equal playing field for application of 707(b) unless all are required to live the same lifestyles and all have the same level of living expenses? Should one debtor be allowed to drive a bigger or more expensive car than another? Must all debtors send their children to public schools rather than private schools? Should one debtor be allowed to pay for a child's college education while another may not? Should all debtors be forbidden from giving to religious organizations and charities during the period of repayment? Should one debtor's family be allowed to eat more or use more electricity or water or gasoline than other debtors? Should one debtor be allowed to take a vacation during the period of repayment while another is forced to stay home? Consider these possible situations.

1. Debtor A rents an apartment while Debtor B lives with parents.[14] Because B has no rent payments, B's expenses are lower than A's and B's disposable income is higher than A's. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability to pay a greater portion of debts than A? Should B be required to continue to live with parents while repaying debts in Chapter 13? Or rather, should a bankruptcy court also dismiss A's case and require A to move in with parents? Or, should A and B be granted Chapter 7 discharges, and B be allowed the freedom to seek the same type of modest accommodations as A?

2. Debtor A and Debtor B live in similar dwellings. Assume that both have the same net income and owe a similar amount of debt. Neither lives a lifestyle that can be described as lavish or exorbitant. However, Debtor B has lower expenses than Debtor A because B has fewer dependents, owns less things, eats less, changes the car's oil, turns off lights when leaving rooms, and simply lives a more austere lifestyle than Debtor A. Consequently, Debtor B has higher disposable income than Debtor A.[15] Should Debtor B's Chapter 7 case, because of a surfeit of disposable income, be a candidate for 707(b) dismissal if Debtor A's case is not? Should the bankruptcy court require Debtor B to continue an austere lifestyle, by dismissing B's bankruptcy case, but allowing Debtor A

**14.** See *In re Lamanna*, 210 B.R. 17 (Bankr.D.R.I. 1997) (substantial abuse indicated where the debtor was living with his mother so that his expenses are low and his disposable income was therefore high enough to fund a Chapter 13 plan); *In re Matias*, 203 B.R. 490 (Bankr. S.D.Fla.1996) (substantial abuse indicated where the debtor was residing with his parents); *In re Brady*, 95 B.R. 1004 (Bankr.W.D.Mo.1987) (substantial abase indicated where the debtor was living with others, so that she had no living expenses and all of her income could be commit-

ted to the payment of creditors); *In re Andrus*, 94 B.R. 76 (Bankr.W.D.Pa.1988) (substantial abuse indicated where the debtor was living with his parents, so that a greater portion of his income could be committed to the payment of creditors because of the fact that he did not have to pay rent). See also the cases cited in note 80 that relate to housing costs.

**15.** See the cases cited in note 30 regarding miscellaneous expenses.

to continue a less than austere lifestyle by granting A a discharge?

3. Debtor A lives in a house and pays a monthly mortgage of $750. Debtor B lives in an efficiency apartment and pays $350 monthly in rent. Because B has lower rent payments than A, B's overall expenses are lower than A's. Consequently, B's disposable income is higher than A's.[16] Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability to pay a greater portion of debts than A? Should B be required to continue to live in a smaller dwelling while repaying debts in Chapter 13? Or rather, should a bankruptcy court also dismiss A's case and require A to move out of a house and into a less expensive dwelling, even if A's present accommodations, although more than adequate, are not lavish? Or, should A and B be granted discharges, and B be allowed the freedom to seek the same type of accommodations as A?

4. Debtor A drives a new car leased on a monthly basis and which is needed to travel to and from work. Debtor B drives and owns an old car for which there are no car payments.[17] Because B has no car payment, B's overall expenses are lower than A's. Consequently, B's disposable income is higher than A's because of the choice to repair and maintain an old car rather than buy a new one. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability to pay a greater portion of debts than A? Should B be required to continue to drive the old car, even if the air conditioner is broken and the car has been driven over 100,000 miles, while B repays debts in Chapter 13? Or rather, should a bankruptcy court also dismiss A's case and require A to surrender the new car and buy an old, second hand car, even if the present car is simple and unassuming? Or, should A and B be granted discharges, and B be allowed the freedom to purchase a new car of at least the same make and model as A?

5. Debtor A has two children. Debtor B has none. Because B has no children, overall expenses are lower than A's.[18] Consequently, B's disposable income is higher than A's because of the voluntary delay in having children. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability to pay a greater portion of debts than A? Should B be required to remain childless, even if B and B's spouse desire a child, while repaying debts in Chapter 13? Or rather, should a bankruptcy court also dismiss A's case because A should have known that expenses associated with raising a child would be significant? Or, should A and B be granted discharges, and B be allowed to have at least the same number of children as A?

6. Debtor A has health insurance but Debtor B does not. Because B has no health insurance, B's overall expenses are lower than A's.[19] Consequently, B's disposable income is higher than A's. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on

---

**16.** See the cases cited in note 30 that relate to housing expenses.

**17.** See *In re Dominguez*, 166 B.R. 66 (Bankr. E.D.N.C.1994) (substantial abuse indicated even though the debtor was driving a 1985 model automobile that would soon need to be replaced); *Heller v. Foulston (In re Heller)*, 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated even though the debtor was driving an 11 year old car that needed replacing); *In re Hutton*, 158 B.R. 648 (Bankr.E.D.Ky.1993) (substantial abuse indicated even though the debtors needed a new automobile so that the amount necessary to cover that expense had to be factored into their monthly expenses); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated even though the debtor owned a 1982 Chevette automobile with 108,000 miles and was

commuting 110 miles per day). See also the cases cited in note 30 that relate to the costs of cars and transportation.

But see *In re Martens*, 171 B.R. 43 (Bankr. N.D.Ohio 1994) (substantial abuse not indicated where the debtor was driving a 1977 Dodge automobile in poor condition); *In re Hill*, 1994 WL 738663 (Bankr.D.Idaho, Dec. 22, 1994) (substantial abuse not indicated where the debtors needed a car since their second car had been driven 150,000 miles).

**18.** See the cases cited in note 77 regarding education expenses and those in note 30 regarding general expenses.

**19.** See the cases cited in notes 75 and 76 regarding medical expenses.

an ability to pay a greater portion of debts than A? Should B be required to continue to be at risk of having to pay for needed medical treatment, while repaying debts in Chapter 13? Or rather, should a bankruptcy court also dismiss A's case because A should have known of the inability to pay both debts and health insurance premiums, especially if A is currently in excellent health? Or, should A and B be granted discharges, and B be allowed to insure that B's family will receive medical treatment in the unfortunate event of injury, disease or illness, since A has been accorded that right?

7. Debtor A has a full time job while Debtor B has a full time job and one part time job.[20] In their full time jobs, A and B work the same number of hours and make the same amount of money. Because B works a second job, B's net income is higher than A's. Consequently, B's disposable income is higher than A's. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability to pay a greater portion of debts than A? What if B wants to quit the second job? Should B's Chapter 7 case still be dismissed because of a desire to work only the 40 hours generally required of others? Is that an indication of "bad faith" or "dishonesty" which suggests 707(b) dismissal? Should a bankruptcy court have the power to force B to remain in both jobs while repaying debts in Chapter 13? Or, should we also dismiss A's case and require A to get a second job to pay creditors, especially if A is currently working "only" 40 hour week? Or, should A and B be granted discharges, and B be allowed the freedom to work the same number of hours as A?

8. Debtor A's non-debtor spouse does not work.[21] Debtor B's non-debtor spouse does work. Because B's spouse works, the couple has a greater combined net income than A and A's spouse. Consequently, B and B's spouse have greater disposable income be-

cause B's spouse works. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed based on an ability (when B's spouse's income is considered) to pay a greater portion of debts than A? What if B's spouse wants to quit working? Should B's Chapter 7 case still be dismissed because B's spouse's untimely resignation is an indication of "bad faith" or "dishonesty" which suggests 707(b) dismissal? What if there is a special needs child at home or Debtor B's spouse is presently in an intolerable work environment? Should a bankruptcy court have the power to, in effect, force B's spouse to continue to work by dismissing B's case? Or, should a bankruptcy court also dismiss A's case and require A's spouse to get a job so that A too can repay creditors? Or, should A and B be granted discharges, and B's spouse be allowed to stay at home?

9. Debtor A has two non-debtor, 17 year old dependent children living at home who do not work, are excellent students and are active in extra-curricular activities.[22] Debtor B also has two non-debtor 17 year old children, but B's children work after school to earn money to buy their own clothes. Because B's children work, B's expenses are less than A's. Consequently, B has greater disposable income than A. Should A escape 707(b) scrutiny and receive a Chapter 7 discharge while B's case is dismissed? Should a bankruptcy court have the power to, in effect, force B's children to continue to work by dismissing B's case? Or, should A's case also be dismissed because A's children are capable of working to help defray family living expenses? Or, should A and B be granted discharges, and B's children be allowed to choose whether to work or not?

All of the above illustrate various ways that bankruptcy courts can effect both the lifestyles and lives of debtors. But most importantly they demonstrate the potential for inequality of treatment among debtors.

---

**20.** See the cases cited in notes 49 and 50 regarding overtime work and second jobs.

**21.** See the cases cited in notes 84 through 88 regarding spousal income.

**22.** See *In re Kornfield*, 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse was indicated where the debtors were spending too much each month on clothing for their teenage children and the teenage children could work to earn money for their clothing). See also the cases cited in note 230 regarding general expenses.

In every circumstance, dismissal of Debtor B's case would in effect punish the relatively frugal and industrious debtor while allowing a discharge to the relatively less frugal and less industrious Debtor A. Such a result in turn illustrates the problems of making substantial abuse determinations based solely on disposable income and demonstrates how difficult a determination of necessary expenses is to make.

### b. Lifestyle

Many courts offer two reasons for examining a debtor's lifestyle. One reason is, if a debtor is spending more income than is necessary, then that spending is considered "over spending" and evidence that the debtor

can pay creditors something. The other reason is, unless disaster or calamity has precluded a debtor from doing so, there is something "bad," or morally wrong, for a debtor to spend money on things that are not essential or necessary for survival, rather than to pay creditors.[23]

Where courts do examine lifestyle in 707(b) reviews, four sub-factors appear. These are: (1) Some courts are inclined to find substantial abuse where debtors have been "living beyond their means."[24] (2) Some courts are inclined to find substantial abuse where debtors have not evidenced an inclination to "tighten their belts" in order to pay creditors.[25] (3) Some courts are inclined to find

---

**23.** This Court respectfully suggests that these perspectives appear to be in conflict with the indication in *Local Loan Co. v. Hunt*, 292 U.S. 234, 245, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) that a debtor must have room for improvement, not just survival.

Among the reported decisions, some courts, in considering the debtor's lifestyle, advocate that the debtor must maintain the status quo if the debtor's lifestyle is already austere and the courts suggest or mandate reduction of the status quo if the debtor is living an above average economic lifestyle, but allow no room for improvement of the status quo as envisioned by the Court in *Local Loan*. For example, in *In re Buntin*, 161 B.R. 466 (Bankr.W.D.Mo.1993), the bankruptcy court determined that substantial abuse was indicated where the debtors had proposed to spend $550 each month on housing, when their current housing cost them only $350 for a family of two adults. "I find that Chapter 7 relief is not intended to allow debtors to 'upgrade their current low standard of housing,' Amended Schedule J, at the expense of their creditors." 161 B.R. at 468. See also *In re Ploegert*, 93 B.R. 641 (Bankr. N.D.Ind.1988) (substantial abuse indicated where the debtor moved into a larger apartment after filing bankruptcy so that his expenses, because of increased rent, were increased each month by $300).

**24.** See *In re Gavita*, 177 B.R. 43 (Bankr.W.D.Pa. 1994) (substantial abuse indicated where the debtors were "living beyond their relatively modest means for a protracted period of time before they filed for bankruptcy"); *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors had exhibited a pattern of living beyond their means by purchasing a new car after filing bankruptcy and by making certain credit card purchases shortly before bankruptcy); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor was living a lifestyle that was "obviously far beyond his means"); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (sub-

stantial abuse indicated where the debtor had exhibited a consistent pattern of living beyond his means) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989).

Some courts use the term "deficit spending" to describe debtors who are living beyond their means and suggest that substantial abuse is indicated anytime a debtor exhibits "deficit spending." These courts reason that substantial abuse exists anytime a debtor's expenses exceed income on the statement of income and expenses, for two reasons: (1) a debtor should live within means by spending only that earned each month and (2) because one cannot spend more than earnings, "deficit spending" indicates that the debtor is misrepresenting the financial picture to the court. See *In re Wray*, 136 B.R. 122 (Bankr. W.D.Pa.1992) (substantial abuse indicated where the debtors, in their statement of income and expenses, described monthly expenses which exceeded their net monthly income by $1,364); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtors' statement of income and expenses showed more monthly expenses than monthly income); *In re Roth*, 108 B.R. 78 (Bankr.W.D.Pa.1989) (substantial abuse indicted where the debtors had spent substantially more than they earned during the two years preceding bankruptcy); *In re Hudson*, 64 B.R. 73 (Bankr.N.D.Ohio 1986) (substantial abuse indicated where the expense figures on the debtor's statement of income and expenses exceeded the income figures, indicating "deficit spending"). But see *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors monthly expenses exceeded their monthly income).

**25.** See *In re Ontiveros*, 198 B.R. 284 (C.D.Ill. 1996) (substantial abuse indicated where the debtor was living a comfortable lifestyle); *In re Bacco*, 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where the debtor had not "tightened his belt"); *In re Wray*, 136 B.R.

substantial abuse where debtors' monthly expenses are "excessive or unreasonable."[26] (4) And some courts are inclined to find substantial abuse where debtors' lifestyles are "lavish" or "extravagant," regardless of whether a debtor is living at the high or low end of the economic spectrum.[27]

### (1) Living beyond their means

Unless the irresponsible are precluded from bankruptcy simply because of their irresponsibility, then this first sub-factor, that is, "living beyond one's means," may be helpful in explaining how debtors come into bankruptcy, but this Court does not believe that it is helpful for determining whether those debtors should be dismissed from bankruptcy.[28] If coming to bankruptcy is, because debts have been incurred, irresponsible, all may qualify, since living outside of the confines of income, is impossible without *incurring debt* to do so. Consequently, this factor is not very helpful to this Court because the factor can be applied to virtually any debtor, to some extent, and this Court must assume that Congress did not intend 707(b) to be applied to every debtor, regardless of in-

come. That issue is, however, discussed in more detail below, as the factor is actually more of a restatement of the "incurring debts without the ability to pay" factor used by some courts to determine substantial abuse, rather than as independent factor to be considered here.[29]

### (2) Tighten their belts

The second sub-factor, that is, can debtors "tighten their belts," is likewise not helpful to this Court. All debtors can "tighten their belts" depending on the level of sacrifice and austerity demanded. As quoted above, "A debtor's ability to pay is a function of the level of sacrifice demanded." Teresa A. Sullivan, et al., *As We Forgive Our Debtors,* 200 (1989). Theoretically, all could live on less if there were no choices.

### (3) Excessive or unreasonable expenses

Under the third sub-factor, that is, the "excessive or unreasonable" monthly expenses method of evaluating debtors' lifestyles, many courts calculate disposable income by considering what are "unnecessary" monthly expenses. Major expenses, items

122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors had not made a reasonable effort to reduce their standard of living); *In re Vesnesky,* 115 B.R. 843 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors schedules and statement of expenses "fail to reflect any economic hardship"); *In re Rushing,* 93 B.R. 750 (Bankr.N.D.Fla.1988) (substantial abuse indicated where the debtors, despite having the ability to repay, "demonstrated an intent to maintain their current lifestyle which includes keeping an expensive boat used solely for recreational purposes, and paying only those creditors which they choose to pay."); *In re Newsom,* 69 B.R. 801 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtors were "making no effort to tighten their belts or maintain a conservative lifestyle").

26. See the cases cited in note 30.

27. See *In re Bacco,* 160 B.R. 283 (Bankr.W.D.Pa. 1993) (substantial abuse indicated where the debtor was attempting to live an extravagant lifestyle disproportionate to his ability to pay, at the expense of his creditors); *In re Butts,* 148 B.R. 878 (Bankr.N.D.Ind.1992) (substantial abuse not indicated where the debtors were living a lifestyle of modest comfort); *In re Nolan,* 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was living a lavish or excessive lifestyle); *In re Traub,* 140 B.R. 286 (Bankr.D.N.M.1992) (substantial abuse

indicated where the debtors were leading a lavish and excessive lifestyle); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors' lifestyle was not excessive or extravagant); *In re Krohn,* 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor was living an extravagant lifestyle exhibited by the fact that the debtor and his spouse spent, in the first three months after he entered bankruptcy, $1,065 for recreation and dining out, $355 for groceries, $169 for cosmetics, $66 for cigars, $671 for clothes, and $256 for gasoline) *aff'd,* 87 B.R. 926 (N.D.Ohio 1988) *aff'd,* 886 F.2d 123 (6th Cir.1989); *In re Bryant,* 47 B.R. 21, 26 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor was living a "relatively exorbitant lifestyle which he seeks to maintain while taking shelter from his creditors under the Bankruptcy provisions" and is seeking "to live the life of Riley while his creditors suffer on his behalf").

28. Without fiscal irresponsibility there would be fewer bankruptcies. "[N]early every person who files a Chapter 7 bankruptcy proceeding at some point in time could fairly be said to have managed his or her money unwisely." *In re Walton,* 866 F.2d 981, 986 (8th Cir.1989)(dissent of Judge McMillian).

29. See the cases cited in note 53 and 54 regarding ability to pay and intent to pay.

such as food, clothing, utilities, home rental or mortgage payments, home maintenance expenses, car payments and transportation expenses, and recreational expenses, provide the most fertile ground for criticism. Other expenses examined have included charitable contributions, books and magazines, cable television, toiletries, laundry, tobacco and general household items. For those courts that find substantial abuse after an examination of these items, many do so based upon determinations that debtors could pay debts with the money they were otherwise spending on these "unnecessary expenses." [30]

30. The specific individual expenses that have been scrutinized by courts for purposes of determining section 707(b) substantial abuse include: Food:

*In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996) (substantial abuse indicated where the debtor was spending $450 each month on food for himself); *In re Kornfield*, 211 B.R. 468, (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors wastefully or unnecessarily were spending $1200 (any more than $850) each month to provide food for a family of six); *In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y.1997) (substantial abuse indicated where the debtors were spending $850 (any more than $550) each month to provide food for a family of four); *In re Stewart*, 201 B.R. 996 (Bankr.N.D.Okla.1996) (substantial abuse indicated where the debtor was spending $500 each month to provide food for himself); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor was spending $775 each month to provide food ($750) and house cleaning supplies ($25) for a family of two adults); *In re Hill*, 1994 WL 738663 (Bankr.D.Idaho, Dec. 22, 1994) (substantial abuse not indicated even though debtors unnecessarily were spending $700 (any more than $500) each month to provide food for a family of four); *In re Tindall*, 184 B.R. 842 (Bankr. M.D.Fla.1994) (substantial abuse indicated where the debtors were spending $645 each month on food for a family of two adults); *In re Sanseverino*, 171 B.R. 46 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was spending $500 each month on food for himself); *In re Dickerson*, 166 B.R. 480 (Bankr. N.D.Ga.1993) (substantial abuse indicated where the debtor purported to spend $500 each month to provide food for himself); *In re Buntin*, 161 B.R. 466 (Bankr.W.D.Mo.1993) (substantial abuse indicated where the debtors were spending $868 (over $160) each month to provide food for a family of two adults); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated even though the debtors unnecessarily were spending $515 (over $400) per month for food for a family of two adults); *In re Johnson*, 115 B.R. 159 (Bankr.S.D.Ill.1990) (substantial abuse indicated where the debtors were spending $930 on food each month for a family of five); *In re Piontek*, 113 B.R. 17 (Bankr.D.Or.1990) (substantial abuse indicated where the debtors were spending $600 (over $500) for food for a family of three); *In re Cook*, 110 B.R. 544 (Bankr. N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $750 per month on food for a family of three); *In re*

*Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $433 each month on food for himself); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor was spending $700 each month to provide food for a family of two) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Hudson*, 64 B.R. 73 (Bankr. N.D.Ohio 1986) (substantial abuse indicated where the debtor was spending $600 (more than $560 per month or $28 per week per person) per month on food for a family of five); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor was spending $636 per month to provide food for a family of five); *In re Kress*, 57 B.R. 874 (Bankr.D.N.D. 1985) (substantial abuse indicated where the debtor was spending $500 per month for food for a family of four); *In re Bell*, 56 B.R. 637, 642 (Bankr.E.D.Mich.1986) (substantial abuse indicated where the debtor was spending $480 (over $300) per month to provide food for himself) *vacated on other grounds after appeal*, 65 B.R. 575 (Bankr.E.D.Mich.1986); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $625 (more than $500) per month on food for a family of four); *In re Bryant*, 47 B.R. 21 (Bankr. W.D.N.C.1984) (substantial abuse indicated where the debtor was spending $500 per month for food for a family of four and the debtor's listed expenses for a family of four included expenses for eating at restaurants rather than cooking and eating at home).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonably necessary expenses of $718 each month to provide food and cigarettes ($150–$200) for a family of four); *In re Messenger*, 178 B.R. 145 (Bankr.N.D.Ohio 1995) (substantial abuse not indicated where the debtor and his non-debtor spouse had monthly expenses of $800 for food); *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors were spending $600 each month on food for a family of four).
Clothing:

*In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were spending $400 (any more than) each month to provide clothing for a family of six); *In re Carlton*, 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors were spending $150 (any more than $75) each month to provide clothing for a family of four); *In re Stallman*, 198 B.R. 491

(Bankr.W.D.Mich.1996) (substantial abuse indicated where the debtor was spending $105 each month to provide clothes for himself); *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors purported to spend $326 each month to provide clothes for a family of two adults); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was spending $200 each month (more than $100) to provide clothing for himself); *In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okl.1991) (substantial abuse indicated where the debtor was spending $200 per month on clothing for a family of four); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa. 1990) (substantial abuse indicated where the debtors were spending $290 each month on clothing for a family of five); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $400 each month on clothing for a family of three); *In re Ploegert*, 93 B.R. 641 (Bankr. N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $200 each month on clothing purchases); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor was spending $150 each month to provide clothes for a family of two and spent $671 for clothes in the first three months after he entered bankruptcy) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor was spending $100 per month to provide clothing for a family of five); *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $267 (more than $100) per month on clothing for a family of four).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonably necessary expenses of $200 each month to provide clothing for a family of four); *In re Messenger*, 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor and his non-debtor spouse had monthly expenses of $150 for clothing).

Housing:

*In re Kornfield*, 211 B.R. 468 (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were spending $3000 each month to provide housing for a family of six); *In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa.1996) (substantial abuse indicated where the debtors were spending $4550 (more than $2000–$2500) each month to provide a house for a family of two adults); *In re Dempton*, 182 B.R. 38 (Bankr. W.D.Mo.1995) (substantial abuse indicated where the debtor was spending $2191 each month to provide a home for a family of four); *In re Gavita*, 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors were spending $780 each month on housing); *In re Dickerson*, 166 B.R. 480 (Bankr.N.D.Ga.1993) (substantial abuse indicated where the debtor was paying his girlfriend, with whom he was residing, $1,000 per month rent); *In re Buntin*, 161 B.R. 466 (Bankr.W.D.Mo.1993) (substantial abuse indicated where the debtors proposed to spend $550 each month on housing, when current housing cost them only $350 for a family of two adults); *In re Wray*, 136 B.R. 122 (Bankr. W.D.Pa.1992) (substantial abuse indicated where the debtors were spending $722 per month on rent and utilities for a family of two); *In re Vesnesky*, 115 B.R. 843 (Bankr.W.D.Pa.1990) ("substantial abuse indicated where the debtors were spending $716 each month to rent a house for a family of four, even though they were living in an area where the cost of living was low"); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $2006 per month on "lodging" for a family of three); *In re Byrne*, 1989 WL 268880 (Bankr.C.D.Ill., Nov. 13, 1989) (substantial abuse indicated where the debtor was spending $575 each month to provide housing for himself); *In re Andrus*, 94 B.R. 76 (Bankr. W.D.Pa.1988) (substantial abuse indicated where the debtor was living with his parents, so that a greater portion of his income could be committed to the payment of creditors because of the fact that he paid no rent); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor moved into a larger apartment after filing bankruptcy so that his expenses, because of increased rent, were increased each month by $300, and the debtor, a single man, purported to spend $550 each month on rent).

But see *In re Messenger*, 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor was spending $472 each month to provide modest housing for a family of two adults).

Cars and transportation:

*In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996) (substantial abuse indicated where the debtor was leasing an expensive BMW automobile); *In re Zuercher*, 1993 WL 836700 (D.Haw., Feb. 10, 1993) (substantial abuse indicated where the debtor was a wealthy dentist living an extravagant lifestyle evidenced by his paying tuition for his sons to attend private schools and driving a leased Mercedes and leasing a BMW for one of his sons); *Wilson v. United States Trustee (In re Wilson)*, 125 B.R. 742 (W.D.Mich.1990) (substantial abuse indicated where the debtor owned two Cadillac automobiles valued on her petition at $22,600); *In re Stewart*, 201 B.R. 996 (Bankr. N.D.Okla.1996) (substantial abuse indicated where the debtor was spending $1000 each month on transportation expenses); *In re Schmidt*, 200 B.R. 36 (Bankr.D.Neb.1996) (substantial abuse indicated where the debtors, on their income and expense statement, improperly computed monthly transportation expense by multiplying $0.30 by the number of miles driven by one of the debtors in her business, rather than describing actual out-of-pocket expense, and in addition, describing a redundant expense of $150 for gas and maintenance); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors bought two cars in

the 90 day period preceding bankruptcy and were spending $250 (more than $125) each month to provide transportation for a family of two); *In re Tindall,* 184 B.R. 842 (Bankr. M.D.Fla.1994) (substantial abuse indicated where the expenses stated by the debtors on their statement of income and expenses included cash reserves for "future anticipated expenses", including $600.00 per month for a new car, and $222.00 for projected minor repair expenses, and $200.00 for projected major repair expenses); *In re Stallman,* 198 B.R. 491 (Bankr.W.D.Mich. 1996) (substantial abuse indicated where the debtor was spending $609 (more than $349) each month to provide two automobiles for himself); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors listed as an expense $120.00 per month for a bus pass even though they own three motor vehicles, and listed an expense of $100.00 per month for motor vehicle repairs, without additional explanation); *In re Dickerson,* 166 B.R. 480 (Bankr. N.D.Ga.1993) (substantial abuse indicated where the debtor was paying his girlfriend $400 a month as vehicle lease payment and, on his statement of income and expenses, listed $622 in transportation expenses, and neglected to reduce his transportation expenses by travel reimbursement that he received from his employer); *In re Bacco,* 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where the debtor was spending $1,788 each month, or 45% to 63% of his total monthly budget, to provide four automobiles for a family of two, and during the three years preceding bankruptcy, the debtor bought $83,000 in automobiles on credit); *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors, after filing their bankruptcy petition, leased a new car on a 48 month lease for $400 per month).

See also, *In re Hampton,* 147 B.R. 130 (Bankr. E.D.Ky.1992) (substantial abuse not indicated even though the debtors unnecessarily were spending $340 (over $150) per month for transportation costs for a family of two adults); *In re Scheinberg,* 132 B.R. 443 (Bankr.D.Kan.1991) (substantial abuse indicated where the debtors owed vehicle related secured debts of $44,760) *affirmed sub nom. Scheinberg v. United States Trustee (In re Scheinberg),* 134 B.R. 426 (D.Kan. 1992); *In re Goodson,* 130 B.R. 897 (Bankr. N.D.Okl.1991) (substantial abuse indicated where the debtor was spending $320 per month on automobile insurance for four cars for a family of four and a total of $500 per month on transportation costs); *In re Helmick,* 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were spending $190 each month on transportation for a family of five); *In re Vesnesky,* 115 B.R. 843 (Bankr. W.D.Pa.1990) (substantial abuse indicated where the expenses described on the debtors' statement of income and expenses include "projected expenditures" of $550 for new cars); *In re Cook,* 110 B.R. 544 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $400 each month in transportation costs (not including car payments) for a family of three); *In*

*re Gyurci,* 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor and his family of three owned five automobiles); *in re Ploegert,* 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $335 each month on transportation related costs); *In re Gaskins,* 85 B.R. 846 (Bankr.C.D.Cal.1988) (substantial abuse indicated where the debtors, with a family of two, owned three automobiles, one of which was purchased during the year preceding bankruptcy with a tax refund of $8,300); *In re Krohn,* 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor's family of two spent, in the first three months after he entered bankruptcy, $256 for gasoline) *aff'd,* 87 B.R. 926 (N.D.Ohio 1988) *aff'd,* 886 F.2d 123 (6th Cir. 1989); *In re Struggs,* 71 B.R. 96 (Bankr. E.D.Mich.1987) (substantial abuse indicated where the debtor was spending $1004 each month (more than $370) in transportation costs (car loans, gasoline, insurance and maintenance) to provide himself with one luxury automobile); *In re Kress,* 57 B.R. 874 (Bankr.D.N.D.1985) (substantial abuse indicated where the debtor was spending $450 per month on transportation related costs in using one automobile for business and transportation for a family of four, excluding car payment of $334 per month); *In re Bell,* 56 B.R. 637, 642 (Bankr.E.D.Mich.1986) (substantial abuse indicated where the debtor was spending $608 (over $300) per month to provide automobile transportation for himself, including car payment plus gasoline and maintenance expenses) *vacated on other grounds after appeal,* 65 B.R. 575 (Bankr.E.D.Mich.1986); *In re Grant,* 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors were leasing two or more automobiles for a family of four even though one of the debtors was not working outside of the home); *In re Bryant,* 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor was spending $731 per month on car payments, car maintenance, insurance, and gasoline to provide two automobiles for a family of four).

But see *In re Messenger,* 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor and his non-debtor spouse had monthly transportation expenses of $400); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors were spending $400 each month on automobile related expenses and transportation costs for a family of four).

Home maintenance:

*In re Ontiveros,* 198 B.R. 284 (C.D.Ill.1996) (substantial abuse indicated where the debtor was spending $300 each month on home maintenance for himself); *In re Vianese,* 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors were spending $100 (more than $50) each month to provide home maintenance for a family of two); *In re Tindall,* 184 B.R. 842 (Bankr.M.D.Fla.1994) (substantial abuse indicated where the debtors purported to spend $707 each month on home maintenance

for a family of two adults); *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors purported to spend $152 each month on home maintenance for a family of two adults); *In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okl.1991) (substantial abuse indicated where the debtor was spending $100 per month on home maintenance for a family of four).

Utilities:

*In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa. 1996) (substantial abuse indicated where the debtors were spending $500 each month to provide utilities for a family of two adults); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors were spending $722 per month on rent and utilities for a family of two); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $382 per month on utilities for a family of three); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $250 each month on utilities); *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $285 (more than $250) per month on utilities for a family of four).

Telephone:

*In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were spending $120 (any more than $70) each month to provide telephone services for a family of six); *In re Braithwaite*, 192 B.R. 882 (Bankr.N.D.Ohio 1996) (substantial abuse indicated where the debtor was spending $150 each month for telephone services); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors were spending $72.70 (more than $45) each month to provide telephone service for a family of two); *In re Sanseverino*, 171 B.R. 46 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was spending $100 each month to provide telephone services for himself); *In re Veenhuis*, 143 B.R. 887 (Bankr.D.Minn.1992) (substantial abuse indicated where the debtor was spending $40 (any amount) per month on cellular telephone service for a family of three); *In re Piontek*, 113 B.R. 17 (Bankr.D.Or.1990) (substantial abuse indicated where the debtors were spending $100 (over $55) in telephone expenses for a family of three); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl. 1990) (substantial abuse indicated where the debtors were spending $153 per month in telephone expenses for a family of three); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor's expenses included $80 per month for a telephone credit card for the debtor's adult son serving in the military out of state and expenditures incurred as a result of the debtor's daughter making long distance telephone calls to her mother).

Recreation:

*In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were spending $150 (any more than $75) each month to provide recreation for a family of four); *In re Braithwaite*, 192 B.R. 882 (Bankr. N.D.Ohio 1996) (substantial abuse indicated where the debtor was spending $96 each month for recreation); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor was spending $264 each month to provide recreation (recreation, cigarettes, and cable television) for a family of two adults); *In re Tindall*, 184 B.R. 842 (Bankr.M.D.Fla.1994) (substantial abuse indicated where the debtors purported to spend $325 each month on recreation for a family of two adults); *In re Gavita*, 177 B.R. 43 (Bankr. W.D.Pa.1994) (substantial abuse indicated where the debtors listed an expense of $100.00 per week for renting movies even though they subscribed to cable TV plus "The Movie Channel"); *In re Christie*, 172 B.R. 233 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor's ability to save for a vacation evidenced the ability to accumulate funds for her own purposes while choosing not to save for repayment of unsecured debt); *In re Martinez*, 171 B.R. 264 (Bankr.N.D.Ohio 1994) (substantial abuse not indicated even though the debtors unnecessarily were spending an amount each month on recreation, clubs, entertainment, newspapers, and charitable contributions); *In re Sanseverino*, 171 B.R. 46 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was spending $100 (any amount) each month on recreation for himself); *In re Buntin*, 161 B.R. 466 (Bankr. W.D.Mo.1993) (substantial abuse indicated where the debtors were spending $100 (any amount) each month to provide vacations for a family of two adults and were spending $275 (over $100) each month to provide recreation for a family of two adults); *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors purported to spend $113 (any amount) each month on recreation for a family of two adults).

See also, *In re Barnes*, 158 B.R. 105 (Bankr. W.D.Tenn.1993) (substantial abuse indicated where the debtors took a $600 vacation following the filing of their petition, thus indicating an "ability to accumulate funds for their own purposes while choosing not to save for repayment of unsecured debt"); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was spending $200 each month on recreation for himself); *In re Traub*, 140 B.R. 286 (Bankr.D.N.M.1992) (substantial abuse indicated where the debtors were spending $7,000 per month on recreation, entertainment, travel and gifts); *In re Wray*, 136 B.R. 122 (Bankr. W.D.Pa.1992) (substantial abuse indicated where the debtors were spending $58 per month on recreation and donations to charity for a family of two); *In re Goodson*, 130 B.R. 897 (Bankr. N.D.Okl.1991) (substantial abuse indicated where the debtor was spending $100 per month on recreation for a family of four); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were spending $100 each month on recreation for a family of five); *In re Roth*, 108 B.R. 78 (Bankr.

W.D.Pa.1989) (substantial abuse indicated where the debtors were spending $100 per month on recreation for a family of five); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $840 each month for recreation); *In re Krohn*, 78 B.R. 829 (Bankr. N.D.Ohio 1987) (substantial abuse indicated where the debtor's family of two spent, in the first three months after he entered bankruptcy, $1,065 for recreation and dining out and was spending $435 each month for recreation for a family of two) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Newsom*, 69 B.R. 801 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtors were spending $250 per month on recreational or discretionary items, over and above "disposable income," for a family of two, each month); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor was spending $120 per month for recreation for a family of five); *In re Kress*, 57 B.R. 874 (Bankr.D.N.D. 1985) (substantial abuse indicated where the debtor was spending $200 per month for recreation for a family of four); *In re Kelly*, 57 B.R. 536 (Bankr.D.Ariz.1986) (substantial abuse indicated where the debtors were spending $500 (over $250 per month) on recreation for a family of two adults) *rev'd on other grounds sub. nom., Kelly v. Solot (In re Kelly)*, 70 B.R. 109 (9th Cir. BAP 1986) *rev'd sub. nom., Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $115 (more than $70) per month on recreation for a family of four); *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor was spending $100 per month or more "dining out and for going to movies" for a family of four).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors have reasonably necessary expenses of $240 each month to provide recreation and cable television for a family of four); *In re Messenger*, 178 B.R. 145 (Bankr.N.D.Ohio 1995) (substantial abuse not indicated where the debtor and his non-debtor spouse have monthly expenses of $125 for recreation); *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors were spending $200 each month on entertainment for a family of four).

Charity:

*In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtors were donating $200 (any amount) each month to charity); *In re Stallman*, 198 B.R. 491 (Bankr.W.D.Mich.1996) (substantial abuse indicated where the debtor was donating $44 (any amount) each month to his church, rather than paying that amount to creditors and donating his time and expertise to the church instead); *In re Sanseverino*, 171 B.R. 46 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor was donating $10 each month (any amount) to charity); *In re Martens*, 171 B.R. 43 (Bankr.

N.D.Ohio 1994) (substantial abuse not indicated even though the debtor was making unnecessary donations of $16 each month (any amount) to charity); *In re McCormack*, 159 B.R. 491 (Bankr. N.D.Ohio 1993) (substantial abuse indicated where the debtors purported to donate $132 (any amount) to charity each month); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was donating $50 each month to charity); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors were spending $58 per month on recreation and donations to charity for a family of two); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to donate $125 each month to charities); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor was donating $200 each month to charities) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Hudson*, 64 B.R. 73 (Bankr. N.D.Ohio 1986) (substantial abuse indicated where the debtor was giving $25 (any money) each month to his church).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonably necessary expenses of $50 each month for donations to charity).

Cable Television:

*In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y. 1996) (substantial abuse indicated where the debtors were spending $35 (any amount) each month to provide cable television for a family of two); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor was spending $264 each month to provide recreation (recreation, cigarettes, and cable television) for a family of two adults); *In re Buntin*, 161 B.R. 466 (Bankr.W.D.Mo.1993) (substantial abuse indicated where the debtors were spending $34 (any amount) each month to provide cable television for a family of two adults); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors were spending any amount each month for cable television for a family of two); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were spending any amount each month on cable televisions for a family of five); *In re Bryant*, 47 B.R. 21 (Bankr. W.D.N.C.1984) (substantial abuse indicated where the debtor's listed expenses for a family of four include expenses for cable television).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonable necessary expenses of $240 each month to provide recreation and cable television for a family of four); *In re Messenger*, 178 B.R. 145 (Bankr.N.D.Ohio 1995) (substantial abuse not indicated where the debtor and his non-debtor spouse had monthly expenses of $42 for cable television).

Laundry:

*In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y. 1996) (substantial abuse indicated where the debtors were spending $90 (more than $45) each

month to provide laundry and dry cleaning for a family of two); *In re Cook*, 110 B.R. 544 (Bankr. N.D.Okl.1990) (substantial abuse indicated where the debtor was spending $120 each month for "cleaning"); *In re Byrne*, 1989 WL 268880 (Bankr.C.D.Ill., Nov. 13, 1989) (substantial abuse indicated where the debtor was spending $100 each month to provide laundry and dry cleaning for himself); *In re Ploegert*, 93 B.R. 641 (Bankr. N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $216 each month on laundry); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $85 (more than $50) per month on dry cleaning for a family of four); *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor was spending $100 per month for laundry costs for a family of four even though he owned a washing machine).

Books:

*In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind. 1988) (substantial abuse indicated where the debtor, a single man, purported to spend $65 each month on books and newspapers); *In re Hudson*, 64 B.R. 73 (Bankr.N.D.Ohio 1986) (substantial abuse indicated where the debtor was spending $30 (more than $4.60) per month on newspapers and books for a family of five); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $35 (more than $15) per month on newspapers and books for a family of four).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonably necessary expenses of $90 each month to provide books, periodicals, and school supplies for a family of four).

Tobacco:

*In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor was spending $264 each month to provide recreation (recreation, cigarettes, and cable television) for a family of two adults) *In re Buntin*, 161 B.R. 466 (Bankr.W.D.Mo.1993) (substantial abuse indicated where the debtors were spending $262 (over $96) each month to provide tobacco products for a family of two adults); *In re Johnson*, 115 B.R. 159 (Bankr.S.D.Ill.1990) (substantial abuse indicated where the debtors were spending $230 each month on tobacco products for a family of five); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor's family of two spent, in the first three months after he entered bankruptcy, $1,065 for recreation and dining out, $355 for groceries, $169 for cosmetics, $66 for cigars, $671 for clothes, and $256 for gasoline) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor was spending $97 each month for cigarettes); *In re Hudson*, 64 B.R. 73 (Bankr.N.D.Ohio 1986) (substantial abuse indicated where the debtor was spending $100 (any money) per month on tobacco for two adults in a family of five).

But see *Waites v. Braley*, 110 B.R. 211 (E.D.Va. 1990) (substantial abuse not indicated where the debtors had reasonably necessary expenses of $718 each month to provide food and cigarettes ($150–$200) for a family of four).

Retirement contributions:

*In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtor was voluntarily making $332.05 per month contributions to a 401–K plan, which could be discontinued so that the money could be paid to creditors instead); *In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y.1997) (substantial abuse indicated where the debtors' expenses included a loan payment of $1,100 on a profit sharing account); *In re Bicsak*, 207 B.R. 657 (Bankr.W.D.Mo.1997) (substantial abuse indicated where the debtor was having $395 in retirement contributions deducted from his paycheck each month that could be used to pay creditors); *In re Roth*, 108 B.R. 78 (Bankr.W.D.Pa.1989) (substantial abuse indicated where the debtor was contributing $150 per month Into a retirement plan); *In re Bell*, 56 B.R. 637, 642 (Bankr. E.D.Mich.1986) (substantial abuse indicated where the debtor was having $820 per month (any amount) deducted from his paycheck each month for a retirement annuity) *vacated on other grounds after appeal*, 65 B.R. 575 (Bankr. E.D.Mich.1986); *In re Bell*, 56 B.R. 637, 642 (Bankr.E.D.Mich.1986), "The debtor is apparently saving for his future at the expense of his present creditors; this is simply not reasonably necessary for his support and cannot be condoned," *vacated on other grounds after appeal*, 65 B.R. 575 (Bankr.E.D.Mich.1986).

Miscellaneous expenses:

*In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the physician debtor was spending money each month entertaining referring physicians and the debtor's expenses also included a loan payment of $1,100 on a profit sharing account); *In re Mastromarino*, 197 B.R. 171 (Bankr.D.Me.1996) (substantial abuse indicated where the debtor unnecessarily was spending $250 per month for storage of personal items and paying a large, unexplained amount each month to a family trust, thus discounting his claim that he has only $66 per month in disposable income); *In re Dickerson*, 193 B.R. 67 (Bankr.M.D.Fla.1996) (substantial abuse not indicated even though the debtors unnecessarily were spending $125 (any amount) each year for a "Leadership Jacksonville" membership and $96 (any amount) each year for a "AAA" membership); *In re Braithwaite*, 192 B.R. 882 (Bankr.N.D.Ohio 1996) (substantial abuse indicated where the debtor, who was a teacher, was spending $245 each month for classroom supplies and library materials; and $100 each month for someone to clean her two bedroom apartment); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors were spending $250 (any amount) each month to provide life insurance for a family of two and were spending $387 (any amount) each month to repay educational loans); *In re Jarrell*, 189 B.R. 374 (Bankr.

However, the disparity in the types and amounts of expenses that courts have considered as unnecessary, may raise questions of whether all debtors are being treated equally.

█ What if debtors are not permitted to incur at least the same amount of living expenses as other people who make the same amount of money, or what if a particular debtor is not allowed a sufficient survival buffer to allow for reasonably anticipated expenses, unanticipated future contingencies, and improvement of living conditions? [31]

M.D.N.C.1995) (substantial abuse indicated where one of the debtors was having $129.82 deducted from his paycheck each month for an after-tax contribution to his capital investment plan); *In re Dempton*, 182 B.R. 38 (Bankr. W.D.Mo.1995) (substantial abuse indicated where the debtor was paying $1050 per year or $87 per month for his non-debtor spouse to accompany her children on an airplane to her ex-husband's home each summer); *In re Gavita*, 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors listed an expense for home repair at $80.00 per month but testified that their home is in good repair; and listed an expense of $50.00 per month for medical expenses even though it is common knowledge that the City of Pittsburgh provides medical coverage to its employees; and were spending approximately $100.00 per month for diapers for their healthy three-year old child; and where the debtors did not believe that their expenses for day care ($400.00 per month) would diminish when their child started school).

See also *In re Sanseverino*, 171 B.R. 46 (Bankr. N.D.Ohio 1994) (substantial abuse indicated where the debtor was spending $80 each month for water and sewer assessments even though he owned no real estate); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated even though the debtors unnecessarily were spending $122 (over $100) per month for medical expenses and $238 (over $100) per month for taxes for a family of two adults); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was spending $102 each month to maintain life insurance policies on his minor children and $100 each month (more than $50) for a person to clean his home); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors were spending $166 per month on haircuts, dining out, gifts and pet care for a family of two); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors were spending $75 each month on household items and toiletries for a family of five); *In re Johnson*, 115 B.R. 159 (Bankr.S.D.Ill.1990) (substantial abuse indicated where the debtors were spending $160 each month on household supplies for a family of five); *In re Cook*, 110 B.R. 544 (Bankr.N.D.Okl. 1990) (substantial abuse indicated where the debtors were spending $250 on medical expenses each month even though health insurance premiums are deducted from one of the debtor's paychecks); *In re Roth*, 108 B.R. 78 (Bankr.W.D.Pa. 1989) (substantial abuse indicated where the debtors were spending $74 per month for piano

lessons for their minor children); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $86 each month to provide "personal hygiene" items); *In re Strange*, 85 B.R. 662 (Bankr.S.D.Ga.1988) (substantial abuse indicated where the debtor's statement of income and expenses showed a monthly expenditure of $80 for car insurance even though the debtor owned no car); *In re Krohn*, 78 B.R. 829 (Bankr. N.D.Ohio 1987) (substantial abuse indicated where the debtor belonged to a private club) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Hudson*, 64 B.R. 73 (Bankr.N.D.Ohio 1986) (substantial abuse indicated where the debtor was spending $90 per month on haircuts for a family of five); *In re Kress*, 57 B.R. 874 (Bankr.D.N.D.1985) (substantial abuse indicated where the debtor was spending $100 per month on contact lenses for a family of four).

31. Some courts do not appear to consider that there may be emergencies or other demands on the debtor's cash flow which would justify a small monthly reserve. *In re Scheinberg*, 132 B.R. 443 (Bankr.D.Kan.1991) *affirmed sub nom. Scheinberg v. United States Trustee (In re Scheinberg)*, 134 B.R. 426 (D.Kan.1992). See *In re Dickerson*, 193 B.R. 67 (Bankr.M.D.Fla.1996) (substantial abuse not indicated even though it was unreasonable for the debtors to reserve $150 (any amount) each month for unexpected expenses for a family of three); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors reserved $258 (any amount) each month to provide for roof repairs); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor, a single man, purported to spend $165 each month for "miscellaneous").

Many courts, however, recognize the need for a survival cushion. "[T]he smaller the amount of projected disposable income, the more likely it is that the income as earned will in fact be nondisposable and necessary for support due to inflation, emergencies, or miscalculations on the part of the court." Breitowitz, *New Developments in Consumer Bankruptcy; Chapter 7 Dismissal on the Basis of Substantial Abuse*, 60 Am.Bank.L.J. 33, 37 (1986). See *In re Zaleta*, 211 B.R. 178 (Bankr.M.D.Pa.1997) (substantial abuse not indicated where the debtors budgeted reasonably necessary expenses of $325.00 per month for future anticipated day care expenses, and $125 each month as a cushion for future anticipated expenses such as would be required by the con-

What if a debtor is not self-sufficient, but must rely in part on the good graces of others; or if a debtor is living in unusual circumstances which have artificially reduced the debtors living expenses; or if a debtor is forced to work overtime or to maintain a working condition that places undue strain on health or family relations; or if reducing a debtor's expenses will adversely impact children or a spouse by depriving them of necessities or normal opportunities generally available to those with similar income; or if a debtor's non-debtor spouse or mate will be required to contribute to the payment of the debtor's debts or to shoulder more than a fair share of the family's living expenses.[32]

tamination of their well water, a malfunctioning septic system, and the repair and replacement of household appliances); *In re Hill*, 1994 WL 738663 (Bankr.D.Idaho, Dec. 22, 1994) (substantial abuse not indicated where one of the debtor's children needed future medically required orthodontic work that would cost approximately $2,000); *In re Wilkes*, 114 B.R. 551 (Bankr. W.D.Tenn.1989) (substantial abuse not indicated where the debtor's disposable income ($43) was "minimal and subject to instant depletion if she or a child becomes ill or if household expenses increase even slightly."); *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors were spending $200 or less each month on "miscellaneous expenses" for a family of four); *In re Renner*, 70 B.R. 27, (Bankr.D.N.D.1987) (substantial abuse not indicated where, even though debtor's had a large amount of discretionary and disposable income, they needed cushion against the future which was likely to bring considerable unanticipated expenses related to medical condition of one of debtors).

Of course, the debtor's cushion against unanticipated but inevitable unbudgeted expenses can be found in excess expenditures or expenditures budgeted for non-essential items. And the amount reserved must not be completely unreasonable or designed to perpetuate a lavish or extravagant lifestyle. See *In re Tindall*, 184 B.R. 842 (Bankr.M.D.Fla.1994) (substantial abuse indicated where the expenses stated by the debtors on their statement of income and expenses contained cash reserves for "future anticipated expenses", including a new car of ($600.00 per month), transportation expenses ($222.00 for projected repair expenses, and $200.00 for projected major expenses), a vacation ($100.00 reserve per month), and a savings reserve of $512.00 per month for projected future costs of items which the debtors wished to replace at the conclusion of their estimated useful lives such as two television sets, a microwave, two VCRs, a remote control stereo, a new fence and gate, linoleum and fireplace repair, a refrigerator, two sofas, a love-seat, a washer, a dryer, a stove, a mattress and box springs, a garage door opener, new telephones, a new roof, new carpet, and painting the interior of their house; as well as two reserves for miscellaneous expenses which total $450.00 per year); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated even though debtors unreasonably reserved $530 (over $250) per month for "other" for a family of two adults); *In re Vesnesky*, 115 B.R. 843 (Bankr.W.D.Pa.1990) (substantial abuse

indicated where the expenses described on the debtors' statement of income and expenses included "projected expenditures" of $550 for new cars, and $110 for new furniture and appliances, as well as a $150 reserve for unexpected expenses); *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985) (substantial abuse indicated where the debtor was spending $262 (more than $207) per month on "other" for a family of four).

**32.** The court in *In re Stallman*, 198 B.R. 491 (Bankr.W.D.Mich.1996) determined that substantial abuse was indicated where the debtor was donating $44 each month to his church. The court suggested that the debtor could pay that amount to creditors and donate his time and expertise to the church instead. The court also suggested that the debtor could earn extra money to pay creditors by renting out the condominium that he was living in.

In *In re Kornfield*, 211 B.R. 468, (Bankr. W.D.N.Y.1997), the court determined that substantial abuse was indicated where the debtors were spending too much each month on clothing for their teenage children. The court suggested that the teenage children could work to earn money for their clothing.

In *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985), the court determined that substantial abuse was indicated where the debtors were leasing two or more automobiles for a family of four even though one of the debtors did not work outside the home. The court referred to that practice, as "free-wheeling spending", stating:

> The original schedule includes monthly entertainment expenses of $450.00, and transportation expenses of $890.00 (includes cost of operation of 1982 Mercedes 240D); the amended schedule includes transportation expenses of $580.00. Although the court applauds the thrift of Mr. Grant in surrendering the 1982 Mercedes 240D to the leasing company, it must question the good faith of the debtor in acquiring two 1985 leased vehicles in exchange, a 1985 Nissan and a 1985 Cutlass Sierra. The monthly rental cost of these two vehicles equals that of the Mercedes. Furthermore, Mrs. Grant is not employed, and the court questions whether she has daily need for a vehicle of her own. Certainly this is not the post-petition, belt—tightening budget which a debtor who has newly wiped the slate clean of debts should propose to cure past excesses; such free-wheeling spending is likely to put the debtor in need of additional relief after several years.

Do these questions indicate that even if equality of treatment is the goal, that courts, no matter how hard they try, may not be able to achieve that goal?

### (4) "Lavish, extravagant, excessive or exorbitant" lifestyle

Substantial abuse may be indicated if, under this fourth sub-factor, a debtor maintains a "lavish, extravagant, excessive or exorbitant" lifestyle, and if the pertinent words are accorded their common and ordinary meaning. But against what standard is such a lifestyle to be judged? Is it what a judge or a U.S. Trustee or a Bankruptcy Administrator believes is lavish, extravagant, excessive or exorbitant, or is it the objectively determined average income and expenses of our general population? This Court believes it is the later. The terms "lavish," "extravagant," "excessive" or "exorbitant" are relative terms; relative to the population as a whole;

but not relative at all without reference to that population. They are not triggered simply because a debtor can live a more austere lifestyle but should be considered only in relation to a debtor's lifestyle, when that lifestyle is compared with the lifestyles of other people, debtors and non-debtors alike.

In other words, the standard should not be used to manage a debtor's paycheck each month, without reference to the size of that paycheck. Just the use of the word "extravagant" presumes that a debtor makes, or at least has, a lot of money. If not, the debtor could not live a lifestyle that can be considered lavish, extravagant, excessive or exorbitant. The plain meaning of the word defines a circumstance in which a debtor, because of income far above the norm, is able to afford many more of the amenities of life than someone who earns wages that are closer to the norm.[33]

51 B.R. at 395–396.

A few courts have held, in effect, that 707(b) requires a debtor, whose income is low, but whose expenses are low only because the Debtor is living with parents and has no monthly rental or mortgage payment, to continue to live with parents in order to pay creditors. See *In re Lamanna*, 210 B.R. 17 (Bankr.D.R.I.1997) (substantial abuse indicated where the debtor was living with his mother so that his expenses were low and his disposable income was therefore high enough to fund a Chapter 13 plan); *In re Matias*, 203 B.R. 490 (Bankr.S.D.Fla.1996) (substantial abuse indicated where the debtor was residing with his parents); *In re Brady*, 95 B.R. 1004 (Bankr.W.D.Mo.1987) (substantial abuse indicated where the debtor was living with others, so that she had no living expenses and all of her income could be committed to the payment of creditors); *In re Andrus*, 94 B.R. 76 (Bankr. W.D.Pa.1988) (substantial abuse indicated where the debtor was living with his parents, so that a greater portion of his income could be committed to the payment of creditors because of the fact that he was paying no rent).

Do these circumstances offer the kind of "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt" envisioned by the Supreme Court? *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). This Court does not think so and believes that to require the maintenance of an unusual living arrangement which had existed solely because of "extraordinary efforts by the debtor" would be inequitable, and contrary to a fresh start. See, *In re Hampton*, 147 B.R. 130, 131 (Bankr.E.D.Ky.1992) (substantial abuse not

indicated where the debtors' combined net monthly income had been reduced from $4200 to $3155 because of one debtor's inability because of heart condition, to work more than 40 hours per week, whereas he had been able to work seven days a week before).

33. Those amenities might include non-essential items of property used primarily for recreational or discretional purposes. Courts that have found substantial abuse where a debtor owns such items, generally do so for one of three reasons. These include: (1) presence of the item and an obligation to pay for the item may indicate that the debtor is not being forthcoming about the need for bankruptcy protection; (2) elimination of the debt owed on those items may reduce the debtor's monthly living expenses and free up funds that can be used to pay creditors; (3) if no debt is owed for those items, the debtor can liquidate them and use the proceeds to pay creditors. These reasons require care in their application. The first reason can be construed as a *de facto* denial of the debtor's discharge, without an adversary proceeding or evidence pursuant to 11 U.S.C. § 727(a)(4)(A) based on an implied finding of false oath. The second reason presumes that the debt owed on the item will simply vanish, and it will, if the debtor sells the item for an amount sufficient to pay the secured debt. This, of course, does not consider that if the debtor is forced to surrender the item because of foreclosure or repossession, or is unable to sell the item for an amount sufficient to pay the secured debt, the resulting deficiency will still be a debt that the debtor must contend with and that debt, as between creditors, is just as legitimate and entitled to repayment as any other.

### c. Monitoring lifestyle

■ The key to a fair review of a debtor's expenses and lifestyle is for the review to be based on publicly acknowledged, objective criteria, not on moral perspectives, subjective beliefs or life experiences of those making the review.[34] The appropriate test then to assure such a review is to compare a debtor's total family expenses to the typical expenses of debtors in similarly situated households, with upward adjustments for higher costs of living attributable to specific geographic areas and any special individual circumstances applicable to a particular debtor's family—rather than through an item by item examination. Such information is published regularly and is readily available from federal government agencies such as the U.S. Government Printing Office, or from government document departments of public libraries, especially those that are depository libraries.[35]

The use of such objective criteria serves several purposes. It provides an objective starting point and reference point for all participants in the 707(b) litigation process. It provides an evidentiary basis for 707(b) determinations. It helps insure equality of treatment for similarly situated debtors. And, it bolsters the credibility of the bankruptcy court and bankruptcy process by measuring the situations of all debtors against objective criteria available to all persons.[36]

If the third reason is implicated, the immediate question is, should the trustee not confiscate the item for liquidation, or, if the item is exempt to the debtor, why should the debtor be punished for taking the exemptions authorized by law? See *In re Stallman*, 198 B.R. 491 (Bankr. W.D.Mich.1996) (substantial abuse indicated where the debtor owed $129,500 in secured debts including a boat loan of $34,000 and a $5,000 debt owed on his son's automobile, and where debtor could sell the boat to reduce his purported financial difficulties); *In re Wilkinson*, 168 B.R. 626 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor and her non-debtor husband owned a boat that they could have sold and saved $200 per month); *In re Bacco*, 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where during the three years preceding bankruptcy, the debtor had purchased $95,000 in guns and $83,000 in automobiles on credit, and the debtor and his non-debtor spouse owned property valued at $220,081 and owed secured debts which encumbered that property in the amount of $275,654); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors owned assets valued at $177,101); *In re Hutton*, 158 B.R. 648 (Bankr.E.D.Ky.1993) (substantial abuse indicated where the debtor's monthly expenses of $4,916 included $96 for a time share condominium that had to be deducted from the total to calculate true actual living expenses); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated where the debtors were spending $50 per month for boat insurance and $230 per month in installment payments on a boat and television); *In re Richmond*, 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the debtors were spending money each month for the operation, upkeep, and maintenance of a motor home); *In re Veenhuis*, 143 B.R. 887 (Bankr.D.Minn.1992) (substantial abuse indicated where the debtor was spending $85 each month to pay for a boat instead of using that money to pay his debts and the debtor's financial problems were "caused by his desire to own an expensive recreational boat which he cannot afford" rather than any unforeseen calamity); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was spending $914 each month to maintain a condominium, in addition to his primary home, for recreational purposes); *In re Rushing*, 93 B.R. 750 (Bankr.N.D.Fla.1988) (substantial abuse indicated where the debtors' secured debts included a $7,576 debt owed on the purchase of a ski boat); *In re Struggs*, 71 B.R. 96 (Bankr.E.D.Mich.1987) (substantial abuse indicated where the expenses stated by the debtor in his statement of income and expenses included $598 per month for a mobile home in which no member of the debtor's family was residing).

34. Otherwise, a debtor is subjected to trial without proof and is unable to rebut the reviewer's subjective judgment as to what the debtor's family should spend for food, shelter, clothes and gasoline and the debtor is thus unable to cross-examine the reviewer regarding the stability of the foundation of that subjective judgment. For example, see *In re Grant*, 51 B.R. 385, 396 (Bankr.N.D.Ohio 1985), in which the bankruptcy court, in determining the necessity of the debtor's monthly expenses, relied upon information contained in the Bureau of Census, U.S. Dept. of Commerce, *Statistical Abstract of the United States 1985* (105th ed.1984) and in the Am. Chamber of Com. Researchers Ass'n., *Inter–City Cost of Living Index* (1st qtr.1985).

35. Obviously, these statistics are already used daily to draw life affecting conclusions.

36. No court has the time to make the decisions necessary to manage the lives of the many debtors that pass through Chapter 7 each year, but every court can detect those cases where outrageous variations from normal or typical family expenses occur. As stated by Bankruptcy Judge

■ In conclusion to this Part II–A, this Court certainly understands, but respectfully disagrees with those courts applying a bare "ability to pay" standard to section 707(b) challenges. Because specific factors such as the amount of repayment, the level of income, an ability to fund a chapter 13 plan, necessary expenses, and lifestyle changes cannot be fairly determined, this Court does not believe that such a standard can itself be applied fairly.[37]

## B: The Second Standard of Review: Substantial Abuse and the "Totality of the Debtor's Circumstances"

The second general factor many courts consider in reviewing section 707(b) matters is, whether, based on the totality of the debtor's circumstances, a case should be dismissed.[38] In general, the opinions of courts applying this standard can be divided into two groups.

The court in *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir.1991) represents those courts that have held that section 707(b) *requires*, for dismissal, *egregious conduct* or *bad faith* on the part of a debtor in addition to or aside from the debtor's ability to pay, and that the debtor's ability to pay, standing alone, will not justify dismissal pursuant to section 707(b).

The courts in *In re Krohn*, 886 F.2d 123 (6th Cir.1989), *United States v. Harris (In re Harris)*, 960 F.2d 74 (8th Cir.1992), and *Zolg*

*v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988) represent those courts that have held that section 707(b) *does not require*, for dismissal, *egregious conduct* or *bad faith* on the part of a debtor in addition to or aside from the debtor's ability to pay and that the debtor's ability to pay, standing alone, will justify dismissal pursuant to section 707(b), *in the absence of circumstances that mitigate against dismissal* (those being the factors to consider in addition to "ability to pay").

Other published cases are variations of the above. The majority recognizes the power of a bankruptcy court to dismiss under 707(b) when faced simply with circumstances indicating the debtor's relative insolvency.[39] Only the court in Green and a few bankruptcy courts have required circumstances indicating the debtor's relative dishonesty in addition to the debtor's relative insolvency for dismissal. And even fewer courts have dismissed under 707(b) because of circumstances indicating the debtor's relative dishonesty, when the debtor admittedly did not have the ability to pay debts.

The essential difference in the two applications of the "totality of circumstances" standard is that the *Green* courts require aggravating circumstances *in addition to* an ability to pay while the *Krohn* courts find that the ability to pay, in *the absence of unique*, mitigating circumstances can, without further inquiry, result in dismissal.[40] Under either

Homer Drake in *In re Tefertiller*, 104 B.R. 513 (Bankr.N.D.Ga.1989):

> Any determination of "substantial abuse" necessitates some evaluation of the debtors' expense and income statements, and thus some scrutiny of their personal spending habits, but this Court's role is not to formulate the debtors' budget. Instead, it is to act if there is clear evidence of abuse. The last line of § 707(b) grants a presumption in favor of granting relief to the debtor, and this presumption should apply when examining the debtors' schedules. A stricter interpretation would lead to non-uniformity and confusion as judges pass personal judgement about how people should spend their money.

*Id.* at 514–515 (citations omitted).

**37.** When considering "Ability to pay" this Court must agree with a statement by a former U.S. Secretary of Commerce that reads, "One of the greatest disservices you can do a man is to *lend* him money that he can't pay back." Jesse Jones,

chairman of the Reconstruction Finance Corporation and later secretary of commerce, quoted in *The New York Times Magazine*, July 2, 1839, at 4, reprinted in Library of Congress, *Respectfully Quoted: A Dictionary of Quotations Requested From the Congressional Research Service* 77 (Suzy Platt ed., 1989) (emphasis added).

**38.** That standard may of course include the "ability to pay" standard along with other factors.

**39.** Those same courts, and many more, also recognize the power of the bankruptcy court to dismiss under 707(b) when the court is faced with sufficient circumstances indicating both the debtor's relative solvency and the debtor's relative dishonesty.

**40.** Of course, *Krohn* courts, *if applying a totality of circumstances standard,* consider these mitigating circumstances, to see whether the circum-

framework however, aggravating circumstances, that is, circumstances relevant to determining the debtor's candor and honesty in dealing with his or her creditors, can form an independent basis for dismissal. Similarly, under either framework, unique, mitigating circumstances relevant to determining the debtor's ability to pay can operate to prevent or detract from a finding that the debtor has an ability to pay his or her debts.[41] The many factors that courts have considered in these regards are discussed below.[42]

### 1. Effect on the debtor's "fresh start" if the case is dismissed

If the case is dismissed and the debtor can continue to lead a reasonably comfortable lifestyle, this factor, "the effect of dismissal," would, in and of itself, weigh in favor of dismissal. The court in *In re Ontiveros,* 198 B.R. 284, 291 (C.D.Ill.1996) recognized, "[Section 707(b)] also encompasses the situation where an honest but non-needy debtor attempts to take advantage of the protections of Chapter 7 when he has the ability to live comfortably and to pay off a substantial portion of his unsecured debts." On the other hand, as the court in *In re White,* 49 B.R. 869, 873 (Bankr.W.D.N.C.1985) recognized, this factor would weigh against dismissal, if dismissal would force the debtor to "labor, without incentive and without the opportunity to improve his position that is so fundamental to what is referred to as the 'American way of life.'" Certain sub-factors are relevant in this analysis.

### a. Magnitude of the debts that would have to be repaid if the case is dismissed

If the magnitude of a debtor's obligations are so large that forced repayment would in effect preclude a "fresh start," then this sub-factor would weigh *against* dismissal. However, if the magnitude of the debtor's obligations are not so large that repayment would not deprive the debtor of basic necessities, or of the incentive to work and ability to improve, then the sub-factor would weigh in favor of dismissal.

### b. Debtor's eligibility for Chapter 13 relief

If the debtor is eligible to file a Chapter 13 case, this sub-factor, according to many courts, weighs in favor of dismissal, ostensibly because such eligibility offers a debtor the opportunity to repay without being hampered by creditor collection; eliminates additional interest on unsecured obligations; restricts the time period the debtor would be required to pay; and restricts the amount of disposable income that the debtor would have to pay. If, however, the debtor is ineligible for Chapter 13 relief because of the magnitude of debts, then this sub-factor might weigh against dismissal, unless the debtor earns such a large amount that non-bankruptcy alternatives are feasible.[43]

stances are absent, before concluding that ability to pay is the deciding element.

**41.** The dividing line between "ability to pay" and "totality of circumstances" is obviously murky; however, the outstanding difference is simply that "ability to pay" is only that—"ability to pay." "Totality of circumstances" is a combination of many factors, one of which may include "ability to pay." The practical difference may lie however only in the labels courts give to these applications.

**42.** What number or combination of factors will mandate a finding of substantial abuse under these analyses is difficult to determine. There are many unanswered questions. Is the intimation that ability to pay is a minor factor to be considered only by combining it with some other factor, an indication that dismissal can be obtained? Or, rather, is the intimation that ability to pay is still an essential factor which must be present, in combination with some other factor

indicating the debtor's relative dishonesty, for dismissal to be authorized? Or is the intimation that ability to pay is a non-essential factor which does not have to be present in order for dismissal to be authorized? Must each of the other factors listed in these cases, or any other relevant factor, be combined with another factor, or be combined with the ability to pay, in order to dismiss? Can a small ability to pay and large dishonesty factor result in dismissal? Or can a large ability to pay and small dishonesty factor result in dismissal?

**43.** See *In re Wegner,* 91 B.R. 854 (Bankr.D.Minn. 1988) (substantial abuse not indicated where the debtors, who were supporting a family of three plus two adult sons, the former wife of one of the adult son's, and two children of one of the adult sons, on a combined net monthly income of $4,176, and who had $1,512 in monthly disposable income, and who owed 26 separate credit card debts totaling $104,845, were ineligible for relief under any chapter of the bankruptcy code

### c. Chapter 11 relief plausible if the debtor is ineligible for Chapter 13

This sub-factor would weigh against dismissal if the debtor is unlikely to be able to obtain confirmation of a Chapter 11 plan, or if, in order to obtain confirmation, would have to agree to pay debts "over what could be a substantial and perhaps unlimited number of years so that the incentives to work and support himself would be destroyed and his fresh start denied." *In re White*, 49 B.R. 869, 874 (Bankr.W.D.N.C.1985). If, on the other hand, the debtor is likely to be able to obtain confirmation of a Chapter 11 plan, with reasonable repayment terms, then this sub-factor would weigh in favor of dismissal.

### d. Viable non-bankruptcy options

This court speculates that there are very few effective non-bankruptcy alternatives available to the truly needy because such options are available only if individuals have high monthly incomes. The reason is, high income debtors have the cash in hand and the bargaining power to make out-of-bankruptcy settlements and to extend arrangements with creditors. High income debtors also have sufficient cash to buy immediate and comparable replacements for necessary items taken from them through repossession and foreclosure, or to make temporary rental arrangements until permanent replacements can be purchased or leased. Similarly, state law limitations on garnishments leave high income debtors with sufficient monthly incomes to live comfortable lifestyles.[44]

In other words, high income debtors can, as a rule, survive comfortably without bankruptcy while low and middle income debtors cannot. But of course, there are few truly needy persons who fall into the high income category. But if they do, and this sub-factor is an alternative for a debtor, the factor weighs heavily in favor of dismissal. On the other hand, if non-bankruptcy is not an alternative for a debtor, this sub-factor weighs heavily against dismissal.

### 2. The debtor's prospective earning capacity

A debtor's prospective earning capacity depends on the nature and stability of present employment, and to what extent, if any, either the nature or stability of the employment will change in the foreseeable future; whether a debtor, prior to bankruptcy, was working overtime hours or more than one job; and, whether the debtor's employment situation will remain unchanged. Again, there are sub-factors to consider.

### a. Nature of the debtor's employment

If the debtor works at what some may consider a low-paying job and has no prospects of improving that position, or is otherwise unlikely to be able to earn much more than presently being earned, then this sub-factor would weigh against dismissal.[45] However, if the debtor is perhaps highly educated or trained in an area or skill that carries a greater earning potential, and the debtor is either already earning a high income or has the capacity to do so in the reasonably foreseeable future, then this sub-

---

other than Chapter 7, because interest, outside of bankruptcy, was accruing on credit card debt at such an enormous rate that debtor would be required to make minimum monthly payments of $8,924, with monthly interest of $1,750).

**44.** See *In re Carlton*, 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors could, without a bankruptcy filing, allow creditors to garnish their wages, which would not likely exceed 10% of their annual gross income; reduce their expenses; and live on the remaining 90% of their gross income without being deprived of adequate food, clothing, shelter or other necessities); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor had available to him a state court proceeding which would allow him to retain his exempt property while

paying only the non-exempt portion of his income to creditors) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989).

**45.** See *In re Hamze*, 57 B.R. 37 (Bankr. E.D.Mich.1985) (substantial abuse not indicated where the debtor was a wage earner who was working in the produce department of a grocery store); *In re White*, 49 B.R. 869, 873 (Bankr. W.D.N.C.1985) (substantial abuse not indicated where the "[t]he Petitioner has a high school education and has recently become employed as a store clerk. His income exceeds his estimated expenses by about $130.00 per month. He is unmarried and is eighteen years old. In short, while most debtors come before this Court seeking a fresh start, this Petitioner is laboring to make his first start, and he has already severely impaired his ability to do so.")

factor would weigh in favor of dismissal.[46] However, because the majority of debtors fall somewhere in between those two extremes, the nature of any particular employment does not appear to be a factor to be considered.

### b. Stability of the debtor's present employment

This sub-factor evaluates the longevity of employment in particular situations. If the debtor has held the same job or been gainfully employed in the same line of work for a number of years, or has a proven track record of being employed and has been earning a substantial income, then this factor weighs in favor of dismissal.[47] However, if the debt-

or is unemployed, has a history of unemployment, or sporadic employment, or if it appears that the nature or stability of the debtor's employment will change in the immediate future, then this factor weighs against dismissal.[48]

### c. Overtime and second jobs

Courts are divided when considering whether earnings received from working overtime hours, or from working a second part time job, should be factored into determining a debtor's prospective ability to pay. Some believe that a debtor's decision to reduce overtime hours or to quit a second job, even for health or family reasons, is a cir-

**46.** See *In re Kornfield,* 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where one of the debtors was a physician); *In re Seager,* 211 B.R. 81 (Bankr.M.D.Fla.1997) (substantial abuse indicated where one of the debtors was a physician); *In re Stewart,* 201 B.R. 996 (Bankr.N.D.Okla.1996) (substantial abuse indicated where the debtor was a physician in a highly specialized field who had just completed his residency after filing bankruptcy and had future earning potential of at least $140,000 per year but was currently earning only net monthly income of $3345); *In re Dominguez,* 166 B.R. 66 (Bankr.E.D.N.C.1994) (substantial abuse indicated where the debtor was an anaesthesiologist with a medical degree from Harvard Medical School who was doing his internship); *In re Zuercher,* 1993 WL 836700 (D.Haw., Feb. 10, 1993) (substantial abuse indicated where the debtor was a wealthy dentist who was living an extravagant lifestyle evidenced by his paying tuition for his sons to attend private schools, and driving a leased Mercedes, and leasing a BMW for one of his sons); *In re Nolan,* 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was a television sportscaster); *In re Traub,* 140 B.R. 286 (Bankr.D.N.M.1992) (substantial abuse indicated where the debtor was an oral surgeon); *In re Scheinberg,* 132 B.R. 443 (Bankr.D.Kan.1991) (substantial abuse indicated where one of the debtors was a physician) *affirmed sub nom. Scheinberg v. United States Trustee (In re Scheinberg),* 134 B.R. 426 (D.Kan. 1992); *In re Woodhall,* 104 B.R. 544 (Bankr. M.D.Ga.1989) (substantial abuse indicated where the debtor was a physician who has a proven earning history and likelihood of earning high income); *In re Kress,* 57 B.R. 874 (Bankr.D.N.D. 1985) (substantial abuse indicated where the debtor was an anesthetist); *In re Kelly,* 57 B.R. 536 (Bankr.D.Ariz.1986) (substantial abuse indicated where one of the debtors was an attorney) *rev'd on other grounds sub. nom., Kelly v. Solot (In re Kelly),* 70 B.R. 109 (9th Cir. BAP 1986) *rev'd sub. nom., Zolg v. Kelly (In re Kelly),* 841 F.2d 908 (9th Cir.1988).

But see *In re Butts,* 148 B.R. 878 (Bankr. N.D.Ind.1992) (substantial abuse not indicated even though one of the debtors was a pharmacist with gross annual income of $57,000, who could expect to have his income increase gradually over the next several years).

**47.** See *In re Jarrell,* 189 B.R. 374 (Bankr. M.D.N.C.1995) (substantial abuse indicated where the debtors had a stable source of income, in that one debtor had been employed in the same job for sixteen years, and the other debtor had been employed in the same job for six years); *In re Dominguez,* 166 B.R. 66 (Bankr.E.D.N.C. 1994) (substantial abuse indicated where the debtor would easily be able to pay his debts after he completed his residency and had an excellent prospect of making substantial income in the near future); *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors had a stable source of income, as evidenced by the fact that one of the debtors had held the same job for 18 years and the other debtor had held her same job for 23 years); *In re Shands,* 63 B.R. 121 (Bankr. E.D.Mich.1985) (substantial abuse indicated where the debtor had been employed in the same job for 9 years or longer); *In re Kress,* 57 B.R. 874 (Bankr.D.N.D.1985) (substantial abuse indicated where the debtor had a proven history of earning substantial sums).

**48.** See *In re Fessler,* 168 B.R. 622 (Bankr. N.D.Ohio 1994) (substantial abuse not indicated where both the debtor and his non-debtor spouse became unemployed during the year preceding bankruptcy): *In re Martin,* 107 B.R. 247 (Bankr.D.Alaska 1989) (substantial abuse not indicated where the employment of one of the joint debtors was sporadic and uncertain because of a lack of work in the community); *In re Renner,* 70 B.R. 27 (Bankr.D.N.D.1987) (substantial abuse not indicated where the debtors' "prospects for lasting income stability" were poor).

cumstance that suggest bad faith and weighs in favor of dismissal.[49] The opposing view is that a debtor's decision to reduce overtime hours or to quit a second job is a personal decision, reasonably made, for any reason, but especially if made for the benefit of the debtor's health or the welfare of a family.

■ Wage and hour laws contemplate that a person works 40 hours per week. Section 707(b) neither provides nor even suggests that a debtor must work beyond that amount for the benefit of creditors.[50] And this Court believes, as do others, that "it should not use any standard of previous earnings which is based upon extraordinary work efforts by a debtor when evaluating the ability of the debtors to fund a Chapter 13 plan when the Court is determining whether there is sub-

stantial abuse pursuant to § 707(b)." *In re Hampton,* 147 B.R. 130, 131 (Bankr.E.D.Ky. 1992).

### d. Loss of primary employment

■ Job loss on the eve of bankruptcy, or after a bankruptcy filing, by either the debtor, a joint debtor or a non-debtor spouse, should be a sub-factor that weighs heavily against dismissal, even in the situation where a debtor, a joint debtor or a non-debtor spouse becomes voluntarily unemployed for health reasons or for the benefit of his or her family.[51] However, a few courts have considered job loss on the eve of bankruptcy, or after the bankruptcy filing, to be a circumstance which suggests bad faith and weighs in favor of dismissal.[52] This Court respect-

49. For instance in *In re Helmick,* 117 B.R. 187 (Bankr.W.D.Pa.1990), one of the joint debtors, who worked in a mine, decided, for health reasons, to work a job outside the mine, rather than the job he had historically held. The end result was that the debtor would have less opportunity to work overtime hours outside the mine than he would have had inside the mine. The bankruptcy court held that substantial abuse was indicated, stating:

> Additionally, no evidence was presented as to why working outside would drastically reduce [the debtor's] overtime hours. It appears that if there is activity within the mine, then there would be a call for activity outside as well. At the least, Debtor had a duty to clarify this matter, since some explanation was in order.

117 B.R. at 190.

See also *In re Carlton,* 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where debtor contended that "at 45 years old he can no longer work the overtime that he previously did to maintain a higher level of income" thereby raising a concern as to his "honesty and good faith"); *In re Stallman,* 198 B.R. 491 (Bankr.W.D.Mich.1996) (substantial abuse indicated where the debtor had earned $6,264 in extra income as an independent consultant in the year preceding bankruptcy but contended after bankruptcy that he could not continue to do so because his current schedule did not allow for the necessary travel); *In re Dubberke,* 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the debtor, a single mother, quit her second part-time job in order to stay home with her son); *In re Ploegert,* 93 B.R. 641 (Bankr. N.D.Ind.1988) (substantial abuse indicated where debtor misled the court by failing to include historical overtime pay of 20 to 30 hours per month in the income listed on his statement of income and expenses since historical overtime should be included in disposable income calculation).

50. See *In re Laury–Norvell,* 157 B.R. 14 (Bankr. N.D.Ohio 1993) (substantial abuse not indicated where the debtor's pre-bankruptcy earnings history was inflated because in the year preceding bankruptcy the debtor worked an inordinate amount of overtime and double shifts to the detriment of her health and was incapable of working such a substantial amount of hours anymore); *In re Hampton,* 147 B.R. 130 (Bankr. E.D.Ky.1992) (substantial abuse not indicated where the debtor, a single mother, quit her second part-time job in order to stay home with her son).

51. See *In re Edwards,* 50 B.R. 933 (Bankr. S.D.N.Y.1985) (substantial abuse not indicated where the debtors' combined monthly income would be reduced in the near future because one of the debtors was pregnant and would be forced to leave work for the birth of her child).

52. "A debtor who voluntarily leaves a $10,000 a year job on the eve of bankruptcy without showing the necessity thereof, impresses the Court as a bad faith filer." *In re Helmick,* 117 B.R. 187, 189 (Bankr.W.D.Pa.1990) (substantial abuse indicated where one of the joint debtors elected to eliminate her income by quitting her job). See also *United States Trustee v. Harris (In re Harris),* 125 B.R. 254 (D.S.D.1991) (substantial abuse indicated where one of the debtors quit her job because her evening full-time work was too stressful on her family; the court made its substantial abuse calculations based on the figures provided before the one debtor had quit her job) aff'd, *United States Trustee v. Harris (In re Harris),* 960 F.2d 74 (8th Cir.1992); *In re Vianese,* 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where one of the debtors lost her job after the bankruptcy case was filed).

fully disagrees. Had Congress intended that having a job was one of the requirements for participation in Chapter 7, certainly Congress would have made that point abundantly clear in the language of 707(b).

### 3. Effect on the creditor if the case is dismissed

If a creditor will likely receive a significant repayment over a reasonable period of time if a case is dismissed, then this factor would weigh in favor of dismissal. But, this factor would weigh against dismissal if the creditor "will not receive any material financial recovery in the near future" as the result of dismissal, but instead dismissal "would net this creditor little more than vindication and would make this Petitioner little more than an indentured servant." *In re White,* 49 B.R. 869, 875 (Bankr.W.D.N.C.1985).

### 4. The debtor's "unfair advantage" over creditors if the case is not dismissed

This factor requires a court to weigh the relative hardships to the debtor that will result if the case is dismissed, against the relative hardships to the creditor that will result if the case is not dismissed. In *In re White,* 49 B.R. 869 (Bankr.W.D.N.C.1985), Judge Marvin R. Wooten wrote:

A third consideration in this case is the inherent limitations of § 707(b)'s scope. Section 707(b) was not intended to apply in all cases to effectively strong-arm potential debtors into other Chapters of this Title. This is obvious from the wording of the section. The dismissal option of § 707 is not available in all Chapter 7 cases or even in all cases where a creditor is harmed but is granted only where there exists a substantial abuse. Implicit in this term is some type of an unfair advantage that is obtained by the Debtor because of his filing as against his creditors.

49 B.R. at 875.

### 5. Consumer debts incurred without the ability to repay those debts

Many courts have determined that substantial abuse is indicated if a debtor has incurred a relatively large amount of consumer debts but, when the debts were incurred, the debtor apparently lacked the ability to pay those debts in the foreseeable future.[53] This factor becomes apparent most often if credit card debts described on schedules are of such a magnitude as to suggest that the debtor never had, nor ever will have, the ability to repay those debts, and the debtor should have known that fact.[54] As

**53.** See *In re MD Taj Uddin,* 196 B.R. 19 (Bankr. S.D.N.Y.1996) (substantial abuse indicated where the debtor, even though he had no ability to repay his $170,418 in consumer debts, misrepresented his income on unsolicited credit card applications at a time when he was actually unemployed, then engaged in extravagant spending of consumer credit, piling up debts which he knew he could not repay, by purchasing $60,000 in luxury items, such as jewelry, clothes, airline tickets, toys, radios, televisions, a microwave, perfume and cosmetics; and by spending another $60,000 on gambling trips to Atlantic City); *In re Braithwaite,* 192 B.R. 882 (Bankr.N.D.Ohio 1996) (substantial abuse indicated where the debtor accumulated consumer debt beyond her ability to repay); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors knew "when the debts were incurred that they could not or would not pay them or they chose to ignore the obvious" and debtors "repeatedly borrowed from creditors without ever paying off the debt already owed" and incurred substantial debt long after it had become apparent that they could not repay their existing obligations); *In re Bacco,* 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where the debtor made consumer purchases

that he was unable to afford); *In re Butts,* 148 B.R. 878 (Bankr.N.D.Ind.1992) (substantial abuse not indicated where the debtors' bankruptcy was a result of gradual erosion of financial condition rather than extravagant spending shortly before bankruptcy or abusive use of credit); *In re Nolan,* 140 B.R. 797 (Bankr.D.Col. 1992) (substantial abuse indicated where the debtor incurred consumer debt beyond his ability to pay and continued to incur consumer debt after a $50,000 judgment had been entered against him); *In re Helmick,* 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors "voluntarily burdened themselves with expensive items of debt while voluntarily reducing their ability to pay"); *In re Gyurci,* 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor incurred substantial consumer debt with "complete disregard for an eventual ability to repay,"); *In re Peluso,* 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor "voluntarily incurred consumer debts beyond his ability to pay them.")

**54.** See *In re Ontiveros,* 198 B.R. 284 (C.D.Ill. 1996) (substantial abuse indicated where the debtor owed $35,000 in credit card debt); *Heller*

*v. Foulston (In re Heller)*, 160 B.R. 655 (D.Kan. 1993) (substantial abuse indicated where all of the debtor's $40,360 in unsecured debts were incurred as a result of the use of credit cards); *Wilson v. United States Trustee (In re Wilson)*, 125 B.R. 742 (W.D.Mich.1990) (substantial abuse indicated where the debtor owed $79,236 in credit card debt and the debtor made $2,854 in credit card purchases within 90 days of bankruptcy, including incurring $1,000 in credit card debt to purchase jewelry three days before bankruptcy); *In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa.1996) (substantial abuse indicated where all of the debtor's $224,080 in unsecured debts, including $14,697 incurred in the year preceding bankruptcy, resulted from the use of credit cards); *In re MD Taj Uddin*. 196 B.R. 19 (Bankr.S.D.N.Y. 1996) (substantial abuse indicated where the debtor, even though he had no ability to repay his $170,418 in consumer debts, misrepresented his income on unsolicited credit card applications at a time when he was actually unemployed, then engaged in extravagant spending of consumer credit which he knew he could not repay, by purchasing $60,000 in luxury items, such as jewelry, clothes, airline tickets, toys, radios, televisions, a microwave, perfume and cosmetics; and by spending another $60,000 on gambling trips to Atlantic City); *In re Braithwaite*, 192 B.R. 882 (Bankr.N.D.Ohio 1996) (substantial abuse indicated where the debtor owed $60,356 in credit card debt, $37,169 of which was accumulated from 1989 to 1995 on travel expenses, and $1,795 of which was incurred within 90 days of bankruptcy); *In re Jarrell*, 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where most of the debtors' unsecured debts were owed to credit card providers and at least soon of the credit card debt resulted from cash advances); *In re Tindall*, 184 B.R. 842 (Bankr.M.D.Fla.1994) (substantial abuse indicated where all of the debtors' scheduled debts resulted from credit card purchases and the debtors owed $75,961 in credit card debt); *In re Gavita*, 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors incurred credit card debt in the month preceding bankruptcy and the debtors borrowed money to pay off credit card debts and, within just a few months of so doing, resumed making purchases on those same credit cards); *In re Rogers*, 168 B.R. 806 (Bankr.M.D.Ga.1993) (substantial abuse indicated where all of the debtors' $34,389 in unsecured debts were owed to credit card providers); *In re Dickerson*, 166 B.R. 480 (Bankr. N.D.Ga.1993) (substantial abuse indicated where the debtor's unsecured debt primarily consisted of credit card debt in that, in addition to $5,500 in unsecured credit card debt listed in his schedules, the debtor's $60,000.00 second mortgage indebtedness was incurred for the purpose of consolidating preexisting indebtedness, including a pre-existing second mortgage indebtedness which had, in turn, been incurred for the primary purpose of consolidating credit card debts); *In re Dominguez*, 166 B.R. 66 (Bankr.E.D.N.C. 1994) (substantial abuse indicated where the debtor owed $10,223 in credit card debt and incurred credit card debt that he should have known that he could not repay); *In re Morse*, 164 B.R. 651 (Bankr.E.D.Wash.1994) (substantial abuse indicated where the debtors owed $32,388 in credit card debt and credit card debt represented 57% of the total unsecured debts owed by the debtors).

See also *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where credit card debts made up a large portion of the debtors' unsecured obligations and the debtors used cash advances from certain credit cards to make minimum monthly payments on other credit cards); *In re Barnes*, 158 B.R. 105 (Bankr.W.D.Tenn.1993) (substantial abuse indicated where the debtors, during the year preceding bankruptcy, built a 3,000 square foot house, built an outbuilding and pool at their new home, purchased a new refrigerator, other appliances, new furniture, and construction materials, taking cash advances on some credit cards to make some of these purchases, purchased a new truck, a Jeep Cherokee for $25,000.00, and an additional new truck for their adult son, which the debtors were paying for); *In re Fitzgerald*, 155 B.R. 711 (Bankr.W.D.Tex.1993) (substantial abuse indicated where two-thirds of the debtors' unsecured debts, and 16 out of the 17 of the debtors' unsecured debts, were owed to credit card providers, and the very magnitude of the debtors' credit card debt indicated that the debtors were "in essence living a lifestyle at some percentage beyond their ability to pay for it"); *In re Smurthwaite*, 149 B.R. 409 (Bankr. N.D.W.Va.1992) (substantial abuse indicated where almost half of the debtors unsecured debts were credit card debts and most of the debtor's credit card debt was incurred within the two and a half period prior to bankruptcy); *In re Richmond*, 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the debtors owed $19,300 in credit card debts and the "magnitude of the credit card debt scheduled by debtors is sufficient to warrant a determination that they knew, or should have known, of their inability to repay the debts when they were incurred"); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where virtually all of the debtors' $60,011 in unsecured debts were credit card debts incurred in making consumer purchases); *In re Berndt*, 127 B.R. 222 (Bankr. D.N.D.1991) (substantial abuse indicated where all of the debtor's unsecured debts were either credit card debts or checking account overdrafts); *In re Helmick*, 117 B.R. 187 (Bankr. W.D.Pa.1990) (substantial abuse indicated where the debtors unsecured debt primarily consisted of credit card debts for cash advances and purchase of non-essential items such as weight-lifting equipment, furniture, fishing supplies, gifts, jewelry, and cologne); *In re Gaskins*, 85 B.R. 846 (Bankr.C.D.Cal.1988) (substantial abuse indicated where the debtors owed $30,000 in credit card debt to 17 different credit card providers and 90% of the debtor's unsecured debt consisted of credit card debt and the debtor and his non-debtor spouse used credit cards to finance their

expressed by one court, "The magnitude of the Debtors' credit card and cash advance debt supports the conclusion that they knew or should have known of their inability to repay the debts at the time the debts were incurred." *In re Jarrell*, 189 B.R. 374, 379 (Bankr.M.D.N.C.1995).[55]

Two moral imperatives seem to drive this concept.' One, the implicit suggestion in all of the cases that rely on this factor is that the inability of the debtor to pay is evidence that, at the time the debtor incurred the debt, the debtor never intended to repay the debt, so that the debtor is, in effect, attempting to use Chapter 7 to perpetrate actual fraud on creditors. Two, there is the concept that a person has the moral obligation to pay debts. Again there are sub-factors to consider.

two childrens' college educations); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor's debts included 13 debts incurred by the use of 13 different credit cards and the debtor used his home computer to juggle credit card payments, i.e., to make minimum payments on credit cards with cash advances gained from other credit cards) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Webb*, 75 B.R. 264 (Bankr.W.D.Mo.1986) (substantial abuse indicated where the majority of the debtor's unsecured debt resulted from credit card purchases of nonessential items made within the 90 day period preceding bankruptcy); *In re Grant*, 51 B.R. 385, 387 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors owed seven or more credit card creditors the aggregate sum of $39,-373 or more, the debtors piled up cash advances and consumer purchases on their credit cards far in excess of their ability to repay those debts on a current basis, and the debtors incurred $28,000 of their credit card debt within the two year period preceding bankruptcy).

See also *In re Wegner*, 91 B.R. 854 (Bankr. D.Minn.1988) (substantial abuse not indicated where the debtors, who were supporting a family of three plus two adult sons, the former wife of one of the adult son's, and two children of one of the adult son's, on a combined net monthly income of $4,176, and who had $1,512 in monthly disposable income, and' who owed 26 separate credit card debts totaling $104,845, were ineligible for relief under any chapter of the Bankruptcy Code other than Chapter 7, because interest, outside of bankruptcy, was accruing on credit card debt at such an enormous rate that debtor would be required to make minimum monthly payments of $3,924, with monthly interest of $1750); *In re Beles*, 135 B.R. 286 (Bankr. S.D.Ohio 1991) (substantial abuse not indicated even though all of the debtors unsecured debts

### a. Intent not to repay and actual fraud

Congress has amply provided for punishment for a debtor who incurs debts with the intention of not repaying them. Those debts are nondischargeable under section 523(a)(2)(A). Similarly, section 523(a)(2)(C) requires a court to presume that consumer debts over $1,000 that were incurred for the purchase of "luxury goods or services" within 60 days of bankruptcy, and cash advances over $1,000, that were obtained within 60 days of bankruptcy as an extension of consumer credit under an open end credit plan, are nondischargeable. This Court does not believe that in enacting section 707(b), Congress intended to duplicate the same remedies provided to creditors in section 523, especially considering that section 523(a)(2)(C) was added to the Bankruptcy

were either credit card debts or resulted from department store purchases where debtors incurred credit card debt over a period of several years, primarily for necessities and living expenses, rather than immediately prior to bankruptcy for the purchase of nonessential items, and the debtors used their credit cards for necessities and living expenses when one debtor lost his job and suffered a heart attack, and to provide financial assistance to their daughter when the daughter went through a divorce and was stricken with illness); *In re Fessler*, 168 B.R. 622 (Bankr.N.D.Ohio 1994) (substantial abuse not indicated even though most of the debtor's $17,063 in unsecured debts were owed to credit card providers and many of the debtor's credit card debts were incurred within the six-month period preceding bankruptcy where both debtors had been unemployed during the year preceding bankruptcy and could not afford health insurance for their family); *In re Messenger*, 178 B.R. 145 (Bankr.N.D.Ohio 1995) (substantial abuse not indicated where the debtor's credit card debts were accumulated gradually over a period of years, rather than on the eve of bankruptcy); *In re Balaja*, 190 B.R. 335 (Bankr.N.D.Ill.1996) (substantial abuse not indicated where the debtors owed $38,500 in credit card debt, but the credit card debt gradually increased to unmanageable levels over a period of eight years and minimum payments on the debtors' credit card debt, together with their living expenses, substantially exceeded their income).

**55.** Application of this factor is also indicated if the debtor has made purchases of non-essential or luxury items, on credit, within a short time period before filing bankruptcy, thus suggesting that when the debtor bought the items that the debtor knew or should have known that payment was not possible and would not be made.

Code at the same time as section 707(b) and by the same legislation.

■ While a debtor's accumulation of consumer debt beyond an ability to repay may not be responsible, such an accumulation is not illegal and is not necessarily fraudulent, unless accompanied by the requisite intent.[56] Why then should the bankruptcy court prosecute the credit card company's non-dischargeability case by way of 707(b)? If the credit card debt was incurred without the intent to repay, as evidenced by the debtor's complete inability to pay, then the debt, upon proof of those facts, may be adjudged non-dischargeable. However, in the absence of proof, the debt is dischargeable. Section 707(b) should not circumvent non-dischargeability sections with concomitant bypassing of procedural safeguards required for the prosecution and proof of the elements essential for a judgment of non-dischargeability.

■ In this Court's opinion, substantial abuse, therefore, cannot be found simply in the magnitude of credit card debt, or other consumer credit, owed by a debtor. Section 523 provides remedies and, consequently, precludes adverse consequences for non-fraudulent credit card use, no matter how lavish. Congress did not say that a case should be dismissed if it represents a substantial abuse of consumer credit, but said rather that the case should be dismissed if it represents a substantial abuse of Chapter 7.

### b. Moral obligation to repay

The idea that 707(b) is designed in part to enforce a person's moral obligation to pay debts requires the conclusion that 707(b) was not only created to prevent fraudulent conduct, but was also created to prevent conduct that is not fraudulent, but is merely violative of a generally accepted moral norm of society. This Court does not agree that "[i]t is morally and legally unconscionable that a person should be able to extinguish his obligations without first making a reasonable effort to fulfill them." *In re Scheinberg,* 134 B.R. 426, 429 (D.Kan.1992). Some people simply do not have the means, whether physical, mental, emotional or financial, to do so.

■ The impetus behind 707(b) is purely economic, not moral. *Moral norms are represented elsewhere in the Bankruptcy Code.* Some in favor of debtors, and some not so. For example, the concept of granting a discharge in bankruptcy and a fresh start in life, which is directly opposite to the idea of debt repayment, is arguably the most important moral norm represented in Chapter 7 of the Code. See *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). On the other hand, the concepts in sections 523 and 727 certainly invoke a court's moral perspective, and those in 18 U.S.C. §§ 151–155, which define and provide for the punishment of bankruptcy invoke the strong moral norms of our reviewing society. A court need not construe Section 707(b) to impose upon debtors higher moral standards than those already required.

### c. Creditor complicity

The concept that 707(b) was intended to force debtors to pay their debts appears to be based partly on the belief that debtors are primarily responsible for what has been referred to as a "consumer credit crisis." Contrary to that belief, is the position that consumer creditors, including credit card providers, may bear some responsibility. As recognized by the Court of Appeals for the Eleventh Circuit in *First National Bank of*

---

**56.** Because a creditor sends a debtor a credit card statement of account every month, can the creditor then be said to know the status of the debtor's account at all times? Have the charges on the card been made by the debtor (at least within the credit limits established by the creditor) with the express knowledge and consent, or at least ratification, of the creditor? If so, then how can using the card within the limits set by the company with the company's express knowledge and consent be properly called an "abuse" in a 707(b) review. If there was no intent to repay, upon proof of those facts, the debtor may not receive a discharge of those debts. But if no non-dischargeability complaint is filed, then why should a court presume that there was fraud and consequently abuse? Dismissal of a debtor's case under 707(b) then for the reason that the debtor has incurred debts without the ability to repay them becomes a de facto 523(a)(2)(A) judgment without evidence of actual fraud or intent or the usual due process safeguards attendant to an adversary proceeding.

*Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983), Circuit Judge James C. Hill wrote:

> The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot*, 16 B.R. 50, 52

(Bkrtcy.M.D.La.1981). Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

*Id.*

If a creditor, after reviewing a debtor's monthly charges, does not heed plain indications of over-extension, then is there not blame to share if the creditor continues to lend money to the debtor and the debtor does not pay?

### 6. "Eve of bankruptcy purchases"

If a debtor purchases luxury items on the eve of filing bankruptcy, some courts conclude that the debtor must not have had any intent to pay for the items.[57] This factor, like the "incurred consumer debt without the ability to repay" factor, appears to be duplicative of the already existing remedy in section 523(a)(2)(A), which provides a more than ample punishment for this type of activity. On the other hand, however, if *secured* debt

---

**57.** See *In re MD Taj Uddin*, 196 B.R. 19 (Bankr. S.D.N.Y.1996) (substantial abuse indicated where the debtor, even though he had no ability to repay his $170,418 in consumer debts, misrepresented his income on unsolicited credit card applications at a time when he was actually unemployed, then engaged in extravagant spending of consumer credit which he knew he could not repay, by purchasing $60,000 in luxury items, such as jewelry, clothes, airline tickets, toys, radios, televisions, a microwave, perfume and cosmetics; and by spending another $60,000 on gambling trips to Atlantic City); *In re Vianese*, 192 B.R. 61 (Bankr.N.D.N.Y.1996) (substantial abuse indicated where the debtors bought two cars in the 90 day period preceding bankruptcy); *In re Bacco*, 160 B.R. 283 (Bankr.W.D.Pa.1993) (substantial abuse indicated where during the three years preceding bankruptcy, the debtor bought $95,000 in guns and $83,000 in automobiles on credit which he contends were stolen just before bankruptcy); *In re Barnes*, 158 B.R. 105 (Bankr.W.D.Tenn.1993) (substantial abuse indicated where the debtors, during the year preceding bankruptcy, completed the construction of a $100,000.00, 3000 square foot home; encumbered their home with a $15,000.00 second mortgage for money to install a pool and complete an outbuilding, when, at that point, they could have paid virtually all of their unsecured creditors with the money; purchased a new refrigerator, other appliances, new furniture, and construction materials, taking cash advances on some credit cards to make some of these purchases; purchased a new truck, a Jeep Cherokee for $25,000.00, and an additional new truck for their adult son, which the debtors were paying for); *In re Butts*, 148 B.R. 878 (Bankr. N.D.Ind.1992) (substantial abuse not indicated where the debtors' bankruptcy was a result of gradual erosion of financial condition rather than extravagant spending shortly before bankruptcy or abusive use of credit); *In re Andrus*, 94 B.R. 76 (Bankr.W.D.Pa.1988) (substantial abuse indicated where the debtor incurred $12,000 in unsecured debt within the three month period preceding bankruptcy by purchasing non-essential consumer items such as 11 televisions, eight VCR's, and one stereo and failed to adequately explain what he did with the items, merely stating that he gave them away as gifts but refusing to disclose the identities of the purported recipients of the gifts); *In re Newsom*, 69 B.R. 801 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtors incurred $11,500 in unsecured consumer debt, and purchased a second automobile, in the year preceding bankruptcy, i.e., engaged in a "consumer spending spree", at a time they were "already aware of their financial limitations and already faced with financial difficulties"); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors "engaged in eve of bankruptcy purchases...." of non-essential or luxury items).

was incurred to purchase the item, then this factor has added elements which may lend some credibility to its application in a 707(b) inquiry. That is discussed below under the topic regarding ownership of non-essential items. But in either event, certainly this factor is relevant if it serves to belie or impeach a debtor's contended inability to pay.

### 7. Intent to pay select creditors and to discharge the remainder

■ According to some courts, a factor that indicates substantial abuse is evidence that the debtor, either through reaffirmation or voluntary repayment, is paying one or more creditors, while attempting to discharge the remainder in Chapter 7.[58] The

**58.** See *Heller v. Foulston (In re Heller)*, 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated where the debtor stated expenses on his schedule of income and expenses included $1170 in payments to unsecured, pre-petition creditors); *In re Matias*, 203 B.R. 490 (Bankr.S.D.Fla.1996) (substantial abuse indicated where the monthly disposable income figure of $129 contained in the debtor's statement of income and expenses was arrived at by deducting from net income living expenses and $1,068 being paid by the debtor to select prepetition creditors), *In re Haffner*, 198 B.R. 646 (Bankr.D.R.I.1996) (substantial abuse indicated where the debtor reaffirmed $21,460 in debt to select creditors); *In re Jarrell*, 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors failed or elected not to schedule three particular unsecured debts, including a debt owed to one of the debtor's mother and the debtors' stated net income figure on their income and expense statement was arrived at by deducting from gross income a $280.00 monthly payment to a select unsecured and unscheduled creditor); *In re Dempton*, 182 B.R. 38 (Bankr.W.D.Mo.1995) (substantial abuse indicated where the debtor was paying a $396 per month debt owed by his non-debtor spouse); *In re Gavita*, 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors "favored" certain creditors by reaffirming secured debt and not unsecured debts and elected not to list one unsecured credit card debt on their schedules so that they could keep the account open and continue to use it); *In re Wilkinson*, 168 B.R. 626 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor intended to reaffirm all of her obligations except one); *In re Bacco*, 160 B.R. 283 (Bankr. W.D.Pa.1993) (substantial abuse indicated where the debtor was paying $869 each month on a home equity loan that his father is responsible for); *In re McCormack*, 159 B.R. 491 (Bankr. N.D.Ohio 1993) (substantial abuse indicated where the debtors' statement of income and expenses included as an expense item $2,273 in payments being made on select unsecured debts, and the amount the debtors would have had to pay in Chapter 13 was less than the amount that they were currently paying on selected debts outside of bankruptcy, and the debtors omitted from their schedule of unsecured debts a $2,800 credit card debt owed to the debtor's employer); *In re Hutton*, 158 B.R. 648 (Bankr.E.D.Ky.1993) (substantial abuse indicated where the debtors monthly expenses of $4,916 included $96 for a time share condominium and $954 for payments

on dischargeable credit card debts and other loans and where the debtors had monthly disposable income of $800, after elimination of those payments); *In re Smith*, 157 B.R. 348 (Bankr. N.D.Ohio 1993) (substantial abuse indicated where the debtor's stated expenses included $175 being paid monthly on select dischargeable debts); *In re Fitzgerald*, 155 B.R. 711 (Bankr. W.D.Tex.1993) (substantial abuse indicated where the debtors reaffirmed their only noncredit card debt, which was owed to one of the debtor's mother and the debtors were using Chapter 7 "as a means by which they can affirmatively avoid repaying some of their creditors, while satisfying the claim of a relative"); *In re Richmond*, 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the debtors proposed to reaffirm secured debts totaling $72,-233); *In re Veenhuis*, 143 B.R. 887 (Bankr. D.Minn.1992) (substantial abuse indicated where the debtor filed bankruptcy for the purpose of discharging one debt of $3,296 for a deficiency judgment on repossessed boat).

See also, *In re Traub*, 140 B.R. 286 (Bankr. D.N.M.1992) (substantial abuse indicated where the purpose of the debtors' bankruptcy was to discharge one debt of $300,000 owed to one debtor's ex-wife as a property settlement awarded in a divorce proceeding); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors' stated expenses included $2,178 monthly payments to preferred credit card creditors and payments being made on a loan owed to the father of one of the debtors); *In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okl.1991) (substantial abuse indicated where the debtor was paying $120 per month on a non-dischargeable student loan, and two of his non-debtor wife's credit cards); *In re Dubberke*, 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the expenses stated on the debtor's statement of income and expenses included $191 for repayment of particular unsecured debts, including charge cards) *In re Palmer*, 117 B.R. 443 (Bankr.N.D.Iowa 1990) (substantial abuse indicated where the debtor filed bankruptcy for the purpose of avoiding the payment of a single debt owed to an ex-spouse); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa. 1990) (substantial abuse indicated where the debtors reaffirmed secured debts on their home, two automobiles and a riding lawnmower); *In re Vesnesky*, 115 B.R. 843 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the expenses described on the debtors' statement of income

primary reason given for application of this factor is that it supports the widely recognized bankruptcy policy that bankruptcy courts should insure equal distribution to all creditors.[59] In the context of this case, however, such an application may conflict with other Bankruptcy Code provisions. The Bankruptcy Code forbids only a very limited variety of *pre-petition* preference payments and post-petition transfers of estate property. Section 547 of the Bankruptcy Code provides for the recovery of certain prepetition preferences for distribution to unsecured creditors. Section 549 provides for the recovery of post-petition transfers of estate property. Neither statute forbids however, or allows the recovery of a post-petition transfer by a debtor of post-petition earnings, which are definitely not property of the bankruptcy estate. 11 U.S.C. § 541(a)(6). Similarly, section 524(c) specifically allows a debtor to, in effect, prefer one creditor over another from post-petition earnings through reaffirmation of that creditor's debt, for any reason, so long as the repayment of the debt does not impose an undue hardship on the debtor. And section 524(f) specifically authorizes a debtor to repay voluntarily any debt from post-petition earnings, even without the necessity of a reaffirmation agreement.[60] In contrast, no section of the Bankruptcy Code forbids a debtor from preferring one creditor over another from post-petition earnings.

and expenses included $1,821 per month being paid by the debtors on particular unsecured obligations); *In re Roth*, 108 B.R. 78 (Bankr. W.D.Pa.1989) (substantial abuse indicated where the debtors' expenses stated on their statement of income and expenses included $2,340 in monthly payments to unsecured creditors that the debtor had been paying and intended to voluntarily repay); *In re Busbin*, 95 B.R. 240 (Bankr.N.D.Ga.1989) (substantial abuse indicated where the debtor owed only a single unsecured creditor); *In re Rushing*, 93 B.R. 750 (Bankr.N.D.Fla.1988) (substantial abuse indicated where the debtors, despite having the ability to repay, "demonstrated an intent to maintain their current lifestyle which includes keeping an expensive boat used solely for recreational purposes, and paying only those creditors which they choose to pay."); *In re Krohn*, 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor's non-debtor spouse had several credit cards in her own name that were not included in the bankruptcy, debtor was seeking a discharge of credit card debts incurred in his own name but not the debts incurred by use of credit card accounts maintained jointly by him and his non-debtor spouse, and debtor reaffirmed a large bank loan in exchange for a commitment by the bank to finance the building, post-petition, of a new, larger home) *aff'd*, 87 B.R. 926 (N.D.Ohio 1988) *aff'd*, 886 F.2d 123 (6th Cir.1989); *In re Day*, 77 B.R. 225 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtor's expenses, as stated on his statement of income and expenses, included $546 in monthly payments to select unsecured creditors); *In re Antal*, 74 B.R. 8 (Bankr.W.D.Mo.1987) (substantial abuse indicated where the expenses stated by the debtor in his statement of income and expenses included $250 in payments to select unsecured creditors and the debtor intended to pay certain unsecured debts, including debts owed to his parents, while discharging other unsecured debts); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor was paying $200 each month on an unsecured note to protect a co-signer); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor was paying one "favored" unsecured creditor $360 and one secured creditor $142 for a total of $488.59 per month while attempting to discharge a debt owed to a former spouse and the debtor's Chapter 7 filing was motivated by "spite" in the form of trying to discharge only one debt, to the former spouse, rather than an inability to pay her debts); *In re Kelly*, 57 B.R. 536 (Bankr.D.Ariz. 1986) (substantial abuse indicated where the debtors had one unsecured debt) *rev'd on other grounds sub. nom., Kelly v. Solot (In re Kelly)*, 70 B.R. 109 (9th Cir. BAP 1986) *rev'd sub. nom., Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir.1988); *In re Bryant*, 47 B.R. 21, 24 (Bankr. W.D.N.C.1984) (substantial abuse indicated where the bankruptcy was filed for the purpose of discharging one or two particular debts rather than all of the debtor's debts, i.e., the bankruptcy case was filed "not because of the debtor's unemployment or an inability to pay on his part, but because he simply desired to shuck a couple of his debts" and the debtor purposely omitted consumer debts from his schedules).

But see *In re Messenger*, 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor's non-debtor spouse chose not to file bankruptcy, but instead to pay the outstanding balances on three credit cards that were issued to her in her own name).

**59.** "The preference of certain creditors over others offends the paramount goal of bankruptcy— that of equality of treatment of creditors." *In re Dubberke*, 119 B.R. 677, 681 (Bankr.S.D.Iowa 1990).

**60.** Of particular note is the fact that subsection (f) was added to the Bankruptcy Code at the same time and by the same legislation as was section 707(b).

Consider for example a situation where a debtor is specifically trying to defeat the rights obtained by a former spouse under a divorce decree.[61] Congress has defined the parameters under which that debtor may or may not discharge a debt owed to the former spouse. Section 523(a)(5) precludes unconditionally the discharge of a debt for alimony, maintenance or support owed to a former spouse in connection with a divorce decree. Section 523(a)(15) precludes the discharge of any other debt owed by the debtor to a former spouse in connection with a divorce decree, unless the debtor does not have the ability to pay the debt from property that is not reasonably necessary for the support of the debtor and dependent and the conduct of business, if any; or unless the benefit to the debtor of discharging the debt would outweigh the detrimental consequences of discharging the debt to the former spouse.

Because Congress has specifically provided the circumstances under which a debtor may or may not discharge a debt to a former spouse in Chapter 7, it is improbable that Congress meant for bankruptcy courts to dismiss, under the very unclear language of 707(b), the cases of debtors who are attempting to discharge such a debt. Stated another way, why would Congress have specifically provided the circumstances under which a debtor may, or may not discharge a debt to a former spouse in Chapter 7, if it intended for a case in which a debtor seeks to obtain the discharge of such a debt to be dismissed. The appropriate question in that circumstance is whether the debt is dischargeable, not whether the debtor's case should be dismissed.

On the other hand, the mechanical form by which a debtor accomplishes an intended "preference" to select creditors may effect a "substantial abuse" inquiry in other ways and may be manifested if the debtor either reaffirms the debts owed to the select creditors; or the debtor omits the select creditors from schedules; or the debtor skews disposable income by either adding payments being made to the select creditors to the monthly expenses figure on the statement of income and expenses or deducting those payments from gross income along with ordinary living expenses, so that the resulting disposable income figure is lower than it would be if only ordinary living expenses were deducted from the net monthly income figure.[62] If

---

**61.** See *In re Traub,* 140 B.R. 286 (Bankr.D.N.M. 1992) (substantial abuse indicated where the purpose of the debtor's, bankruptcy was to discharge one debt of $300,000 owed to one debtor's ex-wife as a property settlement awarded in a divorce proceeding); *In re Palmer,* 117 B.R. 443 (Bankr.N.D.Iowa 1990) (substantial abuse indicated where the debtor filed bankruptcy for the purpose of avoiding the payment of a single debt owed to an ex-spouse); *In re Shands,* 63 B.R. 121 (Bankr.E.D.Mich.1985) (substantial abuse indicated where the debtor was paying one "favored" unsecured creditor $360 and one secured creditor $142 for a total of $488.59 per month while attempting to discharge a debt owed to a former spouse and the debtor's Chapter 7 filing was motivated by "spite" in the form of trying to discharge only one debt, to a former spouse, rather than an inability to pay her debts).

**62.** For cases involving the circumstance where debtors have reaffirmed select debts, see *In re Haffner,* 198 B.R. 646 (Bankr.D.R.I.1996) (substantial abuse indicated where the debtor reaffirmed $21,460 in debt to select creditors); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors "favored" certain creditors by reaffirming secured debt and not unsecured debts); *In re Wilkinson,* 168 B.R. 626 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor intended to

reaffirm all of her obligations except one); *In re Fitzgerald,* 155 B.R. 711 (Bankr.W.D.Tex.1993) (substantial abuse indicated where the debtors reaffirmed their only non-credit card debt, which was owed to one of the debtor's mother); *In re Richmond,* 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the debtors proposed to reaffirm secured debts totaling $72,233); *In re Helmick,* 117 B.R. 187 (Bankr. W.D.Pa.1990) (substantial abuse indicated where the debtors reaffirmed secured debts on their home, two automobiles and a riding lawnmower); *In re Krohn,* 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor reaffirmed a large bank loan in exchange for a commitment by the bank to finance the building, post-petition, of a new, larger home) *aff'd,* 87 B.R. 926 (N.D.Ohio 1988) *aff'd,* 886 F.2d 123 (6th Cir.1989).

For cases involving the circumstance where debtors have deducted payments being made to the select creditors from either monthly expenses or gross income to arrive at reduced disposable income figure, see *Heller v. Foulston (In re Heller),* 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated where the debtors stated expenses on his schedule of income and expenses included $1,170 in payments to unsecured, prepetition creditors); *In re Matias,* 203 B.R. 490

either of the later occur, that is the debtor either omits creditors from a petition or distorts disposable income, the debtor may, according to some courts: (1) be said to have intentionally attempted to mislead the bankruptcy court by not depicting a true financial picture; [63] (2) be accused of hiding and paying a credit card debt in order to retain the use of that credit card and continue to "abuse" consumer credit even after filing bankruptcy; [64] (3) be making payments to select creditors which is sufficient to demonstrate an ability to pay all creditors, especially if the amount being paid would fund a substantial distribution to all creditors in Chapter 13; [65] (4) be adding payments to

(Bankr.S.D.Fla.1996) (substantial abuse indicated where the monthly disposable income figure $129 contained in the debtor's statement of income and expenses was arrived at by deducting from his gross income net income living expenses and $1,068 being paid by the debtor to select prepetition creditors); *In re Jarrell,* 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors' stated net income figure on their income and expense statement was arrived at by deducting from gross income a $280.00 monthly payment being made to a select unsecured and unscheduled creditor); *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors' statement of income and expenses included as an expense item $2,273 in payments being made on select unsecured debts); *In re Hutton,* 158 B.R. 648 (Bankr.E.D.Ky.1993) (substantial abuse indicated where the debtor's monthly expenses of $4,916 included $96 for a time share condominium and $954 for payments on dischargeable credit card debts and other loans); *In re Smith,* 157 B.R. 348 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtor's stated expenses included $175 being paid monthly on select dischargeable debts); *In re Wray,* 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtor's stated expenses included $2,178 monthly payments to preferred credit card creditors and payments being made on a loan owed to the father of one of the debtors); *In re Dubberke,* 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the expenses stated on the debtor's statement of income and expenses included $191 for repayment of particular unsecured debts, including charge cards); *In re Vesnesky,* 115 B.R. 843 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the expenses described on the debtors' statement of income and expenses included $1,821 per month being paid by the debtors on particular unsecured obligations); *In re Roth,* 108 B.R. 78 (Bankr.W.D.Pa.1989) (substantial abuse indicated where the debtors expenses stated on their statement of income and expenses included $2,340 in monthly payments to unsecured creditors that the debtor had been paying and intended to voluntarily repay); *In re Day,* 77 B.R. 225 (Bankr.D.N.D.1987) (substantial abuse indicated where the debtor's expenses included $546 in monthly payments to select unsecured creditors); *In re Antal,* 74 B.R. 8 (Bankr.W.D.Mo.1987) (substantial abuse indicated where the expenses stated by the debtor in his statement of income and expenses included

$250 in payments being made to select unsecured creditors).

For cases involving the circumstance where a debtor omitted the select creditors from schedules, *see In re Jarrell,* 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors failed or elected not to schedule three particular unsecured debts, including a debt owed to one of the debtor's mother); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors elected not to list one unsecured credit card debt on their schedules so that they could keep the account open and continue to use it); *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors' omitted from their schedule of unsecured debts, a $2,800 credit card debt owed to the debtor's employer); *In re Krohn,* 78 B.R. 829 (Bankr.N.D.Ohio 1987) (substantial abuse indicated where the debtor's non-debtor spouse had several credit cards in her own name that were not included in the bankruptcy) *aff'd,* 87 B.R. 926 (N.D.Ohio 1988) *aff'd,* 886 F.2d 123 (6th Cir. 1989); *In re Bryant,* 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor purposely omitted consumer debts from his schedules for the purpose of either evading a substantial abuse inquiry, avoiding the discharge of those debts while discharging scheduled debts, or of continuing to incur consumer credit following bankruptcy).

**63.** See, for example, *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtors exhibited a lack of candor in portraying their financial condition to the court by including in their statement of expenses $2,273 in payments being made on select credit cards and by omitting from their schedules a credit card debt due to one of the debtor's employers).

**64.** See, for example, *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors elected not to list one unsecured credit card debt on their schedules so that they could keep the account open and continue to use it); and *In re Bryant,* 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor omitted seven or eight credit card creditors from his petition, for the apparent purpose of continuing to incur consumer credit following bankruptcy).

**65.** See, for example, *In re McCormack,* 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse

monthly expenses figure to arrive at a reduced disposable income figure, that may have artificially reduced disposable income so that an accurate determination of ability to pay is difficult to make; or (5) may be creating an unfair situation where a debtor is able to choose who to pay and who not to pay.[66]

This Court believes that of the above, numbers 3 & 4 are legitimate concerns under 707(b).[67] Only 3 & 4 relate to or effect a debtor's ability to pay debts, and only 3 and 4 will militate in favor of dismissal if either the amount being paid by the debtor to select creditors demonstrates an ability to pay remaining creditors, or, if by recalculating the debtor's income and expenses figures, without consideration of the amount being paid by the debtor to select creditors, there is a demonstration that the debtor has the ability to pay.

## 8. Does the debtor have exempt property?

■ Some courts have determined that substantial abuse is indicated if the debtor has exempt property that could be voluntarily liquidated to help pay creditors.[68] Section

---

indicated where the amount that the debtors would have had to pay in Chapter 13 was less than the amount that they were currently paying on selected debts outside of bankruptcy).

**66.** "Debtors' all-or-nothing approach in which they favor certain creditors by paying them in full while paying the remainder nothing is impermissible and demonstrates bad faith on their part." *In re Gavita*, 177 B.R. 43, 49 (Bankr. W.D.Pa.1994). "This being the case, the three above creditors are being preferred over all other creditors. This is unacceptable." *In re Goodson*, 130 B.R. 897, 902 (Bankr.N.D.Okl.1991).

**67.** Numbers 2 & 5 are problematic because, as discussed above, Congress specifically authorizes a debtor to choose whom to pay with post-petition earnings. Number 1 is problematic because this Court does not believe, as will be discussed later, that the debtor's integrity per se is the proper focus of 707(b).

**68.** · See *Heller v. Foulston (In re Heller)*, 160 B.R. 655 (D.Kan.1993) (substantial abuse indicated where the debtor owned exempt property valued at $8,573, including $6,323 accumulated in a pension plan); *In re Walton*, 69 B.R. 150 (E.D.Mo.1986) (substantial abuse indicated where the debtor was due a tax refund that can be used to pay his unsecured creditors) *aff'd,* 866 F.2d 981 (8th.Cir.1988); *In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y.1997) (substantial abuse indicated where the debtors had over $390,000 accumulated in retirement funds); *In re Carlton*, 211 B.R. 468 (Bankr.W.D.N.Y.1997) (substantial abuse indicated where the debtors had accumulated in excess of $10,000.00 in retirement funds, all or part of which might be used by them to pay creditors or supplement family income); *In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa.1996) (substantial abuse indicated where the debtor had anywhere from $25,000 to $131,000 in exempt equity in the residence owned by him and his non-debtor spouse); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor had no assets which could be liquidated to pay creditors); *In re Gavita*, 177 B.R. 43

(Bankr.W.D.Pa.1994) (substantial abuse indicated where the debtors had no non-exempt assets for distribution to creditors); *In re Fitzgerald*, 155 B.R. 711 (Bankr.W.D.Tex.1993) (substantial abuse indicated where the debtors had $30,000 accumulated in retirement funds); *In re Smurthwaite*, 149 B.R. 409 (Bankr.N.D.W.Va.1992) (substantial abuse indicated where creditors would receive nothing in Chapter 7 because the debtor owned no real property and had exempted all of his personal property); *In re Veenhuis*, 143 B.R. 887 (Bankr.D.Minn.1992) (substantial abuse indicated where the debtor had exempted assets consisting of $3,400 in a savings account, $500 in equity in a boat, and an automobile valued at $1,000); *In re Stratton*, 136 B.R. 804 (Bankr.C.D.Ill.1991) (substantial abuse indicated where the debtors had $28,000 in an exempt retirement account); *In re Wray*, 136 B.R. 122 (Bankr.W.D.Pa.1992) (substantial abuse indicated where the debtors "claimed as exempt virtually all of their assets which could be liquidated to make at least a partial distribution to those creditors."); *In re Palmer*, 117 B.R. 443 (Bankr. N.D.Iowa 1990) (substantial abuse indicated where the debtor owned $86,565 in exempt assets, including his homestead valued at $58,000 and his retirement account valued at $19,000, and owed only $35,018 in unsecured debts, so that the value of his exempt assets exceed his unsecured debts by over $50,000); *In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa.1990) (substantial abuse indicated where the debtors exempted a Kawasaki Jet Ski); *In re Higginbotham*, 111 B.R. 955 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtor exempted "superfluous vehicles and expensive toys" including three guns valued at $500, a calve valued at $250 and three trucks valued at $2550, each with over 100,000 miles on it); *In re Gyurci*, 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor and his non-debtor spouse had $57,000 in equity in their homestead); *In re Strange*, 85 B.R. 662 (Bankr.S.D.Ga.1988) (substantial abuse indicated where the debtor received an income tax refund during the year before bankruptcy); In re Grant, 51 B.R. 385 (Bankr.N.D.Ohio ·1985) (substantial abuse indi-

522(b) of the Bankruptcy Code authorizes a debtor to use either state law exemptions or federal law exemptions without limitation. Therefore, this Court may not assume that Congress intended, by way of 707(b), to punish debtors who utilize the rights to withhold exempt property as specifically provided for them in section 522(b). Under both state and federal bankruptcy law (see 11 U.S.C. § 522(I)) a debtor's spouse and children have rights in the debtor's exempt property that require protection and may not be effected by a backdoor application of 707(b). For those reasons, a debtor's exemption of property cannot be a factor that indicates substantial abuse of Chapter 7.

On the other hand, if a debtor owns a great deal of property, there may be evidence of substantial abuse, since, commonly, people who make a great deal of money are those that can afford to buy, pay for, and maintain a large amount of property. Therefore, this factor, or more accurately stated, the fact that a debtor owns a great deal of property, may be relevant in states where the exemptions allowed by state law are very generous and situations in which the debtor actually owns a great deal of property. However, if the amount of property exempted by the debtor is small, or if the state law

exemptions of the state in which the debtor resides are not generous, as in this state, then this factor does not appear to have great significance.

### 9. Attempts to repay debts prior to filing a Chapter 7 case

Some courts have determined that substantial abuse is indicated if a debtor made no attempt to repay creditors prior to making a decision to file a Chapter 7 case or to seek some solution other than a Chapter 7 discharge.[69] On the other hand, some courts find that if the debtor did, in fact, seek to work out a non-bankruptcy payment arrangement with creditors, then this factor would militate against 707(b) dismissal.[70]

■ From this Court's perspective, if a debtor *cannot* pay debts according to whatever relevant standard a particular court elects to adopt, then this factor should not result in the dismissal of the case, since there is no evidence that Congress intended for debtors who cannot pay their debts to be denied access to a Chapter 7 discharge. If, on the other hand, a debtor *can* pay debts according to whatever relevant standard a particular court elects to adopt, then this factor should be irrelevant, since the ability to pay will provide ample reason for 707(b) dismissal. This factor may have utility not

cated where the debtors were entitled to an income tax refund that could be applied toward the payment of creditors); *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor had exempted equity in his home that he could have surrendered for the benefit of creditors).

But see *In re Hampton*, 147 B.R. 130 (Bankr. E.D.Ky.1992) (substantial abuse not indicated where the debtors, who were in their 50's, lack substantial exempt retirement funds); *In re Beles*, 135 B.R. 286 (Bankr.S.D.Ohio 1991) (substantial abuse not indicated even though the debtors had exempted retirement accounts containing $24,500).

69. See *In re Fitzgerald*, 155 B.R. 711 (Bankr. W.D.Tex.1993) (substantial abuse indicated where there was "evidence that chapter 7 was the debtors' first solution to their financial problems coupled with evidence that other solutions were available but not tried" and the debtors had not "exhausted all the available routes for repaying their debts"); *In re Veenhuis*, 143 B.R. 887 (Bankr.D.Minn.1992) (substantial abuse indicated where there was no evidence that the debtor made a sincere effort to repay his debt).

70. See *In re Farrell*, 150 B.R. 116 (Bankr.D.N.J. 1992) (substantial abuse not indicated where the debtor had consulted with private credit counselor prior to filing who advised the debtor to file Chapter 7); *In re Shepherd*, 147 B.R. 422 (Bankr. N.D.Ohio 1992) (substantial abuse not indicated where the debtor evinced an attempt to pay debts); *In re Hampton*, 147 B.R. 130 (Bankr. E.D.Ky.1992) (substantial abuse not indicated where the debtors, prior to filing bankruptcy, consulted with a credit counseling service in an attempt to avoid filing); *In re Edwards*, 50 B.R. 933 (Bankr.S.D.N.Y.1985) (substantial abuse not indicated where debtors unsuccessfully attempted to repay creditors through a pre-bankruptcy workout).

But see *In re McCormack*, 159 B.R. 491 (Bankr.N.D.Ohio 1993) (substantial abuse indicated even though the debtors' consulted with a credit counselor prior to bankruptcy, who told them that their debts were too large to be adjusted through negotiations with creditors and the debtors presented documented evidence that they had attempted to negotiate with creditors prior to filing bankruptcy and had tried to obtain a home equity loan, for the purpose of paying their creditors, from three different banks but were unsuccessful).

as an indicator of the debtor's integrity, but as evidence from the debtor's perspective of an inability to pay. If a debtor tried, and was unable, to pay debts without the benefit of bankruptcy, then that may be one fact that indicates that the debtor is truly in need of the benefits that Chapter 7 offers.

### 10. Misleading the bankruptcy court

Some courts have determined that substantial abuse is indicated if a debtor has misled the court, that is, by failing to disclose in the bankruptcy petition, accurate financial conditions, or failing to disclose an inaccurate

picture of financial conditions. Ordinarily, this factor is manifested when the debtor has failed to include a historical source of income in the statement of income and expenses or has understated income or understated expenses in the statement of income and expenses; has failed to include property or undervalued property in the petition; has omitted creditors from the petition; or has amended the statement of income and expenses, to decrease income or increase expenses.[71]

The principle reason generally given for the factor is the idea that a dishonest debtor

**71.** Courts considering such actions have included these circumstances:

Omitting creditors:

See *In re McCormack,* 159 B.R. 491 (Bankr. N.D.Ohio 1993) (substantial abuse indicated where the debtors' omitted from their schedule of unsecured debts a $2,800 credit card debt owed to the debtor's employer); *In re Bryant,* 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor omitted seven or eight credit card creditors from his petition). Amending Income and Expense Statement:

See *Fonder v. United States (In re Fonder),* 974 F.2d 996 (8th Cir.1992) (substantial abuse indicated where the debtor amended his statement of income and expenses after a 707(b) inquiry had begun by increasing his monthly expenses by over $400); *In re Carlton,* 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors amended their statement of income and expenses to increase their stated monthly living expenses by $358 after the 707(b) motion had been filed "raising the question as to whether the Amended Statement of income and expenses is representative of the Carltons' true financial condition"); *In re Weber,* 208 B.R. 575 (Bankr.M.D.Fla.1997) (substantial abuse indicated where the debtor amended his statement of income and expenses after a 707(b) inquiry had begun); *In re Haffner,* 198 B.R. 646 (Bankr. D.R.I.1996) (substantial abuse indicated where the debtor amended his statement of income and expenses to increase his monthly expenses from $1,500 to $2,824 after a 707(b) motion had been filed); *In re Gavita,* 177 B.R. 43 (Bankr.W.D.Pa. 1994) (substantial abuse indicated where the debtors amended their statement of income and expenses to decrease the amount of their net monthly income from $2,758.00 to $2,377.00 and to decrease their monthly expenses from $2,715.00 to $2,465.00); *In re Christie,* 172 B.R. 233 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor amended her statement of income and expenses after a 707(b) motion had been filed to increase her monthly expenses by $250 for semi-annual family vacations and by $50 for birthday and Christmas gifts for members of her family); *In re Dickerson,* 166 B.R. 480 (Bankr.N.D.Ga.1993) (substantial abuse

indicated where the debtor amended his statement of income and expenses, by increasing his net monthly income from $2,717 to $3,943, and by increasing his monthly living expenses from $2,717 to $3,874, after a 707(b) inquiry had begun, in "a transparent attempt to conceal from the Court the availability of sufficient disposable income to pay well in excess of 50% of his unsecured debts over a three-year period"); *In re Lee,* 162 B.R. 31 (Bankr.N.D.Ga.1993) (substantial abuse indicated where the debtors amended their statement of income and expenses, by substantially increasing their monthly living expenses from $2,064 to $3,410, after a 707(b) inquiry had begun).

See also *In re Bacco,* 160 B.R. 283 (Bankr. W.D.Pa.1993) (substantial abuse indicated where the debtor made extensive amendments to his bankruptcy schedules after a 707(b) inquiry had begun); *In re Barnes,* 158 B.R. 105 (Bankr. W.D.Tenn.1993) (substantial abuse indicated where the debtors amended their schedules to increase the monthly expenses shown on their statement of income and expenses after a 707(b) inquiry was begun); *In re Smurthwaite,* 149 B.R. 409 (Bankr.N.D.W.Va.1992) (substantial abuse indicated where the debtor amended his schedule of unsecured debts to increase the amount of his unsecured debt by 30% after a 707(b) inquiry had begun; and the debtor amended his statement of expenses to increase his monthly expense for food from $250 to $300 per month and to increase his monthly expense for recreation from $20 to $250); *In re Dubberke,* 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the debtor amended her income and expense statement after a 707(b) inquiry had begun); *In re Vesnesky,* 115 B.R. 843 (Bankr. W.D.Pa.1990) (substantial abuse indicated where the debtors amended their statement of income and expenses three times after a 707(b) inquiry had begun; *In re Higginbotham,* 111 B.R. 955 (Bankr.N.D.Okl.1990) (substantial abuse indicated where the debtor amended his statement of income and expenses after a 707(b) inquiry had begun to increase his monthly expenses from $1,511 to $2,373, even though his originally listed expenses were "unreasonably low"); *In re Cook,* 110 B.R. 544 (Bankr.N.D.Okl.1990) (sub-

has no right to a Chapter 7 discharge. There is, however, as discussed herein, no indication from legislative history or otherwise that Congress intended that the debtor's integrity per se should be the proper focus of 707(b). Section 727(a)(4)(A) provides that a debtor should not obtain a Chapter 7 discharge if there has been a false oath or account in connection with a bankruptcy case. And, pursuant to 18 U.S.C. §§ 152(2), the making of either a false oath or a false statement made under penalty of perjury, in relation to a bankruptcy case, is a felony. In those statutes, Congress specifically defined the level of integrity required of a Chapter 7 debtor and specifically designated the appropriate punishments for the failure to adhere to that level of integrity. This Court cannot assume that Congress intended to define a lesser, different or redundant standard of conduct for Chapter 7 debtors by use of the hazy, ambivalent, and undefined "substantial abuse" terminology of 707(b), and this Court cannot interpret 707(b) to impose a higher standard of conduct on Chapter 7 debtors than that already imposed by Congress in

stantial abuse indicated where the debtors amended their statement of income and expenses after a 707(b) inquiry had begun to reduce their stated monthly expenses from $7,304 to $4,804); *In re Andrus*, 94 B.R. 76 (Bankr.W.D.Pa.1988) (substantial abuse indicated where the debtor amended his statement of income and expenses after a 707(b) inquiry had begun to increase his stated monthly expenses from $0.00 to $400–500); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind. 1988) (substantial abuse indicated where the debtor amended his statement of income and expenses after a 707(b) inquiry had been initiated by increasing his expenses from $1,785 per month to $3,400 per month, and decreasing his net monthly income from $2,000 per month to $1,600 per month); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor amended his statement of income and expenses to increase his stated monthly expenses and decrease his stated disposable income twice, from an originally stated $584 per month to a deficit of $48 per month); *In re Grant*, 51 B.R. 385, 387 (Bankr.N.D.Ohio 1985) (substantial abuse indicated where the debtors exhibited "bad faith in the filing of their petitions and schedules" by amending the income and expense statement originally filed by them, which must be verified or contain an unsworn declaration of truth).
Miscellaneous:

See *Wilson v. United States Trustee (In re Wilson)*, 125 B.R. 742 (W.D.Mich.1990) (substantial abuse indicated where the debtor scheduled $993 worth of household goods even though $19,300 of her credit card debt was incurred for the purchase of furniture; where the debtor scheduled only $2,000 worth of clothing even though $29,907 of her credit card debt was incurred for the purchase of clothing; and where the debtor failed to include in her schedules substantial income received by her during the year before bankruptcy from a part time job); *In re Stallman*, 198 B.R. 491 (Bankr.W.D.Mich.1996) (substantial abuse indicated where the debtor exhibited dishonesty by electing not to include his extra income earned as an independent consultant in the year preceding bankruptcy in his statement of income and expenses, and by electing not to disclose rental income receive by him from the rental of a condominium, even though the rent was used simply to pay the amounts he in turn owed each month to his vendor of the property); *In re Jarrell*, 189 B.R. 374 (Bankr.M.D.N.C.1995) (substantial abuse indicated where the debtors failed to schedule real estate on their bankruptcy petition, even though they owned a 2.01–acre parcel of property on which their home was situated, which had a value of $49,000.00, and a one-acre residential lot that was valued at $12,-000.00; where the debtors' statement of income and expenses showed a $50 payment each month to the Internal Revenue Service for federal income taxes, even though only one $50 payment had been made to the IRS by the debtors in the year and a half period prior to bankruptcy; and where the debtors' unsecured debts were actually $6,000.00 less than the $21,391.64 amount that was scheduled in their bankruptcy petition); *In re Christie*, 172 B.R. 233 (Bankr.N.D.Ohio 1994) (substantial abuse indicated where the debtor increased the amount of weekly payroll deductions from her paycheck for taxes in an attempt to defeat the 707(b) motion); *In re Traub*, 140 B.R. 286 (Bankr.D.N.M.1992) (substantial abuse indicated where the debtors misrepresented their monthly income on their statement of income and expenses by stating it to be $10,000, when in fact, during the first three months they were in Chapter 7, their monthly income was $19,000); *In re Palmer*, 117 B.R. 443 (Bankr.N.D.Iowa 1990) (substantial abuse indicated where the debtor failed, in his statement of income and expenses, to accurately reflect his net disposable income); *In re Andrus*, 94 B.R. 76 (Bankr. W.D.Pa.1988) (substantial abuse indicated where the debtor failed to adequately explain what he did with $12,000 in non-essential consumer entertainment items purchased on credit within the three month period preceding bankruptcy, merely stating that he gave them away as gifts but refusing to disclose the identities of the purported recipients of the gifts); *In re Ploegert*, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where the debtor misled the court by failing to include historical overtime pay of 20 to 30 hours per month in the income stated on his statement of income and expenses); *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C.1984) (substantial abuse indicated where the debtor had been evasive or uncooperative in disclosing his true financial picture).

section 727(a)(4)(A) and 18 U.S.C. §§ 152(2) and (3).

But should the fact that a debtor amended an income and expenses after an 707(b) inquiry has begun, be an aggravating "circumstance" that militates toward 707(b) dismissal? Should a debtor be penalized for amending an income and expense statement without antagonists satisfying the false oath provisions of section 727(a)(4)(A) and 18 U.S.C. §§ 152(2) and (3)?

Some courts assume that an amendment filed after an 707(b) inquiry is inherently suspect and an indication of bad faith. But this Court must ask, is it proper or even fair for a bankruptcy court to assume that an amendment to an income and expenses statement filed by a debtor after a 707(b) inquiry has begun is inaccurate or fraudulent? Does the presumption contained in 707(b) in favor of granting Chapter 7 relief to the debtor not require a court to assume, absent evidence to the contrary, that the debtor's amendment has been filed in good faith and is accurate, or does the presumption at least require a court to give some deference to the accuracy and veracity of the debtor's figures?

This Court does not assume that a debtor is knowledgeable about Chapter 7 or that a debtor is aware of the requirements of official bankruptcy forms. Mistakes and omissions are too frequent for this Court to assume that deceit is evident simply because mistakes are present. Insufficient information or poor advice is more likely one of the causes. A large percentage of income and expense statements are probably erroneous in some fashion or other, either because of simple negligence or oversight, or because of a lack of understanding of the forms or the significance of the questions asked, or because of miscommunication between debtors and their attorneys or, in joint cases, because of miscommunication between spouses.[72] For example, debtors commonly wish to pay certain debts outside of Chapter 7 and for personal reasons do not include relatively small debts owed to friends and relatives on their petitions. For this reason and other similar ones, absent evidence of fraud, abuse or prejudice to creditors, this Court attaches little significance to errors and omissions on bankruptcy petitions.[73]

**72.** The Court in *In re McDonald*, 213 B.R. 628 (Bankr.E.D.N.Y.1997) appropriately recognized that:

All too frequently in this district, the statement of income and expenses, which is required to be filed by an individual debtor, is nothing more than a 'working backwards' from stated income in an attempt to show to the Court and to the creditors that there is nothing disposable. In other words, debtors 'guesstimate' their expenses by first taking their income and then adjusting the amount of itemized expenses until no disposable income remains. This 'procedure' is often exposed when an amendment of their Chapter 13 plan is required, and the debtors are able to come up with 'previously undiscovered disposable income.' The statement of counsel quoted above indicates that these Debtors and their attorney would not resort to such impropriety, even in the face of their desperate situation. For this, not only are they to be commended, but their statements are to be given 'great weight.' *Id.* at 629.

· See also *In re Messenger*, 178 B.R. 145 (Bankr. N.D.Ohio 1995) (substantial abuse not indicated where the debtor amended his statement of income and expenses after a 707(b) motion had been filed but "[t]he amendments to the Debtor's schedule were not a reflection of an initial absence of honesty, but rather an honest misunderstanding that the scope of the information was to include his wife's income and expenses"); *In re*

*Laury–Norvell,* 157 B.R. 14 (Bankr.N.D.Ohio 1993) (substantial abuse not indicated where the inaccuracies and inconsistencies in the debtor's schedules, such as undervaluation of her house by $10,000.00 to $13,000.00, and overstatement of expenses for furnace repairs, transportation costs, charitable contributions, property insurance, and life, accident and health insurance premiums, were properly attributable to the debtor's counsel rather than the debtor); *In re Butts,* 148 B.R. 878 (Bankr.N.D.Ind.1992) (substantial abuse not indicated where the debtors had been forthright in disclosing their finances); *In re Hampton,* 147 B.R. 130 (Bankr.E.D.Ky. 1992) (substantial abuse not indicated where the debtors amended their statement of income and expenses twice, by increasing their monthly expenses from $2,300 to $3,197 to $4,057 and by decreasing their net monthly income from $4,200 to $3,555 to $3,155); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where there was no evidence that the debtors' statement of income and expenses did not represent their true financial condition); *In re Penna,* 86 B.R. 171 (Bankr.E.D.Mo.1988) (substantial abuse not indicated where there was no evidence that the debtor's original understatement of income and expenses was intentional).

**73.** The official bankruptcy forms are not clear. Does the statement of income and expenses ask for information as the information currently is,

On the other hand, if information in either a debtor's originally filed forms or the amendment filed to those forms is found, based on evidence presented, to be inaccurate, then whatever information the court finds to be accurate must be used to make the substantial abuse determination. Also, if information in either a debtor's originally filed forms or the amendment filed to those forms is found, based on evidence presented, to be fraudulently false, then that fact may constitute evidence that indeed the debtor does have a sufficient ability to pay and that may result in dismissal pursuant to 707(b). And of course, if either of the above exists, an interested party may elect to use that information to attempt to prove that the debtor intentionally included false information in a bankruptcy petition, on which section 727(a)(4)(A) objection to discharge may be made.

### 11. Causes of the debtor's financial difficulties

Several courts have stated that a factor to be considered in determining substantial abuse is whether the debtor's bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment.[74] The reasoning appears to be that a debtor whose petition was filed because of an intention to incur debts without the ability to pay, should not be entitled to a Chapter 7 discharge, but, that a debtor whose bankruptcy petition was filed because of sudden illness, calamity, disability, unemployment, or other unforeseen forces over which there was no control, should be entitled to a Chapter 7 discharge.

■ This Court respectfully disagrees. Clearly, bankruptcy is not limited to those debtors whose difficulties resulted from calamity and had Congress intended for calamity to be a threshold eligibility requirement for Chapter 7 relief it could have included that factor. Section 707(b) was intended and designed to address economic issues, therefore, it should be interpreted in a manner that focuses on a debtor's need for bankruptcy relief, rather than in a manner that attaches other significance to the reasons for the debtor's need for bankruptcy relief.

Of course, if the debtor is disabled or unemployed, and for either of those reasons has no income or insufficient income, or the debtor is likely to incur substantial medical bills in the future that will devour disposable income, or the burden to the debtor of paying debts will adversely impact physical or mental health, substantial abuse is not indicated.[75] There are courts that agree and dis-

as it normally is, as it will be following the filing of the petition, or as it will be taking into consideration anticipated changes in circumstances? Does the statement call for an average of income of expenses, or what they were exactly in the month the case was filed? Does the statement require information regarding a non-debtor spouse or a companion who is living with the debtor? Does the statement ask what overtime pay a debtor may have received in a particularly unusual month or what overtime pay a debtor will receive in the future?

Similarly, the official statement of income and expenses was not intended to cover every minute detail of the debtor's financial history or prospects for the debtor's future. It is not an all encompassing tool designed for fraud detection, but is simply an imprecise tool with standard, broad categories, designed to illustrate a general thumbnail sketch of the debtor's monthly finances. By necessity, therefore, Congress intended the specifics of the debtor's financial condition to be determined by detailed questioning of the debtor, and that the debtor not be punished for failing to include a detailed picture of monthly finances in the statement of income and expenses.

**74.** *Green v. Staples (In re Green),* 934 F.2d 568, 572 (4th Cir.1991).

**75.** Medical problems represent the most common form of calamity that causes economic problems and persistently impairs a debtor's ability to pay debts. A prime example of that circumstance is the case of *In re Renner,* 70 B.R. 27 (Bankr.D.N.D.1987). In that case, both of the joint debtors suffered from "economically debilitating illnesses." *Id.* at 28. One of the joint debtors had suffered a heart attack and had undergone open heart surgery, while the other was afflicted with multiple sclerosis which prevented her from working. One of the debtor's sole source of income was social security disability payments. The bankruptcy court determined that substantial abuse was not indicated where the debtors were in bankruptcy because of "unfortunate health problems" and not "irresponsible consumer spending," and it was likely that the debtors, because of health problems, would incur substantial expenses in the future, so that their "disposable discretionary income will quite soon turn out to be critically necessary." 70 B.R. at 29.

See also *In re Dickerson,* 193 B.R. 67 (Bankr. M.D.Fla.1996) (substantial abuse not indicated

agree.[76]

### 12. Payment of school tuition for children

A number of courts believe that substantial abuse is indicated if a debtor spends money for education of children, other than the usual costs associated with sending minor children to public schools .[77] The stated reason for that belief is that the debtor's creditors are more entitled to the funds used by the debtor to educate children than are the debtor's children. As explained by one court, "A debtor does not have the right to force his creditors to donate to his children's education." *In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okl.1991).

■ This Court believes that this factor has validity within certain confines but should not be used as a general prohibition on the basis of moral opinion rather than

where one of the debtors had multiple surgeries every year for the six years preceding bankruptcy); *In re Hill*, 1994 WL 738663 (Bankr.D.Idaho, Dec.22, 1994) (substantial abuse not indicated where one of the debtor's children needed future medically required orthodontic work that would cost $2,000; *In re Farrell*, 150 B.R. 116 (Bankr. D.N.J.1992) (substantial abuse not indicated where the debtor's financial difficulties were a direct result of drug abuse and related psychological problems, for treatment of which the debtor was under a doctor's care, and refusal to grant the debtor a discharge of his debts could possibly result in the debtors relapse); *In re Shepherd*, 147 B.R. 422 (Bankr.N.D.Ohio 1992) (substantial abuse not indicated where the debtor's financial difficulties resulted from psychological problems and five tragic events that effected the debtor's life in the year preceding bankruptcy); *In re Hampton*, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated where the debtors combined net monthly income had been reduced from $4,200 to $3,155 because of one debtor's inability because of heart condition to work more than 40 hours per week, whereas he was able to work seven days a week before); *In re Penna*, 86 B.R. 171 (Bankr. E.D.Mo.1988) (substantial abuse not indicated where the debtor, who was suffering from chronic depression and required medical treatment for that condition that she could not afford, was "unable to meet her debts as they become due given her continued need for medical treatment.").

But see *In re Ontiveros*, 198 B.R. 284 (C.D.Ill. 1996) (substantial abuse indicated even though the debtor had severe neck and hip problems that required medical treatment not covered by insurance); *In re Bicsak*, 207 B.R. 657 (Bankr. W.D.Mo.1997) (substantial abuse indicated even though one of the children that the debtor lived with and helped support required psychiatric treatment); *In re Braithwaite*, 192 B.R. 882 (Bankr.N.D.Ohio 1996) (substantial abuse indicated even though the debtor, who had visual problems, had to spend $160 each month for glasses and contact lenses).

**76.** See *In re Richmond*, 144 B.R. 539 (Bankr. W.D.Okla.1992) (substantial abuse indicated even though the debtors suffered a loss of income as a result of one debtor's illness); *In re Berndt*, 127 B.R. 222 (Bankr.D.N.D.1991) (substantial abuse indicated even though the 71 year old debtor had quadruple heart bypass surgery and suffered congestive heart failure in the year preceding bankruptcy); *In re Byrne*, 1989 WL 268880 (Bankr.C.D.Ill., Nov, 13, 1989) (substantial abuse indicated even though the debtor was an alcoholic). But see *In re Martinez*, 171 B.R. 264 (Bankr.N.D.Ohio 1994) (substantial abuse not indicated where all of the debtor's unsecured debts were medical bills which the debtor could not pay without depriving his family of necessities).

**77.** See *In re Carlton*, 211 B.R. 468 (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors were spending $160 each month on school tuition for their two teenage children); *In re Kornfield*, 211 B.R. 468, (Bankr. W.D.N.Y.1997) (substantial abuse indicated where the debtors were spending $4,470 (any amount at all) each month for college and private school tuition for their four children); *In re Zuercher*, 1993 WL 836700 (D.Haw., Feb. 10, 1993) (substantial abuse indicated where the debtor was a wealthy dentist who was living an extravagant lifestyle evidenced by his paying tuition for his sons to attend private schools, and driving a leased Mercedes, and leasing a BMW for one of his sons); *In re Nolan*, 140 B.R. 797 (Bankr.D.Col.1992) (substantial abuse indicated where the debtor was spending $325 each month on tuition for his son to attend a private preparatory school); *In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okl.1991) (substantial abuse indicated where the debtor was sending $750 per month to two children living away from home at college); *In re Cook*, 110 B.R. 544 (Bankr. N.D.Okl.1990) (substantial abuse indicated where the debtors were spending $372 each month on their daughter's college education); *In re Roth*, 108 B.R. 78 (Bankr.W.D.Pa.1989) (substantial abuse indicated where the debtors expenses included $116 per month for visits to their 19 year old child in college); *In re Gyurci*, 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor and his nondebtor spouse used credit cards to finance their two emancipated childrens' college educations, and the debtor's expenses included tuition for his minor son to attend an exclusive private high school); *In re Grant*, 51 B.R. 385 (Bankr. N.D.Ohio 1985) (substantial abuse indicated where the debtors were sending $400 per month to an "emancipated" son in college).

Congressional intent or economic reality. There has been no expression of legislative intent that 707(b) might be used to deprive a debtor's children of *necessary* educational opportunities or that a college education is not a necessary component of support. The economic reality of interpreting 707(b) as a general prohibition is that the debtor's children, and not the debtor, will be the persons prejudiced. Absent express Congressional mandate, this court will not presume that Congress favors the private payment of debts over the education of youth or that Congress favors consumer creditors over student loan creditors.[78]

### 13. Support for persons where no legal requirement exists

A few courts have determined that substantial abuse is indicated if a debtor is using a portion of otherwise disposable income to support persons that the debtor is not required by law to support. The reasoning seems to be that since creditors are legally entitled to be paid from the debtor's income, at least to the extent that garnishment exemption laws permit, the debtor should not be able to use bankruptcy to shield income from those creditors and then to dissipate the same income by giving it to persons who are not legally entitled to it.[79] Under that reasoning, some courts have concluded that 707(b) requires dismissal of a Chapter 7 case if the debtor is using money that, could be used to pay creditors, to help support grown children, or an elderly mother, or an elderly grandmother, or grandchildren, or a live-in mate and that mate's children.[80]

78. As an example of how complicated a court's predicament can become, consider the situation where quality, safe public primary education is not available so that the debtor's children can not receive a quality primary education without being sent to private school. Should a debtor then suffer 707(b) scrutiny because of an election to use income to send children to private primary schools? What if an economical, quality college education is not available, should a debtor not, in light of 707(b), be allowed to finance a more expensive college education for children? But what if educational opportunities do exist? Is private school then acceptable? Can courts agree on what is quality, public education? If none exists in a particular locality, can spending money on a private education ever be an abuse?

79. In *In re Mastromarino*, 197 B.R. 171 (Bankr. D.Me.1996), the court held that substantial abuse was indicated where the debtor was supporting his live-in mate and her four children. The court stated its reasoning as follows:

> I will disregard both the additional household income and the household expenses attributable to Mastromarino's choice to live with and support his domestic partner and her four children. This is not a moral judgment, but a legal one. Mastromarino has no obligation to support them. But he is legally obligated to his creditors. To grant such voluntary expenditures priority over existing legal obligations would be to permit Mastromarino unilaterally to subordinate his creditors to his personal lifestyle choices. That he may not do.

197 B.R. at 178.

The court in *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) held that substantial abuse was indicated where the debtor was providing support for his two healthy adult sons. The court stated:

> A debtor may choose to support his able bodied grown children. However, there is no reason why his creditors should be forced to pay for this choice.

1995 WL 20345, *2.

In *In re Richmond*, 144 B.R. 539 (Bankr. W.D.Okla.1992), the court held that substantial abuse was indicated where the expenses listed by the debtors in their statement of income and expenses included money provided for the partial support of seven grandchildren, stating:

> The debtors' schedule of current income and expenditures contains excessive prospective expenditures which, at least in part, apparently relate to their voluntary contributions to the support of their grandchildren and to the operation, maintenance and upkeep of the motor home which they propose to retain. This court does not believe that debtors' unsecured creditors should be required to contribute to the voluntary support of family members who are not dependents of debtors, or to in effect pay the expenses of debtors' recreational vehicle.

144 B.R. at 542.

80. See *In re Bicsak*, 207 B.R. 657 (Bankr. W.D.Mo.1997) (substantial abuse indicated even though one of the children that the debtor was living with and supporting required psychiatric treatment); *In re Duncan*, 201 B.R. 889 (Bankr. W.D.Pa.1996) (substantial abuse indicated where the debtor and his non-debtor spouse were helping to support four adult children and two grandchildren that were living with them); *In re Mastromarino*, 197 B.R. 171 (Bankr.D.Me.1996) (substantial abuse indicated even though the debtor was supporting his live-in mate and her four children); *In re Smith*, 1995 WL 20345 (Bankr.D.Idaho, Jan. 11, 1995) (substantial abuse indicated where the debtor was providing support to two healthy adult sons); *In re Domin-*

An analysis of 707(b), as a legal directive, must begin within the confines and perspective of Chapter 7 as a whole and with the premise that bankruptcy, in the abstract, is contrary to the concept that a creditor has a legal right to be paid. The premise of bankruptcy is, quite opposite. That is, *the debtor will not be required to pay creditors even though, absent bankruptcy, there is a legal obligation to do so.* Although some courts have found that a debtor has a higher legal obligation to pay creditors than to support "non-legal" dependents, this Court does not believe that such a finding is a basis for a 707(b) determination since bankruptcy purposely ignores the legal obligation, except in the case of debts specifically made nondischargeable by the Bankruptcy Code. As to those nondischargeable debts, and none other, Congress recognizes the legal obligation on the part of the debtor to pay, as paramount to the right of the debtor to obtain a discharge and to use income to support "non-legal" dependents.

Of course, generosity to others must have limits and apparently 707(b) may be concerned with those limits. A debtor should not be able to give income away to someone who does not really need it. A debtor should not be permitted to use income for any unnecessary purpose to the detriment of creditors. The provision by a debtor to "non-legal" dependents of more money than they need for their support may indicate substantial abuse if the debtor might otherwise be able to pay creditors if unnecessary generosity is curtailed. To the extent that a debtor is giving more money than is needed to needy "non-legal" dependents, or is giving money to persons who are not needy, this factor has validity as an indicator that the debtor truly has the ability to pay creditors, as envisioned by 707(b).[81] And, of course, if the debtor's income is so high, and lifestyle so extravagant, that the ability to pay is evident without considering the support being provided to his "non-legal" dependents, then substantial abuse is indicated.[82] However, if application of the factor precludes a debtor from providing *needed support* to "nonlegal" dependents, the factor's legitimacy must be questioned.[83]

*guez*, 166 B.R. 66 (Bankr.E.D.N.C.1994) (substantial abuse indicated where the debtor was sending money to help support his mother and adults brothers in Puerto Rico); *In re Richmond*, 144 B.R. 539 (Bankr.W.D.Okla.1992) (substantial abuse indicated where the expenses listed by the debtors in their statement of income and expenses included money provided for the partial support of seven grandchildren); *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987) (substantial abuse indicated where the debtor's expenses included $61 per month for his adult son's insurance premiums); *In re Cord*, 68 B.R. 5 (Bankr. W.D.Mo.1986) (substantial abuse indicated where the debtor's expenses included an amount provided each month to help support an elderly grandmother).

81. See *In re Stallman*, 198 B.R. 491 (Bankr. W.D.Mich.1996) (substantial abuse indicated where the debtor was spending $771 (more than $171) each month to help support his adult son).

82. See *In re Barnes*, 158 B.R. 105 (Bankr. W.D.Tenn.1993) (substantial abuse indicated where the debtors, during the year preceding bankruptcy, built a 3,000 square foot house, built an outbuilding and pool at their new home, purchased a new refrigerator, other appliances, new furniture, construction materials, taking cash advances on some credit cards to make some of these purchases, purchased a new truck, a Jeep Cherokee for $25,000.00, and an additional new

truck for their adult son, which the debtors were paying for).

83. See *In re Zaleta*, 211 B.R. 178 (Bankr.M.D.Pa. 1997) (substantial abuse not indicated where the debtors were spending reasonably necessary expenses of $300.00 per month to provide support to their 20 year old daughter, who was residing outside the household); *In re Laury–Norvell*, 157 B.R. 14 (Bankr.N.D.Ohio 1993) (substantial abuse not indicated where the debtor was supporting her two adult daughters and a grandchild who were all living with her because of their own unfortunate circumstances); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989) (substantial abuse not indicated where the debtors helping to support their 21 year old daughter who was in college and helping her pay her college expenses); *In re Wegner*, 91 B.R. 854 (Bankr.D.Minn.1988) (substantial abuse not indicated where the debtors, who were supporting a family of three plus two adult sons, the former wife of one of the adult son's, and two children of one of the adult son's, on a combined net monthly income of $4,176, and who had $1,512 in monthly disposable income, and who owed 26 separate credit card debts totaling $104,845, were ineligible for relief under any chapter of the Bankruptcy Code other than Chapter 7, because interest, outside of bankruptcy, was accruing on credit card debt at such an enormous rate that debtor would be required to make minimum monthly payments of $3,924, with monthly inter-

### 14. Spouse's income

■ Section 707(b), according to its plain language, mandates dismissal if granting a debtor relief would be a substantial abuse of Chapter 7, not if the debtor's non-debtor mate could aid and assist a debtor to pay creditors or to shoulder more than his or her share of family living expenses in order for the debtor to pay debts. This Court has difficulty determining how the appropriate figure to be used in measuring the ability to pay for purposes of 707(b) is the combined income of the debtor and the debtor's non-debtor spouse or mate minus combined family living expenses, without regard to how much income each party contributes. There are courts that disagree.[84]

Of course, a court should assume that each party to a relationship, to the extent of his or her income, shares equally in paying the family living expenses and the court should attribute at least one-half of the family living expenses to the debtor and the other half to the non-debtor spouse.[85] The appropriate

est of $1,750); *In re Penna*, 86 B.R. 171 (Bankr. E.D.Mo.1988) (substantial abuse not indicated where the debtor was providing limited financial assistance to her elderly mother).

84. In *In re Stewart*, 201 B.R. 996 (Bankr. N.D.Okla.1996), the court held that the income of the debtor's non-debtor spouse had to be added to that of the debtor for purposes of determining whether the debtor had the ability to pay his creditors, even though the individuals, because of their job requirements, maintained two households in two different cities. According to the court, the non-debtor should be required to support the debtor during the period of time that the debtor would be required to pay his debts. "And he can afford to pay what he owes, to them and to all his other creditors—if not all at once, then certainly over time, within the near and foreseeable future, entirely from his own earnings if need be, but certainly with the help of his current wife, whose own considerable earnings can support them while Stewart pays his just debts." 201 B.R. at 1007.

*In In re Wilkinson*, 168 B.R. 626 (Bankr. N.D.Ohio 1994), the court held that substantial abuse was indicated where the debtor, who was earning net monthly income of $800, could pay her debts if her non-debtor spouse, who was earning net monthly income of $1,134, helped her pay them. "This Court finds that Debtor has the ability to pay the debt to Fidelity Guaranteed Mortgage in twenty (20) months if her husband contributes to the payments." 168 B.R. at 628.

In *In re Strong*, 84 B.R. 541 (Bankr.N.D.Ind. 1988), the debtor and his wife had an arrangement in which they each paid their own individual debts but shared household expenses equally. Under that arrangement, the debtor's expenses each month were $1,130.50 while the debtor's wife's expenses were $775. The debtor had net monthly income of $1,144 while the debtor's non-debtor spouse had net monthly income of $1,800. The court held that although the debtor lacked the ability to pay his debts without consideration of his wife's income, the debtor had the ability to pay if his wife's income was considered, which would result in combined monthly disposable income of $1,038.

See also *In re Bicsak*, 207 B.R. 657 (Bankr. W.D.Mo.1997)(child support received by the debtor's live-in mate from her ex-husband for the support of her two children that lived with her and the debtor, had to be added to the debtor's income for purposes of determining whether or not the debtor satisfied the ability to pay test implicit in 707(b)); *In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa.1996)(income of non-debtor spouse had to be included in debtor's income in assessing under 707(b) whether the debtor was be able to repay at least a portion of his debts, even though the debtor and his non-debtor spouse were helping to support four adult children and two grandchildren who were living with them); *In re Dempton*, 182 B.R. 38 (Bankr. W.D.Mo.1995)($700 in child support received by non-debtor spouse for support of two children unrelated to debtor had to be added to the debtor's income for purpose of determining whether the debtor could pay his debts for purposes of 707(b)); *In re Bacco*, 160 B.R. 283 (Bankr. W.D.Pa.1993) ($880 in monthly worker's compensation received by debtor's unemployed non-debtor spouse had to be considered in making a 707(b) determination regarding the debtor); *In re Smith*, 157 B.R. 348 (Bankr.N.D.Ohio 1993) (substantial abuse indicated where the debtor could pay her debts if her spouse's net monthly income of $2,900 was taken into consideration along with her net monthly income of $854); *In re Gyurci*, 95 B.R. 639 (Bankr.D.Minn.1989) (substantial abuse indicated where the debtor and his wife had substantial income); *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C.1984) (net monthly income of non-debtor spouse had to be added to that of the debtor for purposes of determining whether or not the debtor was be able to repay his debts for purposes of 707(b)).

85. See *In re Berndt*, 127 B.R. 222 (Bankr.D.N.D.1991)(debtor's ability to pay for substantial abuse purposes should be determined not by holding income of non-debtor spouse liable for the debtor's debts, but by determining what degree of disposable income the debtor has by virtue of the fact that he and the non-debtor spouse share joint living expenses); *In re Haffner*, 198 B.R. 646 (Bankr.D.R.I.1996) (debtor's ability to pay for substantial abuse purposes should be determined by reducing debtor's income by her share of family living expenses); *In re Shands*, 63 B.R. 121 (Bankr.E.D.Mich.1985) (same).

measure of the debtor's ability to pay for purposes of 707(b) would then be the debtor's sole income minus a one-half share of the family living expenses, unless of course the debtor is the sole or primary provider for the family unit, in which case all or most of the living expenses must be deducted from the debtor's income to determine an ability to pay. A non-debtor should not be forced to shoulder more than his or her half of the family living expenses and a debtor should not be forced to shoulder less than his or her half of the family living expenses.

Congress expressed no intention that 707(b) should effect a non-debtor or that any non-debtor should be required to tighten his or her belt in order to assist the debtor in paying debts. There is no indication that section 707(b) dismissal should depend on the fortuity of who the debtor is married to, whether or not that person works, and what amount that person earns. A policy that focuses on the income of a non-debtor spouse or mate can adversely effect not only that non-debtor spouse, but also other non-debtors who may be dependent on the income received by that non-debtor spouse or mate. For example, a particularly difficult situation occurs when child support received by a non-debtor spouse or mate is considered for purposes of determining the debtor's ability to pay under 707(b).[86] The question that must be asked is, do the debtor's creditors have rights in funds received by a non-debtor spouse or mate (for the support of children

that are not related by blood or adoption to the debtor?)[87]

■ In conclusion to this Part II-B (and Part II-A), as discussed above, courts have considered at least 14 different factors in attempts to arrive at a definition of "totality of circumstances," and many more to define "ability to pay." Not all courts have applied all factors because there will always be factual differences that cannot be compared, but there are such glaring differences in the courts' treatments of debtors, due to the courts' use of so many different factors, that this Court proposes a compromise standard that attempts to avoid some of the worst problems of the other two.

## C: A Third Standard of Review: "An Ability (Based on Objective Statistical Data) to Pay Without Difficulty"

### 1. Constitutional questions

As discussed above, many courts relate 707(b) to a debtor's lack of integrity and have recognized moral justifications for many of the factors that have been developed to describe substantial abuse.[88] Representative is the statement that, "[I]t is morally and legally unconscionable that a person should be able to extinguish his obligations without first making a reasonable effort to fulfill them." *In re Hudson*, 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985). This Court respectfully disagrees and believes that section

---

86. The court in *In re Bicsak*, 207 B.R. 657 (Bankr.W.D.Mo.1997) determined that child support received by the debtor's live-in mate from her ex-husband for the support of her two children that lived with her and the debtor had to be added to the debtor's income for purposes of determining whether or not the debtor satisfied the ability to pay test implicit in 707(b). See also, *In re Dempton*, 182 B.R. 38 (Bankr. W.D.Mo.1995) (held that $700 in child support received by a non-debtor spouse for support of two children unrelated to the debtor had to be added to the debtor's income for purpose of determining whether the debtor can pay his debts for purposes of 707(b)).

87. Certainly this court and others have considered combined incomes in determining adequate protection for purpose of reliefs from stay.

88. In addition to the authorities referred to in footnotes contained in the previous section, see *In re Kornfield*, 211 B.R. 468, (Bankr.W.D.N.Y. 1997) (substantial abuse indicated where the debtor expressed a desire not to file a Chapter 11 case, thus indicating a lack of honesty); *In re Duncan*, 201 B.R. 889 (Bankr.W.D.Pa.1996) (substantial abuse indicated where the debtor received a pension pay out of $187,888 in the two year period preceding bankruptcy which was not available to pay to creditors when bankruptcy was filed); *In re Bacco*, 160 B.R. 283 (Bankr. W.D.Pa.1993) (substantial abuse indicated where the debtor claimed that several expensive guns that were listed on his bankruptcy petition had been stolen from his car shortly before bankruptcy); *In re Traub*, 140 B.R. 286 (Bankr.D.N.M. 1992) (substantial abuse indicated where one of the debtors transferred two cars to his son immediately prior to bankruptcy).

707(b) was intended by Congress and its progenitors to solve economic problems and address economic issues, otherwise the Congressionally authored standard becomes so vague and subject to such a broad array and variety of interpretations, that it permits a court to define standards to apply to any case based simply on the court's sensibilities. Thus, the statutory standard can in effect be applied, depending on the sensibilities of a particular court, to virtually any case regardless of the factual circumstances involved. As a result, the statute comes perilously close to the kind of vagueness that can result in the denial of due process as well as an unequal treatment of the persons subjected to that statute. The standards created, because they are so unclearly defined, may be subject to arbitrary, capricious, and indiscriminate application. That would be unjust and certainly would result, in many instances, in the unfair and unequal treatment of persons subject to the statute. Such would then of course undermine the legitimacy of the bankruptcy applications process as well as the confidence of the participants in that process.

## 2. Substantial abuse is a function of a debtor's ability to pay debts as debts become due

■ The immense conceptual and practical difficulties that exist in applying the statute evenly and fairly coupled with the plain import of the words "substantial" and "abuse," and the fact that Congress elected to provide no guidance as to what actually might be a "substantial abuse" of Chapter 7, leads this Court to the opinion that Congress did not intend to remedy every abuse of Chapter 7, whether real or imagined, but only intended to address the most flagrant and egregious cases of abuse. That is, Congress intended for people who (relatively speaking) make a lot of money and whose debts are not overwhelming, to pay at least a substantial portion of debts if able to and

that those people not be allowed to live lavish lifestyles while disregarding creditors. In essence, the statute was not intended to effect those who have difficulty paying their bills, but instead, was intended to target those who more or less simply choose *not to pay* their debts.

Legislative history, from the Senate report that accompanied an earlier draft of the law that contained 707(b), supports the proposition that Congress did not expect 707(b) to effect more than a narrow variety of cases or more than a few in total. That history reads:

> This provision represents a balancing of two interests. It preserves the fundamental concept embodied in our bankruptcy laws that *debtors who cannot meet debts as they come due should be able to relinquish nonexempt property in exchange for a fresh start.* At the same time, however, it upholds creditors' interests in obtaining repayment *where such repayment would not be a burden.* Crushing debt burdens and severe financial problems place enormous strains on borrowers and their families. Family life, personal emotional health, or work productivity often suffers. By enabling individuals *who cannot meet their debts to start a new life,* unburdened with debts they cannot pay, the bankruptcy laws allow troubled borrowers to become productive members of their communities. Nothing in this bill denies such borrowers with *unaffordable debt burdens* bankruptcy relief under Chapter 7. However, *if a debtor can meet his debts without difficulty as they come due,* use of Chapter 7 would represent a substantial abuse.

S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983) (emphasis added).[89]

Paraphrasing the language of the report, the proper test for 707(b) substantial abuse, may be where a debtor cannot meet debts as they become due, the debtor is entitled to the benefits of Chapter 7 and dismissal pursuant to 707(b) is not warranted.[90] If requiring by

**89.** This explanation of how 707(b) was meant to be applied has been referred to by the United States Courts of Appeal for both the Eighth and Ninth Circuits as "the best available evidence of Congress' intent in enacting section 707(b)." *In re Walton,* 866 F.2d 981, 983 (8th Cir.1989),

*quoting Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914 n. 7 (9th Cir.1988).

**90.** Congress had rejected an earlier proposed future income test for determining substantial abuse and instead opted for the more general test:

a debtor of debts would be a burden that would place an enormous strain on the debtor or the debtor's family, or otherwise cause family life, personal emotional health or work productivity to suffer, then there are indications that the debtor cannot meet debts as they become due. If, however, a debtor can meet debts without difficulty as they come due, then use of Chapter 7 would represent a substantial abuse of Chapter 7 and dismissal of the case pursuant to 707(b) is warranted.

The above test for substantial abuse, gleaned from the language of the Senate report, comports with this Court's concept of the true intended purpose and proper application of 707(b). This construction of 707(b), (which results in the dismissal of a case only where the "ability to repay" is clear, real and substantial), is supported by other language contained in section 707. Had Congress intended for 707(b) to apply to every abuse of Chapter 7, rather than only the most egregious cases of abuse, why would it have created a presumption in favor of granting the debtor the requested Chapter 7 relief? [91] If Congress had intended for the application of 707(b) to be broad, would Congress not have allowed creditors and other parties in interest to raise and prosecute issues of substantial abuse, *rather than specifically forbidding them from doing so.* Bankruptcy courts, Bankruptcy Administrators or U.S. Trustees cannot, under an expansive view of 707(b), effectively police 707(b) concerns in the avalanche of consumer bankruptcies filed each year. The entities can however *effectively* police the relatively small number of very clear cases of abuse, that is those cases in which substantial abuse is fairly apparent from the record. The impossibility of effort required of a bankruptcy court and a Bankruptcy Administrator or a U.S. Trustee to review and dwell over every Chapter 7 case

filed suggests that Congress expected 707(b) to be a concern in only a relatively few cases.

### 3. Is this court disinterested?

In the instant case, even though the Bankruptcy Administrator (the U.S. Trustee is in an equal position) raised the issue of "substantial abuse," 707(b) specifically puts the bankruptcy court in the position of a joint prosecutor, a position adversarial to the debtor. By contrast, in Chapter 13, when a creditor objects to the confirmation of a plan for failure of the debtor to commit all disposable income to the payment of creditors, the creditor files, prosecutes, and proves the motion. The court naturally acts as a disinterested arbiter of the dispute between debtor and creditor. The lack of safeguards inherent in the 707(b) situation where the court is not a disinterested arbitrator of the dispute, but instead is charged with an obligation by statute to police the abuse of Chapter 7, supports the conclusion that only the most egregious cases, which in effect cry out to prosecute themselves, were intended to fall within the prohibition of 707(b).

### 4. Using objective criteria to eliminate some problems

The use of objective evidence, such as statistical information compiled and maintained by the United States Government, which may be properly judicially noticed by the bankruptcy court may serve several purposes. As expressed earlier, such criteria provides an objective starting point and reference point for all participants in the 707(b) litigation process. It provides an evidentiary basis for 707(b) determinations. It helps insure equality of treatment for similarly situated debtors. And it bolsters the credibility of the bankruptcy court and process by measuring the situations of all debtors against objective criteria available to all persons, and not against arbitrary subjective

---

The committee thus understood the substantial abuse concept as standing in sharp contrast to the rejected future income test. Instead of requiring dismissal of a Chapter 7 case whenever the debtor had sufficient income to pay *some substantial part of his or her indebtedness,* as with the future income test, "substantial abuse" was seen as requiring dismissal only where the debtor has sufficient income to pay all of his or her indebtedness, *without difficulty, as it becomes due.*

91. "[T]he presumption is in reality a caution and a reminder to the bankruptcy court that the Code and congress favor the granting of bankruptcy relief, and that accordingly 'the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse *is clearly present.'* " *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 916 (9th Cir.1988) (quoting 4 Collier § 707.08, at 707–19) (emphasis added).

standards based on unimpeachable, and for the most part, unwritten and thus unavailable, life experiences or general mental impressions of those reviewing the process. Within the standard this court proposes, such criteria would be the initial test to determine which cases are selected for a substantive review, and would create a level base from which to review all debtors.

### 5. The third standard: "an ability to pay without difficulty"

This Court must conclude that a construction of 707(b) which encompasses only (in the words of the statute) the "substantial" cases of abuse, is mandated by the importance and sanctity historically accorded to a debtor's right to a bankruptcy discharge. A comparison of the Supreme Court language relating to the bankruptcy discharge with the language contained in the Senate report quoted above, indicates that Congress enacted 707(b) with those cases in mind and intended the application of 707(b) to be guided and tempered by the beneficent philosophy contained in those cases. From the language of those cases, 707(b) considerations for determining substantial abuse can be stated which logically parallel the test framed above from the language of the Senate report. In *Meltzer v. C. Buck LeCraw & Co.*, 402 U.S. 937, 958, 91 S.Ct. 1624, 1626, 29 L.Ed.2d 107 (1971), Justice Hugo L. Black stated: "[B]ankruptcy is designed to permit a man to make a new start unhampered by overwhelming debts in hopes of achieving a useful life." Therefore, if a debtor is hampered from achieving a useful life by overwhelming debts then substantial abuse should not be indicated. If, on the contrary, a debtor's debts are not overwhelming so that the debtor is not hampered by the burden of those debts from achieving a useful life, then the debtor may not need a Chapter 7 discharge, in which case substantial abuse may, therefore, be indicated.

In *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), Justice George Sutherland stated that one of the primary purposes of bankruptcy is to provide "the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." 292 U.S. at 245, 54 S.Ct. at 699. He further explained the importance of a debtor's right to unfettered use of his future wages to the preservation of that "new opportunity:"

When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either. The amount of the indebtedness, or the proportion of wages assigned, may here be small, but the principle, once established, will equally apply where both are very great. *The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.*

292 U.S. at 245, 54 S.Ct. at 699 (emphasis added).

Paraphrasing the words of Justice Sutherland, 707(b) dismissal is not justified if doing so will preclude a debtor from realizing that new opportunity in life and clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt, the result Chapter 7 was designed to provide. If the effect of 707(b) dismissal would be to make the debtor a pauper, or oblige the debtor to devote a considerable portion of earnings for an indefinite time in the future to the payment of his pre-petition indebtedness, then the debtor will effectively have been precluded from realizing that new opportunity in life and clear field for future effort. If, on the other hand, a debtor does

not need a Chapter 7 discharge to realize a clear field for future effort because pre-existing debt is not of such a burdensome amount that it will hamper efforts in that regard, then 707(b) dismissal may be indicated.

■ Based on the above, this Court concludes that after the above discussed objective criteria is considered, and a case is selected for 707(b) review, the *appropriate standard to apply in section 707(b) matters is whether a debtor has the ability to pay debts, without difficulty, as those debts become due.* If a debtor *can* meet debts without difficulty as the debts come due, then use of Chapter 7 represents a substantial abuse and dismissal of the case pursuant to 707(b) is warranted.[92] If, on the other hand, a debtor *cannot* meet debts as the debts become due, the debtor is entitled to the benefits of Chapter 7 and dismissal of the case pursuant to 707(b) is unwarranted.[93]

### Part III—Application of Law to Facts

In the pending case, an application of the debtor's *entire current net monthly income* of $3,072 (net income after taxes and deductions but before deducting any living expenses) to the repayment of his debts of $129,631 ($126,293 (unsecured) + $3,338 (IRS)) would result in repayment in just over 42 months. That is assuming that those debts did not increase and that the debtor was left with no income on which to survive; assumptions of course, that are unreasonable. The amount of the debtor's debts has in fact, by the accretion of interest, already increased substantially since this bankruptcy was filed and will continue to increase over the course of any theoretical repayment outside of bankruptcy. Thus even assuming application each month of the debtor's *entire* net monthly income toward the satisfaction

of the unpaid principal balance of his debt, plus interest of only 8% per annum during the period required for repayment, repayment of the debt would require approximately 57 months. And, of course, since the interest being charged on the debts owed to creditors other than the debtor's father is accumulating at a much higher rate than 8%, the actual repayment period would in fact be much longer.

The equation becomes even more unbalanced, if that is possible, when considering the debtor's living expenses. And the imbalance grows even more so where the expenses are considered in a light most favorable to creditors, that is by considering only an amount of living expenses equal to a national average (where in fact this debtor has testified that his expenses are much higher). In mathematical terms, the debtor's annual living expenses of $24,780 exceed, according to the latest census report, the average annual expenditures by similar single person consumer units of $19,345, by $5,435.[94] Deducting that amount from this debtor's expenses leaves the debtor with monthly living expenses of $1,612. Deducting that amount from the debtor's current net monthly income leaves a theoretically reasonable disposable monthly income of $1,460. An application by the debtor of that income of $1,460 to the repayment of his debts of $129,631 would result in repayment in approximately 89 months, or just over 7.5 years. That is again falsely assuming that the amount of his debts did not increase and the debtor's living expenses were reduced to the national average. But again, as indicated before, the debt amount is not standing still but is increasing daily. And because it is, an application each month of the theoretically reasonable disposable monthly income of $1,460 would result in repayment of the un-

92. If requiring repayment by a debtor of his debts would be a burden that would place enormous strain on the debtor or the debtor's family, or otherwise cause the family life, personal emotional health or work productivity to suffer, then that would be one indication that the debtor cannot meet debts as they become due.

93. Accord *In re Balaja,* 190 B.R. 335, 341 (Bankr.N.D.Ill.1996); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989).

94. This information was obtained from table No. 705, entitled "Average Annual Expenditures of All Consumer Units, by Region and Size of Unit: 1994" which is located in Bureau of the Census, U.S. Dept. Of Commerce, *Statistical Abstract of the United States 1996* 458 (1996). That document can be purchased from the U.S. Government Book Store and is also published on the Internet at http://www.census.gov/prod/2/gen/96statab/96statab.html.

paid principal balance of the debt, plus interest at the rate of 8% per annum during the period required for repayment, in approximately 135 months, or just over 11 years. But again, as indicated before, interest is accruing on a part of the debt owed to persons other than the debtor's father at a rate which greatly exceeds 8% per annum, so that the actual period required for repayment would be much longer.

On the other hand, if this debtor were to file a Chapter 13 case, the accrual of interest on his pre-petition, non-priority debts would cease. However, his total debts structure would increase markedly by the addition of court costs, attorney's fees and Chapter 13 trustee fees. Based on theoretically reasonable disposable monthly income of $1,460, the debtor, in Chapter 13, might be able to pay approximately $50,000 to creditors over a period of 36 months; an amount that would pay the debtor's administrative expenses and priority creditors in full but provide his non-priority creditors with only a 36% dividend.[95]

■ Under Alabama garnishment law, a creditor may recover only 25% of the wages due a judgment debtor. Code of Alabama 1975, §§ 6–10–7, 5–19–15. Therefore, if the debtor was dismissed from bankruptcy, and elected not to file Chapter 13, the garnishment by creditors of his wages would leave him with about $2,304 to live on each month, which would be more than sufficient, based either on his monthly living expenses figures or on the national average. However, interest would continue to accrue on his debts so that amortization of them by way of a garnishment would require a virtual eternity

and the debtor would be retired before he could be rid of his debt.

■ Based on the above, the Court finds that:

1. The debtor is being hampered from achieving a useful life by the burden of overwhelming debts.

2. Section 707(b) dismissal would preclude the debtor from realizing that new opportunity in life and clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt, that Chapter 7 was designed to provide.

3. Section 707(b) dismissal would oblige the debtor to devote a considerable portion of his earnings for an indefinite time in the future to the payment of his pre-petition indebtedness.

4. The debtor cannot meet his debts as they become due. In fact, in order for the debtor to repay his debts, he would have to devote over half of his net (before deducting any living expenses) monthly income to that repayment effort for many years.

5. Requiring repayment by a debtor of his debts would be a burden that would place enormous strain on the debtor, and is likely to cause his family life, personal emotional health or work productivity to suffer.

Based on the foregoing findings, the Court determines that the debtor *does not have the ability to pay his debts without difficulty as those debts become due*, and is entitled to obtain the benefits of Chapter 7 and that his use of Chapter 7 does not represent a sub-

---

**95.** Also, based on theoretically reasonable disposable monthly income of $1,460, the debtor, in Chapter 13, might be able to pay approximately $100,000 to creditors over a period of 60 months; an amount that would pay the debtor's administrative expenses and priority creditors in full and provide his non-priority creditors with a 79% dividend. However, Congress, in 11 U.S.C. § 1322(d) limited Chapter 13 plans to 36 months in duration, absent a specific finding of "cause." Furthermore, 11 U.S.C. § 1325(b)(1)(B) requires confirmation of a plan which provides that all of the disposable income to be received by a debtor for a period of three years will be applied to make payments. Therefore, since a debtor, upon dismissal from Chapter 7 for substantial abuse, has the right to propose and obtain confirmation

of a plan which does not exceed 36 months in duration, and cannot be required to fund a Chapter 13 plan for more than that time period, speculation as to what the debtor can pay in Chapter 13 in a period longer than 36 months (although plans of 60 months are routinely confirmed in this district) is not properly the focus of a substantial abuse inquiry. Accord *In re Barnikow*, 211 B.R. 176 (Bankr.M.D.Pa.1997); *In re Zaleta*, 211 B.R. 178 (Bankr.M.D.Pa.1997); *In re Messenger*, 178 B.R. 145 (Bankr.N.D.Ohio 1995); *In re Edwards*, 50 B.R. 933 (Bankr.S.D.N.Y. 1985). In addition, the high rate of failure of high pay-out plans which exceed 36 months dictates against using a period longer than 36 months as a basis for determining substantial abuse.

stantial abuse of that Chapter.[96] Therefore, the *Bankruptcy Administrator's Motion to Dismiss Pursuant to 11 U.S.C. Section 707(b)* must be denied.[97]

### Part IV—Conclusion

Based on the above, the Court finds that the *Bankruptcy Administrator's Motion to Dismiss Pursuant to 11 U.S.C. Section 707(b)* is due to be denied.

---

**96.** See *In re Balaja,* 190 B.R. 335, 341 (Bankr.N.D.Ill.1996)(substantial abuse not indicated where the monthly interest on credit card debt exceeded the debtor's disposable income and minimum monthly payments required on credit card accounts plus monthly living expenses exceeded the debtor's monthly income); *In re Messenger,* 178 B.R. 145 (Bankr.N.D.Ohio 1995)(substantial abuse not indicated where the debtor was unable to fund a Chapter 13 plan that would pay his priority creditors in full and pay 70% of his unsecured debts over a period of 36 months in Chapter 13); *In re Tefertiller,* 104 B.R. 513 (Bankr.N.D.Ga.1989)(substantial abuse not indicated where debtors with net monthly income of $3,400 owed $56,691 in unsecured debts and the debtors' monthly expenses exceeded their monthly income by $2,000); *In re Barni-*

*kow,* 211 B.R. 176 (Bankr.M.D.Pa.1997)(substantial abuse not indicated where debtor could only pay $26,729 over a three year period on total unsecured debt of $45,000); *In re Zaleta,* 211 B.R. 178 (Bankr.M.D.Pa.1997)(substantial abuse not indicated where it would take the debtor six years to pay total unsecured debts of $36,000); *In re Edwards,* 50 B.R. 933 (Bankr.S.D.N.Y.1985)(substantial abuse is not indicated unless a debtor can pay 100% of his unsecured debts over a period of 36 months).

**97.** The Court applauds the Bankruptcy Administrator for bringing the 707(b) inquiry in this case. Based on much of the reported case law, the inquiry was amply justified.